# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | |
|---|---|
| IN RE: CAST IRON SOIL PIPE AND FITTINGS ANTITRUST LITIGATION | Case No. 1:14-md-2508<br>Judge Harry S. Mattice, Jr. |
| THIS DOCUMENT RELATES TO:<br><br>ALL DIRECT PURCHASER CLASS ACTIONS | CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

## <u>CONSOLIDATED AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs A&S Liquidating Inc., Aaron & Co., Hi Line Supply Co. Ltd., and Red River Supply, Inc. (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, bring this class action for damages—preliminarily estimated to be in the hundreds of millions of dollars—and other relief pursuant to the federal antitrust laws, and demand a trial by jury.

## <u>INTRODUCTION</u>

1.      This is a proposed class action against Defendants AB&I Foundry, Tyler Pipe Company and McWane, Inc. (collectively, "McWane"); Defendants Charlotte Pipe and Foundry Company and Randolph Holding Company LLC (collectively, "Charlotte Pipe"); and Defendant Cast Iron Soil Pipe Institute, Inc. ("CISPI"), for violations of the federal antitrust laws in the cast iron soil pipe and fittings (collectively, "CISP") market. McWane, Charlotte Pipe and CISPI are collectively referred to herein as "Defendants."

2.      This case alleges a conspiracy among the Defendants to fix, raise, maintain and stabilize prices for CISP that McWane and Charlotte Pipe sold directly to Plaintiffs and other class members. The conspiracy began at least as early as January 1, 2006, and it is believed to have continued through December 31, 2013. Plaintiffs further allege that Charlotte Pipe's 2010

1

acquisition and liquidation of Star Pipe Products, Ltd.'s ("Star Pipe's") CISP business, which resulted in substantially decreased competition in the market for CISP, was an illegal acquisition, undertaken to facilitate and ensure the success of the price-fixing conspiracy herein alleged. As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class (defined below) have paid artificially inflated prices for CISP, and thus suffered injury of the type the federal antitrust laws are designed to prevent.

3. Since at least 2006, defendants McWane and Charlotte Pipe and their predecessors have been the primary sellers and manufacturers of CISP in the United States. Together, McWane and Charlotte Pipe control over 90% of the market for CISP.

4. Beginning at least as early as 2006, defendants McWane and Charlotte Pipe, including through meetings conducted under the auspices of defendant CISPI, entered into a conspiracy to fix, raise, maintain and stabilize the prices of CISP sold in the United States. In order to facilitate price increases and further the goals of their unlawful conspiracy, Defendants engaged in various collusive acts, including agreements on CISP price levels and agreements not to compete with each other at particular customer accounts and in certain geographic areas.

5. Defendants McWane and Charlotte Pipe were able to effectuate this conspiracy as they constitute the only members of their trade association, defendant CISPI, and thus had numerous opportunities to communicate and collude at (or around the time of) CISPI events and non-public CISPI meetings, as well as at other industry functions. CISPI facilitated communications and information-sharing among McWane and Charlotte Pipe about prices, customers, and confidential, commercially-sensitive information.

6. Following these conspiratorial discussions at CISPI meetings, McWane and Charlotte Pipe announced identical price increases, typically in the autumn, to be effective in January.

7. In 2007, Star Pipe entered the CISP market and began to compete with Charlotte Pipe and McWane for a share of the CISP market. Star Pipe's entrance in the market threatened Defendants' supra-competitive pricing and increased competition in the market.

8.     In July 2010, Charlotte Pipe, through its subsidiary defendant Randolph Holding Company, purchased the CISP assets of Star Pipe, further effectuating the supra-competitive price-fixing scheme being implemented by the Defendants. The purchase agreement included non-compete and confidentiality clauses for many of Star Pipe's top CISP executives.

9.     Following the purchase, Charlotte Pipe destroyed Star Pipe's CISP assets and shuttered its CISP foundries. Charlotte Pipe previously had engaged in similar conduct to eliminate actual and potential competitors, and to maintain and further the Defendants' implementation of their price-fixing conspiracy by purchasing smaller competitors in the CISP market only to sell off their assets and close their operations.

10.     The effect of Charlotte Pipe's purchase of Star Pipe's CISP business was to lessen competition in the CISP market and to pave the way for Charlotte Pipe and McWane to continue to fix and set prices.

11.     The United States Federal Trade Commission ("FTC") launched an investigation into Charlotte Pipe's acquisition of Star Pipe's CISP business, resulting in the FTC's filing of an administrative complaint against Charlotte Pipe on April 2, 2013. Subsequently, Charlotte Pipe entered into a Consent Agreement, prohibiting it from engaging in certain anti-competitive activities.

12.     Due to the Defendants' conspiracy and actions to keep competitors out of the CISP market, prices for CISP have increased steadily since at least 2006, despite declining demand in the United States.

13.     Defendants' conduct alleged herein has unlawfully and unreasonably restrained competition and led to artificially inflated prices for CISP.

14.     Plaintiffs bring this action on behalf of themselves and similarly situated direct purchasers of CISP in the United States from defendants McWane or Charlotte Pipe from at least January 1, 2006 through December 31, 2013 (the "Class Period").

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including attorneys' fees, against

3

Defendants for the injuries that Plaintiffs and the other members of the Class have suffered from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 7 of the Clayton Act, 15 U.S.C. §18.

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, because this action arises under the federal antitrust laws.

17. Venue is proper in this District under 28 U.S.C. § 1391(b), (c) and (d) and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22, because, during the Class Period, Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

18. This Court has personal jurisdiction over each Defendant because each Defendant (a) transacted business throughout the United States, including in this District; (b) sold CISP throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; or (d) committed one or more overt acts in furtherance of their illegal price-fixing scheme and acquisition in the United States. In addition, the conspiracies and illegal acquisition alleged below were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

19. Plaintiff A&S Liquidating, Inc., is a Michigan corporation located in Grand Blanc, Michigan. A&S Liquidating purchased CISP directly from one or more of the Defendants during the Class Period. See the attached "fact sheet" (Exhibit 1) for additional information.

20. Plaintiff Aaron & Co. is a New Jersey corporation located in Piscataway, New Jersey. Aaron & Co. purchased CISP directly from one or more of the Defendants during the Class Period. See the attached "fact sheet" (Exhibit 1) for additional information.

21.    Plaintiff Hi Line Supply Co. Ltd. is an Illinois corporation located in Peoria, Illinois. Hi Line Supply Company purchased CISP directly from one or more of the Defendants during the Class Period. See the attached "fact sheet" (Exhibit 1) for additional information.

22.    Plaintiff Red River Supply, Inc. ("Red River") is a Louisiana corporation located in Shreveport, Louisiana. Red River purchased CISP from one of more of the Defendants during the Class Period. See the attached "fact sheet" (Exhibit 1) for additional information.

23.    Defendant AB&I Foundry ("AB&I") is a division of McWane, Inc., with its principal place of business located at 7825 San Leandro Street, Oakland, California 94621. AB&I was acquired by McWane, Inc. in late 2006, and since that time AB&I has been a division of, and controlled by, McWane, Inc.

24.    Defendant McWane, Inc. is a Delaware corporation with its principal place of business located at 1201 Vanderbilt Road, Birmingham, Alabama 35234.

25.    Defendant Tyler Pipe Company ("Tyler Pipe") is a division of McWane, Inc., with its principal place of business located at 11910 County Road 492, Tyler, Texas 75706. At all relevant times, Tyler Pipe has been a division of, and owned and controlled by, McWane, Inc. Defendants Tyler Pipe, McWane, Inc., and AB&I are collectively referred to herein as "McWane."

26.    Defendant Charlotte Pipe and Foundry Company is a North Carolina corporation with its principal place of business located at 2109 Randolph Road, Charlotte, North Carolina 28207.

27.    Defendant Randolph Holding Company, LLC is a wholly-owned subsidiary of Charlotte Pipe and is a limited liability company organized, existing, and doing business under and by virtue of the laws of the State of Delaware with its principal place of business located at 2109 Randolph Road, Charlotte, North Carolina 28207. Defendants Charlotte Pipe and Foundry Company and Randolph Holding Company, LLC, are collectively referred to herein as "Charlotte Pipe."

28.    Defendant Cast Iron Soil Pipe Institute, Inc. ("CISPI") is an Illinois corporation located at 3008 Preston Station Drive, Hixson, Tennessee 37343-3300. Its registered agent for

5

service of process is CT Corporation System, Ste. 2021, 800 S. Gay Street, Knoxville, Tennessee 37929-9710.  Although CISPI is not itself a producer and seller of CISP, defendants McWane and Charlotte Pipe, or their predecessors, founded CISPI with other suppliers in 1949.  McWane and Charlotte Pipe were the only members of CISPI during the Class Period and are its only members as of the filing of this complaint.  Defendants McWane and Charlotte Pipe are also believed to have held, and to continue to hold, significant leadership positions within CISPI, and they have dominated and controlled CISPI at least during the Class Period.  Meetings of CISPI were not open to the public, and their number, frequency, attendees, and locations are not fully known at this time, but they are believed and alleged to have occurred bi-annually during the Class Period.  Such meetings provided numerous opportunities for McWane and Charlotte Pipe not only to collude on prices, but also to police and monitor agreements reached and, as alleged, such meetings were used by McWane and Charlotte Pipe for collusion. The non-public CISPI meetings also facilitated the sharing by defendants McWane and Charlotte Pipe of commercially sensitive and confidential information in furtherance of the conspiracy which, but for the alleged conspiracy, would not have been in their independent self-interests.

## AGENTS AND CO-CONSPIRATORS

29.     The acts of the Defendants alleged in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of their businesses or affairs.

30.     Various persons or firms not named as defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## INTERSTATE TRADE AND COMMERCE

31.     Defendants' conduct, as described in this Complaint, was within the flow of, was intended to, and did have a substantial effect on the interstate commerce of the United States, including in this District.

32.     During the Class Period, defendants McWane and Charlotte Pipe manufactured, sold and shipped CISP in a continuous and uninterrupted flow of interstate commerce. The price-

6

fixing conspiracy and other anticompetitive conduct in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## RELEVANT MARKETS

33.     The relevant product market for purposes of this Complaint is the market for the sale of CISP for use in commercial, industrial, and multi-story residential buildings in the United States.

34.     The relevant geographic market for purposes of this Complaint is the United States.

## FACTUAL ALLEGATIONS

### Cast Iron Soil Pipe and Fittings

35.     CISP is primarily used in buildings for sanitary and storm drain, waste, and vent piping applications.

36.     CISP has been used in the United States since the beginning of the 19th century, when it replaced wooden systems.

37.     CISP is manufactured predominantly from cast iron.  Cast iron is a generic term that refers to a series of alloys primarily made of iron, carbon, and silicon.  Cast iron may also contain trace amounts of other materials such as manganese, sulfur, and phosphorous.

38.     Numerous state and local building codes require the use of CISP for certain types of construction.

39.     CISP has numerous characteristics that make it particularly well-suited for drain, waste, vent, and sewer plumbing applications, including resistance to corrosion and abrasion. The methods for joining CISP in various configurations make it versatile. Additionally, it can be installed both above and below flooring, as well as underground, as the following figure demonstrates:



Figure 1: Typical Housing CISP Pipe Layout

40.     CISP is classified into two major types—"Hub and Spigot" and "Hubless." Hubless CISP is also called "No-Hub."  The method of joining No-Hub pipe and fittings utilizes a metallic shielded hubless coupling that telescopes over the plain ends of the pipe and fittings and is torqued to seal the joint.  Hub and Spigot pipe and fittings have "hubs" into which the

8

spigot (plain end) of the pipe or fitting is inserted. The joint is sealed with a rubber compression gasket or molten lead and oakum. The following figures illustrate the two types of CISP:



Figure 2: Traditional Hub and Spigot CISP



Figure 3: No-Hub Pipe and Hubless Coupling

41.     While No-Hub pipes come in only one standard thickness, Hub and Spigot pipe comes in a standard thickness, called service weight, and also an "extra heavy" thickness.

42.     CISP fittings include various designs and sizes, consisting of bends, tees, wyes, traps, drains, and other special fittings. The following figure illustrates some of the different types of CISP fittings:

9



Figure 4: Various CISP Fittings

## **The CISP Industry**

43.     The most frequent purchasers of CISP are plumbing wholesalers.  End-users of CISP include construction companies, plumbers and developers.

44.     Fifty-nine percent of the CISP produced is 3-inch and 4-inch (in diameter), 25% is 1 1⁄2-inch and 2-inch, and 16% is 5-inch and over.

45.     Fittings constitute roughly a quarter of the total tonnage of CISP combined production.

46.     CISP is delivered to purchasers across the United States and is generally shipped directly to the job site from the manufacturer via truck.

47.     According to U.S. Census data, the annual value of CISP shipped in the U.S. between 2004 and 2011 was between $350,000,000 and $450,000,000.

## Market Characteristics Conducive to Collusion

### Limited Number of Producers

48.     There are currently only three producers of CISP in the United States: Charlotte Pipe; AB&I; and Tyler Pipe. Both Tyler Pipe and AB&I are divisions of McWane.

49.     McWane and Charlotte Pipe together account for over 90% of the market for CISP. The FTC has described the industry as "highly concentrated," and the exit of Star Pipe from the market "substantially increased the level of concentration in the relevant market []."

50.     In fact, the industry is so concentrated that in 2007 and 2009, the U.S. Census withheld reporting CISP data specifically because there was a risk that with so few producers, the release of data would enable the public to identify proprietary company information even from the aggregate data.

### High Barriers to Entry

51.     There are significant barriers to entry and expansion to new entrants to the CISP market.  First, there are substantial costs associated with either building or acquiring a foundry as well as the specialty manufacturing tools necessary to produce CISP.  For example, Star Pipe's CISP assets that were acquired by Charlotte Pipe, which constituted a very small percentage of the market overall, still sold for $19 million.

52.     Additionally, a new entrant would have to develop a distribution network and relationships with both plumbing distributors and end-users.

53.     Finally, manufacturers must be able to produce both the most commonly requested CISP, and also less common types of CISP, in order to offer a full line of CISP products to customers.

### Product Homogeneity

54.     CISP is a commodity-like product, and defendant McWane's and defendant Charlotte Pipe's products are produced to industry-wide standards.  Because all CISP is standardized and must meet strict American Society for Testing and Materials requirements, manufacturers of CISP compete mainly on price.  This product homogeneity enhanced Defendants' ability to collude on prices and to detect deviations from those collusively set prices.

11

## Price Inelasticity

55.    If a given change in price triggers a smaller proportionate change in the quantity demanded, then the demand for the good or service is said to be inelastic.

56.    Demand for CISP is inelastic because there is no functional substitute for CISP. Plastic or polymer pipes, such as PVC or acrylonitrile butadiene styrene pipe, are not a substitute for CISP because CISP has several properties that plastic pipe cannot replicate, such as:

      a.    CISP's acoustical characteristics make it more effective in reducing plumbing noise than other materials.

      b.    Unlike other materials, cast iron has high crush strength and resistance to tree roots, penetration by rodents, and failure because of ground shifts.  Unlike plastic pipe, no special bedding is required to support CISP.

      c.    The thermal expansion and contraction of cast iron is far less than that of other materials, such that failures from expansion and contraction due to extreme cold and heat are virtually impossible.

      d.    Unlike other materials, CISP is non-combustible and will not burn in the event of a building fire.

54.    Ductile Iron Pipe is not a substitute product because it comes in much larger sizes and is used mainly for large waterworks projects, whereas CISP is much smaller and is used for drain waste and vent plumbing inside residential and commercial properties.

55.    Additionally, state, municipal and local codes often require the use of CISP, as opposed to plastic piping, which means that there is no potential alternative for CISP in those areas.

## Defendants Had Many Opportunities to Collude

56.    Defendants (and affiliated entities) comprise the only members of a trade association called the CISPI, which is a defendant in this action.    Defendant CISPI was organized in 1949 by the leading American CISP manufacturers.  At the time of its inception, it included 24 manufacturers.  Today, it includes only entities owned and controlled by defendants

McWane and Charlotte Pipe.   Defendants Charlotte Pipe and McWane are CISPI's sole funders and supporters.

57.     As the only members of CISPI, defendants McWane and Charlotte Pipe have had numerous opportunities to discuss pricing at CISPI events.   Executives and managers from defendants McWane and Charlotte Pipe attend CISPI events together at least twice per year.

58.     Defendant CISPI is used by defendants McWane and Charlotte Pipe as a mechanism to facilitate communication and coordination of their activities, including price fixing, maintaining their market shares, and excluding foreign competition.  The Executive Vice President of CISPI, Bill LeVan, has communicated—in writing or by telephone—to defendants McWane and Charlotte Pipe on numerous occasions for the purpose of alerting them that CISP customers were being solicited by foreign manufacturers.  LeVan also has provided weekly reports to defendants McWane and Charlotte Pipe that provided information concerning bidding and pricing information.  In addition, CISPI has been used to communicate information directly between defendants McWane and Charlotte Pipe about potential competitive threats posed by importers.

59.     Senior officials from defendants McWane and Charlotte Pipe have participated in bi-annual CISPI meetings to effectuate the conspiracy described herein.  These meetings have included Bill LeVan, Allan Boscatti (President and CEO of AB&I), Frank Dowd IV (current Board Chairman, and former CEO, of Charlotte Pipe), Roddy Dowd Jr. (current CEO, and former President, of Charlotte Pipe), Don Waugaman (formerly Vice President of Sales at Tyler and currently Vice President and National Sales Manager at Charlotte Pipe), Patrick Starkey (Vice President of Sales at Tyler), and Bill Bliss (Executive Vice President of Tyler).  Shortly after certain of these meetings, and before any public announcement, Starkey, Bliss or Sterling Bowman (Tyler's National Sales Manager) reported to Tyler employees that Tyler would increase CISP prices and that Charlotte would do the same.

60.     In addition to their coordinated activities through CISPI, executives of McWane and Charlotte Pipe also attended annual meetings of the American Supply Association, which

counts CISP manufacturers as participants. This association provided further opportunities to discuss and implement the unlawful conspiracy described herein.

61.     Other trade associations, such as the American Water Works Association, held conferences and meetings, which provided additional opportunities for defendants McWane and Charlotte Pipe to come together and discuss and set prices.

## The Price-Fixing Conspiracy

62.     Defendants McWane and Charlotte Pipe—as the dominant suppliers in the market—have been fixing CISP prices since at least 2006. The CISP list prices, rebates, and multipliers (which are percentages multiplied by a given list price to arrive at the respective transaction price) of McWane and Charlotte Pipe have been maintained in lockstep with each other during the course of the conspiracy.

63.     In 2005 or 2006, an employee in Charlotte Pipe's cast iron foundry in North Carolina learned that Charlotte Pipe and the McWane companies were fixing prices of CISP. He learned this from Charlotte's Senior Vice President of the Cast Iron Division, Marshall Coble. Specifically, Mr. Coble stated, during the course of a meeting at the foundry, that the CISP manufacturers met at the bi-annual trade association meeting that Summer or Fall to discuss and agree on pricing for CISP. When the employee challenged Coble about the legality of such actions, Coble quickly brushed his concerns aside and moved on to another topic.

64.     Defendants McWane and Charlotte Pipe often announced identical price increases very close in time to one another and soon after that trade association meeting occurred. For instance, in early September 2010, both Charlotte Pipe and AB&I announced a future price increase of 7.5% set to take effect on January 1, 2011.

65.     Defendants McWane and Charlotte Pipe posted prices for the most common sizes of CISP, all effective the first of the year, mirror each other exactly. These identical prices are reflected, for example, in the price lists by Defendants set forth in the following figure:

| Year | Part | Charlotte Pipe | AB&I | Tyler Pipe |
|---|---|---|---|---|
| 2006 | 3"x10' No-Hub Pipe | $103.20 | $103.20 | $103.20 |
| | 4" x 10' No-Hub Pipe | $134.00 | $134.00 | $134.00 |
| | 3" No-Hub 1/4 Bend | $15.10 | $15.10 | $15.10 |
| | 4" No-Hub 1/8 Bend | $16.00 | $16.00 | $16.00 |
| | 4" x 3" Wye | $28.50 | $28.50 | $28.50 |
| | 3" x10' Single Hub Pipe | $103.20 | $103.20 | $103.20 |
| | 4" x 10' Single Hub Pipe | $134.00 | $134.00 | $134.00 |
| | 3" Hub & Spigot 1/4 Bend | $23.80 | $23.80 | $23.80 |
| | 4" Hub & Spigot 1/8 Bend | $29.10 | $29.10 | $29.10 |
| 2007 | 3"x10' No-Hub Pipe | $108.60 | $108.60 | $108.60 |
| | 4" x 10' No-Hub Pipe | $141.10 | $141.10 | $141.10 |
| | 3" No-Hub 1/4 Bend | $15.90 | $15.90 | $15.90 |
| | 4" No-Hub 1/8 Bend | $16.80 | $16.80 | $16.80 |
| | 4" x 3" Wye | $30.00 | $30.00 | $30.00 |
| | 3" x10' Single Hub Pipe | $108.60 | $108.60 | $108.60 |
| | 4" x 10' Single Hub Pipe | $141.10 | $141.10 | $141.10 |
| | 3" Hub & Spigot 1/4 Bend | $25.10 | $25.10 | $25.10 |
| | 4" Hub & Spigot 1/8 Bend | $30.60 | $30.60 | $30.60 |
| 2009 | 3"x10' No-Hub Pipe | $113.70 | $113.70 | $113.70 |
| | 4" x 10' No-Hub Pipe | $147.70 | $147.70 | $147.70 |
| | 3" No-Hub 1/4 Bend | $16.90 | $16.90 | $16.90 |
| | 4" No-Hub 1/8 Bend | $17.60 | $17.60 | $17.60 |
| | 4" x 3" Wye | $31.40 | $31.40 | $31.40 |
| | 3" x10' Single Hub Pipe | $122.90 | $122.90 | $122.90 |
| | 4" x 10' Single Hub Pipe | $159.70 | $159.70 | $159.70 |

| | | | | |
|---|---|---|---|---|
| | 3" Hub & Spigot 1/4 Bend | $28.40 | $28.40 | $28.40 |
| | 4" Hub & Spigot 1/8 Bend | $34.60 | $34.60 | $34.60 |
| **2010** | 3"x10' No-Hub Pipe | $117.30 | $117.30 | $117.30 |
| | 4" x 10' No-Hub Pipe | $152.30 | $152.30 | $152.30 |
| | 3" No-Hub 1/4 Bend | $17.50 | $17.50 | $17.50 |
| | 4" No-Hub 1/8 Bend | $19.00 | $19.00 | $19.00 |
| | 4" x 3" Wye | $32.40 | $32.40 | $32.40 |
| | 3" x10' Single Hub Pipe | $129.40 | $129.40 | $129.40 |
| | 4" x 10' Single Hub Pipe | $168.20 | $168.20 | $168.20 |
| | 3" Hub & Spigot 1/4 Bend | $29.90 | $29.90 | $29.90 |
| | 4" Hub & Spigot 1/8 Bend | $36.50 | $36.50 | $36.50 |
| **2011** | 3"x10' No-Hub Pipe | $126.80 | $126.80 | $126.80 |
| | 4" x 10' No-Hub Pipe | $164.60 | $164.60 | $164.60 |
| | 3" No-Hub 1/4 Bend | $18.90 | $18.90 | $18.90 |
| | 4" No-Hub 1/8 Bend | $20.50 | $20.50 | $20.50 |
| | 4" x 3" Wye | $35.00 | $35.00 | $35.00 |
| | 3" x10' Single Hub Pipe | $139.90 | $139.90 | $139.90 |
| | 4" x 10' Single Hub Pipe | $181.80 | $181.80 | $181.80 |
| | 3" Hub & Spigot 1/4 Bend | $32.30 | $32.30 | $32.30 |
| | 4" Hub & Spigot 1/8 Bend | $39.50 | $39.50 | $39.50 |
| **2012** | 3"x10' No-Hub Pipe | $136.30 | $136.30 | $136.30 |
| | 4" x 10' No-Hub Pipe | $177.00 | $177.00 | $177.00 |
| | 3" No-Hub 1/4 Bend | $20.30 | $20.30 | $20.30 |
| | 4" No-Hub 1/8 Bend | $22.00 | $22.00 | $22.00 |
| | 4" x 3" Wye | $37.60 | $37.60 | $37.60 |
| | 3" x10' Single Hub Pipe | $150.40 | $150.40 | $150.40 |
| | 4" x 10' Single Hub Pipe | $195.50 | $195.50 | $195.50 |

16

| | | | | |
|---|---|---|---|---|
| | 3" Hub & Spigot 1/4 Bend | $34.70 | $34.70 | $34.70 |
| | 4" Hub & Spigot 1/8 Bend | $42.50 | $42.50 | $42.50 |
| **2013** | 3"x10' No-Hub Pipe | $143.50 | $143.50 | $143.50 |
| | 4" x 10' No-Hub Pipe | $186.30 | $186.30 | $186.30 |
| | 3" No-Hub 1/4 Bend | $21.40 | $21.40 | $21.40 |
| | 4" No-Hub 1/8 Bend | $23.20 | $23.20 | $23.20 |
| | 4" x 3" Wye | $39.60 | $39.60 | $39.60 |
| | 3" x10' Single Hub Pipe | $158.30 | $158.30 | $158.30 |
| | 4" x 10' Single Hub Pipe | $205.80 | $205.80 | $205.80 |
| | 3" Hub & Spigot 1/4 Bend | $36.50 | $36.50 | $36.50 |
| | 4" Hub & Spigot 1/8 Bend | $44.70 | $44.70 | $44.70 |

Figure 5: Sample of Identical Price Lists

66.     Due to the conspiracy, Defendants McWane and Charlotte Pipe have been able to maintain and/or raise prices without regard to market demand.  As shown in the figure below, defendants McWane and Charlotte Pipe have steadily increased prices since January 1, 2006 even though construction spending—a prime determinant of CISP demand—has fallen significantly during that time.  During this period, defendants McWane and Charlotte Pipe raised prices more than 50% although total construction spending declined significantly.



**Total Construction Spending Index and CISP PPI Comparison**
**(Index=1/2006)**

Figure 6: Comparison of CISP PPI with Construction Spending

67.     These price increases also have significantly exceeded changes in the cost of manufacturing CISP during this time period.   The primary cost determinants for CISP— including scrap iron and natural gas—have increased at rates substantially less than the price increases set forth above.

68.     In addition to the aforementioned activities, McWane and Charlotte Pipe also agreed to limit competition for "each other's" customers.   For example, sales representatives at Tyler were trained and directed by Patrick Starkey and Bill Bliss to stay away from Charlotte Pipe's CISP customers and maintain their current market position, rather than trying to seek business from Charlotte Pipe's customers.

**The Acquisition of Star Pipe's CISP Business Furthered the Conspiracy**

69.     In 2007, Star Pipe entered the CISP market.   It entered this market because of the inflated prices charged by McWane and Charlotte Pipe due to their conspiracy.   Prior to that

18

time, Star Pipe had produced and sold, among other things, ductile iron pipe fittings products. Star Pipe sought membership in CISPI — which Defendants controlled — but was not permitted to join.

70.     In order to gain market share in this commodity market, Star priced CISP below McWane's and Charlotte Pipe's prices.  McWane and Charlotte Pipe had significant concerns about the impact of Star Pipe's entry—particularly as Star Pipe's market position strengthened over time—and the impact this entry would have on McWane's and Charlotte Pipe's inflated prices.

71.     Star Pipe's potential growth as a competitor posed a threat to Defendants' ability to maintain their ongoing price-fixing conspiracy.  Just as defendants McWane and Charlotte Pipe had, through their participation and control of defendant CISPI, taken coordinated steps to exclude competition by importers, actions were taken to foreclose competition by Star Pipe. Specifically, in 2010, Charlotte Pipe commenced steps to eliminate Star Pipe as a competitor in the CISP market and to maintain Defendants' price-fixing conspiracy and inflated prices. Charlotte Pipe's anti-competitive actions were in furtherance of the conspiracy because they eliminated the potential threat to the conspiracy presented by Star Pipe.

72.     On July 14, 2010, Charlotte Pipe executed a confidential Asset Purchase Agreement with Star Pipe, which allowed Charlotte Pipe to acquire the entirety of Star Pipe's CISP business, including Star Pipe's CISP inventory, production equipment, business records and customer lists. Shortly after acquiring the Star Pipe assets, Charlotte Pipe had all such equipment destroyed.  The elimination of Star Pipe as a CISP competitor eliminated the downward pressure on CISP prices which Star Pipe had caused. In fact, following Charlotte Pipe's acquisition of Star's CISP production equipment and customer lists, CISP prices rose significantly, beginning as early as January, 2011.

73.     The parties also signed a confidential agreement that prohibited Star Pipe and certain Star Pipe employees from competing with Charlotte Pipe in North America for six years after the date the agreement was signed.  Star Pipe also agreed to send a letter to its customer list stating that it had decided to exit the CISP business.

74.     Several Star Pipe executives received large cash bonuses following the completion of the sale of the CISP business to Charlotte Pipe.

75.     The Star Pipe acquisition was not the only CISP business that Charlotte Pipe had purchased in recent history.  According to the FTC Complaint, Charlotte Pipe acquired the CISP assets of other potential competitors.  If a small CISP company posed a risk of stimulating price competition in the CISP market, Charlotte Pipe has purchased the company in order to shut down production and destroy any CISP assets. The elimination of these competitors, like the activities coordinated through defendant CISPI, has facilitated the ability of defendants McWane and Charlotte Pipe to maintain and enforce their price-fixing conspiracy.

76.     In 2013, as part of a non-public investigation, the FTC challenged the acquisition, alleging that Charlotte Pipe had violated Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45.  The FTC issues such complaints when it has "reason to believe that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest."

77.     The FTC subsequently entered into a consent agreement with Charlotte Pipe to "address the anticompetitive effects resulting from Charlotte Pipe's 2010 acquisition of the cast iron soil pipe business of Star Pipe."

78.     The consent agreement mandated that for the ten years following its execution, Charlotte Pipe must notify the FTC before acquiring any additional entities engaged in the manufacture or sale of CISP products in order for the FTC to "guard against future anticompetitive transactions."  It further mandated that Charlotte Pipe inform its customers and the public of the acquisition of Star Pipe, as well as its previous CISP acquisitions.  It also invalidated the non-compete and confidentiality clauses contained in the Star Asset Purchase Agreement.

## FRAUDULENT CONCEALMENT

79.     Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged

herein until on or about April 2, 2013, when the FTC's redacted complaint challenging Charlotte Pipe's acquisition of Star Pipe's CISP business was filed.

80.     Because Defendants' alleged conspiracy was kept secret until April 2, 2013, Plaintiffs and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for CISP throughout the United States during the Class Period.

81.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

82.     Defendants' conspiracy was inherently self-concealing.  Cast iron soil pipe and fittings are not exempt from antitrust regulation, and thus, before April 2, 2013, Plaintiffs reasonably considered it to be a well-regulated, competitive industry.

83.     In the context of the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' proffered CISP prices before April 2, 2013.

84.     Plaintiffs and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and fraudulently conceal their conspiracy.

85.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until on or about April 2, 2013, when the FTC complaint, and its corresponding factual allegations of anti-competitive conduct concerning the CISP industry, was first publicly disseminated.

86.     None of the facts or information available to Plaintiffs and members of the Class prior to April 2, 2013, if investigated with reasonable diligence, could or would have led to the

discovery of the conspiracy alleged herein prior to that date. Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' (non-public) meetings and communications with each other. Defendants are alleged to have engaged in a secret conspiracy that necessarily did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for CISP. The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, communications and agreements. If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion. Defendants' contacts and meetings with each other were also concealed from Defendants' customers and other non-conspirators.

87. Although Defendants' price increase announcements, including in the form of new price lists, during the Class Period sometimes did not contain justifications for price increases, the announcements and price lists nevertheless constituted implicit statements that price increases were legitimate and were the result of competitive market forces. Customers also were told that price increases were needed because raw material costs were increasing. Such statements were false and misleading, because at times costs were not increasing and announcements and price lists never included the real reason for price increases, namely Defendants' secret conspiracy.

88. For example, Defendants acted in furtherance of the conspiracy, and helped conceal the conspiracy, through communications such as the following:

        a.      In March 2008, AB&I falsely told customers that its price increase was "simply a cost pass-through" because earlier increases were insufficient to cover the rise in scrap iron prices. AB&I, who as of at least May, 2007 had a "policy to give the market as much notice as possible regarding a price increase," because such advance notice was important to ensure that the conspirators would adhere to their price-fixing agreement and implement price increases on the same date, indicated that "it has become

22

necessary to increase prices to recover these added costs of production." AB&I indicated that future price increases might be necessary to cover cost changes.

b.      In November 2009, AB&I falsely told customers that it was increasing prices after trying "to put off this price increase for as long as we could." AB&I represented that "[a]s in all price increases, this one came after weeks of deliberation.  The disturbance such increases can cause to our valued customers is a regrettable effect, but this effect must be weighed against the impacts of NOT raising prices to stay in line with costs." AB&I told customers that the "scrap iron market is a small subset of the ferrous metals market, and AB&I's scrap iron costs are inextricably linked to world steel demand.  Any growth in world steel demand produces upward pressure on scrap iron prices.  World demand for steel has steadily increased since April 2009, according to the World Steel Association.  In fact, China produced more steel in August, 2009 than in any other month in its history.  Despite falling demand in U.S. commercial construction, AB&I is experiencing rising raw material costs."

c.      On September 1, 2010, Charlotte Pipe falsely told customers that price increases were the result of cost increases in raw materials and operating expenses and that as a result of cost increases, prices would remain at higher levels through 2011.

d.      In September 2010, AB&I falsely told customers that because of raw material cost increases it was announcing a commensurate increase in CISP prices.

e.      On September 7, 2011, Charlotte Pipe announced price increases and falsely attributed these increases to cost increases in scrap iron and other major raw materials.

23

       f.      On September 20, 2011, Charlotte Pipe falsely told customers that it was increasing prices "[d]ue to cost increases in scrap iron and other major raw materials as well as increases in general operating expenses."

89.    The statements of defendants McWane and Charlotte Pipe justifying their price increases throughout the Class Period were designed to create, and did create the impression that these increases were based on competitive market forces. These statements were false and misleading, and constituted affirmative and overt acts of concealment of the conspiracy, because CISP price increases were a result of the affirmatively and fraudulently concealed conspiracy set forth herein. Indeed, even statements about the alleged cost justifications for price increases were misleading, and lulled Plaintiffs and other customers into believing that price increases were based on legitimate market forces, because customers were never alerted to Defendants' secret meetings, agreements and cooperation with each other as set forth above. As a result of this misleading conduct, the customers of defendants McWane and Charlotte Pipe, including Plaintiffs and members of the Class, were conditioned by experience in dealing with McWane and Charlotte Pipe in what they believed to be a competitive industry to expect price increases from time to time, and to believe that this was the result of normal market forces, rather than the product of an illegal conspiracy.

90.    Defendants and their co-conspirators engaged in a successful price-fixing conspiracy concerning CISP, which they affirmatively concealed, at least in the following respects:

      a.      By communicating secretly to discuss customers and prices of CISP in the United States;

      b.      By meeting at trade association meetings to discuss and fix prices;

      c.      By issuing or justifying price increase announcements based on false and/or misleading reasons, including cost increases; and

      d.      By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

24

91.     Because of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiffs' claims and the claims of the Class have been tolled.

## VIOLATIONS OF THE ANTITRUST LAWS

92.     Beginning by at least January 1, 2006 and continuing through December 31, 2013, Defendants engaged in an agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of CISP in the United States.

93.     Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of CISP sold in the United States. These activities included:

a.      participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of CISP in the United States;

b.      agreeing during those meetings, conversations, and communications to charge prices at specified levels, to allocate customers and geographic regions, and to otherwise fix, raise, maintain, or stabilize prices of CISP sold in the United States; and

c.      taking numerous steps, as set forth above, to implement and maintain the conspiracy, including Charlotte Pipe's acquisition and elimination of Star Pipe as a competitor.

94.     Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

95.     Charlotte Pipe's acquisition and elimination of Star Pipe's CISP business resulted in decreased market competition, including elimination of downward pressure on CISP prices, and increased concentration in the market for CISP.

96.     Throughout the Class Period, Plaintiffs and the other Class members purchased CISP from Defendants (or their subsidiaries or controlled affiliates) at supra-competitive prices.

97.     Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 7 of the Clayton Act, 15 U.S.C. § 18.

## ANTI-COMPETITIVE EFFECT

98. As a result of Defendants' unlawful conduct, Plaintiffs and the other Class members have been injured in their business and property because they have paid more for CISP than they would have paid absent collusion.

99. Defendants' unlawful contract, combination, or conspiracy has had at least the following effects:

    a.    price competition in the market for CISP has been artificially restrained;

    b.    prices for CISP sold by defendants McWane and Charlotte Pipe have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

    c.    purchasers of CISP from defendants McWane and Charlotte Pipe have been deprived of the benefit of free and open competition in the market for CISP.

## CLASS ALLEGATIONS

100. Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of:

> All persons or entities that purchased cast iron soil pipe or cast iron soil pipe fittings in the United States directly from any of the Defendants, their subsidiaries, predecessors, or affiliates, from January 1, 2006 through December 31, 2013 (the "Class Period"). Excluded from the Class are Defendants, their parent companies, subsidiaries, predecessors, and affiliates, any co-conspirators, federal and state governmental entities and instrumentalities of federal and state governments.

101. The Class is so numerous that joinder of all members is impracticable. On information and belief, hundreds, if not thousands, of individuals and entities purchased CISP from defendants McWane and Charlotte Pipe during the Class Period.

102. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all Class members share the same injury, as they were all damaged by the actions of Defendants, which caused them to pay artificially inflated prices for CISP.

103.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class members.

104.     Plaintiffs are represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

105.     This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

    a.    Whether Defendants engaged in a conspiracy to raise, fix, stabilize, and maintain prices of CISP sold in the United States;

    b.    Whether Defendants agreed to allocate customers;

    c.    The duration and extent of the conspiracy;

    d.    Whether each Defendant was a participant in any such conspiracy;

    e.    Whether the actions of Defendants in so conspiring violated Section 1 of the Sherman Act;

    f.    Whether the conspiracy had the effect of artificially inflating the price of CISP sold in the United States during the Class Period;

    g.    Whether Charlotte Pipe's acquisition of Star Pipe's CISP assets substantially increased concentration or decreased competition in the market for CISP, or was undertaken as a method of ensuring the continuing success of the Defendants' price-fixing conspiracy by eliminating a competitor from the market;

    h.    Whether the conduct of Defendants caused injury to Class members; and

    i.    The measure and amount of damages incurred by the Class.

106.     Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing

incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

## FIRST CLAIM FOR RELIEF:

## Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

107.  Plaintiffs incorporate by reference the allegations of paragraphs 1 through 106 above.

108.  Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Defendants' agreement to fix, raise, maintain and stabilize the prices of cast iron soil pipes and fittings in the United States was a violation of the Sherman Act.

109.  The acts done by each Defendant as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

110.  Beginning at least as early as January 1, 2006, and continuing through December 31, 2013, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators, by and through their officers, directors, employees, agents and/or other representatives, entered into and participated in an agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, maintain and stabilize prices for CISP sold in the United States.

111.  Defendants' anti-competitive acts were intentionally directed at the market for CISP and had a substantial and foreseeable effect on interstate commerce throughout the United States.

112.  Defendants' conspiratorial acts and combinations have harmed competition and caused unreasonable restraints of trade in the CISP market.

113.  As a result of Defendants' unlawful agreement, understanding, combination, contract and conspiracy, Plaintiffs and other members of the Class have been injured in their business and property. Plaintiffs and other Class members have been harmed by being forced to pay higher prices for CISP than they otherwise would have paid in the absence of Defendants'

28

conspiracy. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

114. In formulating and carrying out their unlawful agreement, understanding, combination, contract and conspiracy, Defendants and their co-conspirators actually did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

115. Defendants' contract, combination, and conspiracy in restraint of trade had the following effects, among others:

      a.      Price competition in the CISP market has been restrained, suppressed and/or eliminated in the United States;

      b.      Prices for CISP sold by Defendants have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

      c.      Plaintiffs and members of the Class have been deprived of the benefits of free and open competition.

116. Accordingly, Plaintiffs and the Class seek damages (preliminarily estimated to be in the hundreds of millions of dollars), to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## SECOND CLAIM FOR RELIEF:

### Illegal Merger Under Section 7 of the Clayton Act

117. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 106 of this Complaint.

118. Charlotte Pipe's acquisition of Star Pipe violated Section 7 of the Clayton Act, 15 U.S.C. § 18, because it has substantially lessened competition and/or tended to create a monopoly in the relevant market.

119. The acquisition eliminated actual, direct, and substantial competition between Star Pipe and McWane and Charlotte Pipe.

29

120.    The acquisition increased concentration in the market for CISP and increased Defendants' ability to exert market power.

121.    The acquisition has caused, and will continue to cause, severe anticompetitive effects in the relevant market, including but not limited to artificially high and supra-competitive prices for CISP sold by Defendants throughout the United States.

## DEMAND FOR JURY TRIAL

122.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

123.    Wherefore, Plaintiffs demand judgment against Defendants as follows:

a.    Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined above;

b.    That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

c.    That the acquisition by Charlotte Pipe of Star Pipe's CISP assets be adjudged to have violated Section 7 of the Clayton Act, 15 U.S.C. § 18;

d.    That judgment be entered for Plaintiffs and Class members against Defendants for three times the amount of damages sustained by Plaintiffs and the Class as allowed by law;

e.    That Plaintiffs and the Class recover pre-judgment and post-judgment interest as permitted by law;

f.    That Plaintiffs and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

g.    For such other and further relief as is just and proper under the circumstances.

Dated: August 11, 2014

Respectfully submitted,

/s/ Scott N. Brown, Jr.
Scott N. Brown, Jr., BPR No. 1212
Joseph A. Jackson, II, BPR No. 30203
**SPEARS, MOORE, REBMAN & WILLIAMS, P.C.**
801 Broad Street, Sixth Floor, P.O. Box 1749
Chattanooga, TN 37401-1749
Tel: (423) 756-7000
Fax: (423) 756-4801

*Interim Liaison Counsel for the Direct Purchaser Class Plaintiffs*

/s/ Kit A. Pierson
Kit A. Pierson
Christopher J. Cormier
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Ave., NW
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600
kpierson@cohenmilstein.com
ccormier@cohenmilstein.com

/s/ Solomon B. Cera
Solomon B. Cera
C. Andrew Dirksen
**GOLD BENNETT CERA & SIDENER LLP**
595 Market Street, Suite 2300
San Francisco, California 94105
(415) 777-2230
scera@gbcslaw.com
cdirksen@gbcslaw.com

/s/ Robert N. Kaplan
Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
Matthew P. McCahill
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, New York 10022
Telephone: (212)687-1980
rkaplan@kaplanfox.com
rkilsheimer@kaplanfox.com
garenson@kaplanfox.com
mmccahill@kaplanfox.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs*

Bruce L. Simon
Aaron M. Sheanin
Michael H. Pearson
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Tel: (415) 433-9000
Fax: (415) 433-9008

James B. Sloan
Sean F. Sloan
**JAMES B. SLOAN LTD.**
One Westminster Place
Lake Forest, IL 60045
Tel: (312) 315-5315
Fax: (312) 234-6315

M. Michael Waters
**VONACHEN, LAWLESS, TRAGER & SLEVIN**
456 Fulton Street, Suite 425
Peoria, Illinois 61602
Tel: (309) 676-8986
Fax: (309) 676-4130

Brent W. Landau
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271

Larry S. McDevitt
David M. Wilkerson
**THE VAN WINKLE LAW FIRM**
11 North Market Street
Asheville, NC 28801
Tel: (828) 258-2991
Fax: (828) 257-2767

Eric L. Cramer
Ruthanne Gordon
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000

32

Fax: (215) 875-4604

*Additional Counsel for the Direct Purchaser Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that the foregoing Consolidated Amended Class Action Complaint and accompanying Exhibit 1 have been filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's electronic filing system. In addition, counsel for Direct Purchaser Plaintiffs will today serve Notice of a Lawsuit and Request to Waive Service of a Summons (AO398) and Waiver of Service of Summons (A0399) on the Cast Iron Soil Pipe Institute, newly named as a defendant in this Consolidated Amended Class Action Complaint.

This 11th day of August, 2014.

**SPEARS, MOORE, REBMAN & WILLIAMS, P.C.**

<u>/s/ Scott N. Brown, Jr.</u>
Scott N. Brown, Jr., BPR No. 1212