| | |
|---|---|
| **IN RE: CAST IRON SOIL PIPE AND FITTINGS ANTITRUST LITIGATION** | Case No. 1:14-md-2508<br>Judge Harry S. Mattice, Jr. |
| **THIS DOCUMENT RELATES TO:**<br>**INDIRECT PURCHASER ACTION** | **JURY TRIAL DEMANDED** |

**INDIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF STATE ANTITRUST AND CONSUMER PROTECTION STATUTES**

Plaintiffs Craig Mechanical, Inc. and Keith McNeill Plumbing Contractor, Inc. ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this class action against Defendants AB&I Foundry, AB&I Service Center, Tyler Pipe Company, Tyler Coupling, Tyler Pipe Penn, and McWane, Inc. (collectively, "McWane"), Defendants Charlotte Pipe and Foundry Company and Randolph Holding Company LLC (collectively, "Charlotte Pipe") and Defendant Cast Iron Soil Pipe Institute ("CISPI") for violations of state antitrust, unfair competition, and consumer protection laws in the market for cast iron soil pipe and fittings in the United States (collectively, "CISP" market). McWane, Charlotte Pipe and CISPI are collectively referred to herein as "Defendants." The following allegations are based on personal knowledge as to Defendants' conduct and are made on information and belief as to all other matters based on an investigation by counsel.

## I.    INTRODUCTION

1.    Plaintiffs allege that Defendants conspired to fix, raise, maintain and stabilize prices for CISP that were sold to Plaintiffs and other class members, beginning at least as early as January 1, 2006 and extending through December 31, 2013 (the "Class Period").

2.      The result of the conspiracy is that prices were nearly uniform across all lengths and sizes of CISP, including fittings and accessories, throughout the Class Period.  Furthermore, prices rose significantly during the Class Period, counter to prevailing economic conditions and relatively lower demand through portions of the Class Period.

3.      In furtherance of the scheme to fix, maintain and stabilize CISP prices, in 2010 Charlotte Pipe acquired and then liquidated the CISP business of Star Pipe Products, Ltd. ("Star Pipe"), a significant competitor of Defendants.  This resulted in substantially decreased competition in the market for CISP, which enabled Charlotte Pipe and McWane to continue to fix and set prices.

4.      In order to facilitate the goals of their conspiracy, Defendants engaged in various collusive acts, including forming agreements regarding CISP price levels and agreements not to compete with each other for certain customer accounts and in certain geographic areas.

5.      Defendants McWane and Charlotte Pipe were able to effectuate this conspiracy through defendant CISPI, a purported "trade association" whose only members are the Defendants.  Through CISPI, Defendants had numerous opportunities to communicate and collude at CISPI events and meetings.  CISPI provided the opportunity for Defendants to communicate and share information concerning CISP pricing and customers as well as confidential, commercially-sensitive information.  As further alleged *infra*, following these CISPI meetings, McWane and Charlotte announced identical price increases, typically in autumn, to be effective in January of the following year.

6.      As a direct result of this conduct, Defendants have artificially inflated the price of CISP and have earned substantial profits from their anticompetitive conduct.  Defendants' conduct proximately and foreseeably caused Plaintiffs and members of the Class to suffer

injuries by forcing Plaintiffs and the Class to pay artificially inflated prices for CISP throughout the Class Period.

7.     Plaintiffs bring this class action lawsuit to recover damages under state antitrust, unfair competition and consumer protection laws, including where available treble damages,  as well as to recover the costs of suit, including reasonable attorneys' fees, for injuries sustained as a result of the Defendants' illegal conduct.

8.     Plaintiffs bring this action on behalf of themselves and similarly situated Indirect Purchasers of CISP in the United States during the Class Period.[1]

9.     Defendants' illegal conduct with respect to CISP has substantially affected commerce in each of the states identified herein because Defendants, directly or through their agents, engaged in activities affecting each such state.  Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with their activities relating to the production, marketing, and sale of CISP.  Defendants produced, promoted, sold, marketed, and/or distributed CISP, thereby purposefully profiting from access to Indirect Purchasers in each such state.  Defendants also contracted to supply or obtain goods or revenue related to CISP.  As a result of the activities and practices described herein, Defendants have:

- Caused damage to the residents of each state identified herein;

- Caused damage in each state identified herein by acts or omissions committed outside each such state by regularly doing or soliciting business in each such state;

- Engaged in persistent courses of conduct within each state identified herein and/or derived substantial revenue from the marketing of CISP;

---

[1] Plaintiffs and similarly situated indirect purchasers of CISP who purchased CISP from a direct purchaser (wholesaler) for use in construction projects are referred to herein as "Indirect Purchasers."

- Committed acts, practices or omissions that they knew or should have known would cause damage (and did, in fact, cause such damage) in each state identified herein while regularly doing or soliciting business in each such state, engaging in other persistent courses of conduct in each such state, and/or deriving substantial revenue from the marketing of CISP in each such state;

- Committed acts, practices or omissions that adversely affected public policy or interest and was immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers; and

- Intended that such acts, practices or omissions would be relied upon by others and that such reliance caused injury.

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over these state law claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d) and 1367, in that this is a class action in which the members of the Class (as defined herein) exceed 100; the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs; and some members of the Class are citizens of a state different from some Defendants.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b).  Defendants are found in, reside or transact business in this District.  Moreover, a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## III.    PARTIES

12.     Plaintiff Craig Mechanical, Inc. ("Craig Mechanical") is a California licensed plumbing contractor, located at 10276 Arlington Avenue, Riverside, California, 92503.  Craig Mechanical has been in business over 30 years and handles commercial and industrial plumbing

projects. It has purchased CISP manufactured by one or more of the Defendants from one or more direct purchasers (wholesalers) during the Class Period.

13. Plaintiff Keith McNeill Plumbing Contractor, Inc. ("McNeill") is a Florida-licensed plumbing contractor, located at 3505 North Monroe Street, Tallahassee, Florida, 32303. McNeill has purchased CISP manufactured by one or more of the Defendants from one or more direct purchasers (wholesalers) during the Class Period. [2]

14. Defendant AB&I Foundry ("AB&I") is a division of McWane, Inc., with its principal place of business located at 7825 San Leandro Street, Oakland, California 94621. AB&I was acquired by McWane, Inc. in late 2006, and since that time AB&I has been a division of and controlled by McWane, Inc.

15. Defendant AB&I Service Center is a division or affiliate of McWane, Inc. with its principal place of business located at 15006 Nelson Avenue, City of Industry, California 91774.

16. Defendant McWane, Inc. is a Delaware corporation with its principal place of business located at 1201 Vanderbilt Road, Birmingham, Alabama, 35234.

17. Defendant Tyler Coupling is a division or affiliate of McWane, Inc., with its principal place of business located at 675 Tyler Avenue, Marshfield, Missouri 65706. [3]

18. Defendant Tyler Pipe Penn is a division or affiliate of McWane, Inc., with its

---

[2] Pursuant to the Court's Order dated July 17, 2014, attached hereto as Exhibit A is a "fact sheet" which indicates that Plaintiffs are Indirect Purchasers and, further, identifies the seller or sellers from whom Plaintiffs purchased CISP during the Class Period.

[3] According to the CISPI Member Directory, available at http://www.cispi.org/About-the-Institute/Member-Directory.aspx (last visited on August 11, 2014), Tyler Coupling is located at 1300 Warrens Tyler Road, Marshfield, Missouri 65706. Upon information and belief, this address is out of date.

principal place of business located at 3550 Brookside Road, Macungie, Pennsylvania 18062.[4]

19.    Defendant Tyler Pipe Company ("Tyler Pipe") is a division of McWane, Inc., with its principal place of business located at 11910 County Road 492, Tyler, Texas, 75706. At all relevant times, Tyler Pipe has been a division of and owned and controlled by McWane, Inc.

20.    Defendant Charlotte Pipe and Foundry Company is a North Carolina corporation with its principal place of business located at 2109 Randolph Road, Charlotte, North Carolina, 28207.

21.    Defendant Randolph Holding Company, LLC is a wholly-owned subsidiary of Charlotte Pipe and is a limited liability company organized, existing, and doing business under and by virtue of the laws of the State of Delaware with its principal place of business located at 2109 Randolph Road, Charlotte, NC, 28207.

22.    Defendant CISPI is a trade association founded in 1949 by American manufacturers of cast iron soil pipe and fittings. According to its website, CISPI members include Defendants AB&I Foundry, AB&I Service Center, Tyler Pipe Company, Tyler Coupling, Tyler Pipe Penn and Charlotte Pipe & Foundry. CISPI's principal place of business is located at 3008 Preston Station Drive, Hixson, Tennessee 37343. During the Class Period, representatives from Defendants Charlotte Pipe, McWane and various McWane affiliates are believed to have held, and continued to hold, leadership positions within CISP such that they dominated and controlled CISPI. Upon information and belief, CISPI meetings were held bi-annually during the Class Period and provided the Defendants with the opportunity to collude on

---

[4] Upon information and belief Defendant Tyler Pipe Penn is referred to as "Tyler Pipe Service Center" in the CISPI Member Directory, available at http://www.cispi.org/About-the-Institute/Member-Directory.aspx (last visited on August 11, 2014). Moreover, upon information and belief the location listed in the CISPI Member Directory for "Tyler Pipe Service" is out of date.

pricing and to implement and monitor the illicit agreements Defendants had reached.

23.     Various other entities and individuals not named as defendants in this Complaint participated as co-conspirators in the acts complained of and performed acts and made statements which aided and abetted and furthered the unlawful conduct alleged herein.

24.     The acts of Defendants alleged in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

IV.     **FACTUAL ALLEGATIONS**

25.     Defendants McWane and Charlotte Pipe have been the primary sellers and manufacturers of CISP in the United States since at least 2006.  Together, they control over 90% of the U.S. market for CISP.[5]

26.     CISP is primarily used in buildings for sanitary and storm drain, waste, and vent piping applications. CISP is used in residential, commercial and industrial construction.

27.     Beginning at least as early as 2006, the Defendants entered into a conspiracy to fix, raise, maintain and stabilize the prices of CISP sold in the United States.  Defendants engaged in various collusive acts, including agreeing on CISP price levels and agreeing not to compete with each other at particular customer accounts, in order to facilitate price increases and further the goals of their unlawful conspiracy.

28.     Defendants constitute the only members of Defendant CISPI, and had numerous opportunities to communicate and collude at CISPI events and meetings, as well as other industry functions.

---

[5] *See* Federal Trade Commission: *Charlotte Pipe and Foundry Settles Charges That Its 2010 Purchase of Star Pipe's Cast Iron Soil Pipe Business Was Anticompetitive* ("FTC News Release"), available at http://www.ftc.gov/opa/2013/04/charlottepipe.shtm (last visited on August 11, 2014).

29.     As a result of the price collusion between the Defendants, and as illustrated herein, CISP prices for nearly all types, lengths and sizes of CISP have been virtually identical throughout the Class Period.  Thus, for purchasers of CISP such as Plaintiffs, there has been no meaningful price competition in the market for CISP.

30.     As of 2006, there were effectively only two companies producing and selling CISP.  Star Pipe, a manufacturer in a related cast iron industry, saw this as a competitive opportunity and entered the CISP market in 2007.  At that point, Star Pipe began immediately to compete with Charlotte Pipe and McWane for a share of the CISP market.[6]  Star Pipe's entrance in the market increased competition and threatened Defendants' supracompetitive pricing.

31.     Defendants understood the risk this posed to their price fixing scheme.

32.     In July 2010, Charlotte Pipe, through its subsidiary Randolph Holding Company, purchased the CISP assets of Star Pipe, further effectuating Defendants' price-fixing scheme. The purchase agreement included non-compete and confidentiality clauses for many of Star Pipe's top CISP executives.[7]

33.     Charlotte Pipe then proceeded to *destroy* Star Pipe's CISP production equipment and shutter its CISP foundries.  According to an investigation led by the Federal Trade Commission (the "FTC"), Charlotte Pipe had previously engaged in similar conduct to eliminate actual and potential competitors, and to maintain and further the Defendants' implementation of their price-fixing conspiracy by purchasing smaller competitors in the CISP market only to sell off their assets and close their operations.[8]

---

[6] *See, e.g.*, FTC News Release.

[7] *Id.* Information and allegations relating to Charlotte Pipe's acquisition of Star Pipe's CISP business are based on the FTC action as outlined in the FTC News Release and related FTC publications.

[8] *Id.*

34.     The intended and actual effect of Charlotte Pipe's purchase of Star Pipe's CISP business was to reduce competition in the CISP market and to pave the way for Charlotte Pipe and McWane to continue to fix and set prices.

35.     The FTC launched an investigation into Charlotte Pipe's acquisition of Star Pipe's CISP business which resulted in the filing of an administrative complaint on April 2, 2013 against Charlotte Pipe.[9]  Charlotte Pipe thereafter entered into a Consent Agreement prohibiting it from engaging in certain anti-competitive activities, as addressed further *infra*.[10]

36.     Prices for CISP have increased steadily since at least 2006 despite declining demand in the United States due to the Defendants' conspiracy and actions to keep competitors out of the CISP market.

## Market Characteristics Conducive to Collusion

37.     The Market for CISP is particularly conducive to collusion because: (1) Defendants are the only producers; (2) the barriers to entry are extremely high; (3) the products are homogenous; and (4) the Defendants belong to Defendant CISPI, an organization in which they are the *only* members and regularly meet to discuss pricing and related issues.

## Limited Number of Producers

38.     Charlotte Pipe, AB&I and Tyler Pipe are the only three producers of CISP in the United States.  Both Tyler Pipe and AB&I are divisions of McWane.

39.     McWane and Charlotte Pipe together account for over 90% of the U.S. market for CISP.  The FTC has described the industry as "highly concentrated."  And the removal of Star Pipe from the market "substantially increased the level of concentration in the relevant

---

[9]     Available   at   http://www.ftc.gov/enforcement/cases-proceedings/1110034/charlotte-pipe-foundry-company-et-al (last visited on August 11, 2014).

[10] *Id.*

market[]."[11]

40.     The industry is so concentrated that in 2007 and 2009, the U.S. Census withheld reporting CISP data specifically because there was a risk that with so few producers, the release of data would enable the public to identify proprietary company information even from aggregate data.

### High Barriers to Entry

41.     There are substantial barriers to entry for new entrants in the CISP market.  For instance, there are significant costs associated with either building or acquiring a foundry as well as the specialty manufacturing tools necessary to produce CISP.  For example, Star Pipe's CISP assets that were acquired (and dismantled) by Charlotte Pipe, which constituted a very small percentage of the market overall, sold for $19 million.

42.     In addition, a new entrant in the CISP market must develop a distribution network and relationships with both plumbing distributors and end-users.

43.     Finally, in order to offer a full line of CISP products to customers, a new CISP manufacturer must be able to produce both the most commonly requested CISP and also less common types of CISP.

### Homogenous Products

44.     CISP is a commodity-like product, and Defendants' products are produced to industry-wide standards.  Because all CISP is standardized and must meet strict American Society for Testing and Materials ("ASTM") requirements, manufacturers of CISP theoretically compete mainly on price.  This product homogeneity enhanced Defendants' ability to collude on prices and to detect deviations from those collusively set prices in order to enforce their agreement.

_____
[11] *Id.*

## Price Inelasticity

45.     Demand for CISP is inelastic because there is no functional substitute for CISP. Plastic pipes, such as polyvinylchloride ("PVC") or acrylonitrile butadiene styrene ("ABS") pipe, are not a substitute for CISP because CISP has several properties that plastic pipe cannot replicate, such as:

- CISP more effectively reduces plumbing noise than other materials;

- Cast iron has higher crush strength and resistance to tree roots, penetration by rodents, and failure because of ground shifts.  Unlike plastic pipe, no special bedding is required to support CISP;

- The thermal expansion and contraction of cast iron is far less than that of other materials, such that failures from expansion and contraction due to extreme cold and heat are unlikely;

- CISP is noncombustible and will not burn in the event of a building fire.

46.     CISP is much smaller than Ductile Iron Pipe, which is not a substitute product because it comes in much larger sizes and is used mainly for large waterworks projects.

47.     Additionally, state, municipal and local codes often require the use of CISP, as opposed to plastic piping, which means that there is no potential alternative for CISP in those areas.

48.     Further, building codes and contractors frequently insist on domestically produced CISP such that foreign competition is minimized.

## Opportunity to Collude

49.     As alleged, *supra,* Defendants comprise the only members of Defendant CISPI.

CISPI was organized in 1949 by the leading American CISP manufacturers. At the time of its inception, it included 24 manufacturers. Today, it includes only the Defendants.

50.     Defendants thus have had numerous opportunities to discuss pricing at CISPI events. Executives and managers from Defendants attend CISPI events together at least twice a year.

51.     CISPI is used by Defendants as a mechanism to facilitate communication and coordination of their activities, including price-fixing, maintaining their market shares, and excluding foreign competition. For instance, CISPI's executive vice president, Mr. William H. LeVan, has communicated – in writing or by telephone from CISP institute headquarters in Hixson, Tennessee – to Defendants on numerous occasions to alert them that CISP customers were being solicited by foreign manufacturers. Levan also has produced weekly reports for Defendants to provide them with information concerning bidding and pricing information.

52.     Moreover Senior officials from Defendants have participated in bi-annual CISPI meetings to effectuate the conspiracy described herein. These meetings have included Bill LeVan, Allan Boscatti (President and CEO of AB&I), Frank Dowd (CEO of Charlotte Pipe), Roddy Dowd (former President of Charlotte Pipe), Don Waugaman (formerly Vice President of Sales at Tyler and currently Vice President of Sales at Charlotte Pipe), Patrick Starkey (Vice President of Sales at Tyler), and Bill Bliss (Executive Vice President of Tyler).

53.     In addition to their coordinated activities through CISPI, Defendants' executives also attended annual meetings of the American Supply Association, which counts CISP manufacturers as participants. This association provided further opportunities to discuss and implement the unlawful conspiracy described herein.

54.     Other trade associations, such as the American Water Works Association, held

conferences and meetings, which provided additional opportunities for Defendants to come together and discuss and set prices.

**The CISP Market**

55. CISP is manufactured predominantly from alloys primarily made of iron, carbon, and silicon (and other trace elements) commonly known as "cast iron."

56. Numerous state and local building codes require the use of CISP for certain types of construction as opposed to other piping such as PVC.

57. Moreover, certain construction projects are subject to the "Buy American" provisions of the American Recovery and Reinvestment Act of 2009, a fact emphasized by CISPI in an attempt to minimize any potential competition from foreign producers.[12]

58. CISP has characteristics that make it particularly well-suited for drain, waste, vent, and sewer plumbing applications, including resistance to corrosion and abrasion. It also has characteristics such as low noise transmission and crush resistance that make it non-interchangeable with PVC in many applications.

59. CISP can be joined together in various configurations, which makes it versatile. It can be installed both above and below flooring, as well as underground. CISP fittings include various designs and sizes, consisting of bends, tees, wyes, traps, drains, and other special fittings.

60. Cast Iron Soil Pipe and Fittings used in the United States are classified into two major types—hub and spigot and hubless. Hubless pipe and fittings are also referred to in the plumbing industry as no-hub.

61. Hubless cast iron soil pipe and fittings are manufactured without a hub, in

---

[12] *See* http://www.cispi.org/News/Clarification-on-American-Recovery-and-Reinvestmen.aspx (last visited on August 11, 2014).

compliance with industry norms. The method of joining the pipe and fittings utilizes a coupling that telescopes over the plain ends of the pipe and fittings and is torqued to seal the joint. Hubless cast iron soil pipe and fittings are manufactured in only one class and wall thicknesses will vary depending on size. There are many varied configurations of fittings and both pipe and fittings range in size from 1 1/2" to 15".

62. Hub and Spigot pipe and fittings have hubs into which the spigot (plain end) of the pipe or fitting is inserted. The joint is sealed with an appropriate adhesive. Hub and Spigot pipe and fittings are available in two classes or thicknesses, classified as Service (SV) and Extra Heavy (XH). Additional wall thickness is added to the outside diameter of Extra Heavy (XH), therefore Extra Heavy (XH) and Service (SV) are not readily interchangeable. Hub and Spigot pipe and fittings are available in 2"–15" sizes.

63. The most frequent purchasers of CISP are plumbing wholesalers. End-users of CISP include construction companies, plumbers and developers.

64. Fifty-nine percent of CISP produced is 3-inch and 4-inch (in diameter), 25% is 1 ½ - inch and 2-inch, and 16% is 5-inch and over. Fittings constitute roughly a quarter of the total tonnage of CISP combined production.

65. CISP is delivered to purchasers across the United States and is generally shipped directly to the job site from the manufacturer via truck.

66. According to U.S. Census data, the annual value of CISP shipped in the U.S. between 2004 and 2011 was between $350 million and $450 million.

**The Price-Fixing Conspiracy**

67. Defendants have used their overwhelming control of the CISP market to collectively set supracompetitive prices since at least 2006. CISP list prices, rebates, and

multipliers of McWane and Charlotte Pipe have been maintained in near-lockstep with each other during the course of the conspiracy.

68.     In 2005 or 2006, an employee in Charlotte Pipe's cast iron foundry in North Carolina learned that Charlotte Pipe and the McWane companies were fixing prices of CISP. He learned this from Charlotte Pipe Senior Vice President Marshall Coble. Specifically, Mr. Coble stated, during the course of a meeting at the foundry, that the CISP manufacturers met at the bi-annual trade association meeting that Summer or Fall to discuss and agree on pricing for CISP. When the employee challenged Coble about the legality of such actions, Cobly brushed his concerns aside and moved on to another topic.

69.     Defendants often announced identical price increases very close in time to one another and soon after that trade association meeting occurred in autumn.  For instance, in early September 2010, both Charlotte Pipe and AB&I announced a future price increase of 7.5% set to take effect on January 1, 2011.

70.     Defendants' posted prices, derived from price lists for the most common sizes of CISP, all effective the first of the year, mirror each other nearly exactly.  The striking near-uniformity of these prices is interrupted only with respect to single-hub pipe in early 2008.  This temporary price diversion led to an unusual mid-year price correction to realign the co-conspirators' pricing for the second-half of 2008.  These identical prices are reflected, for example, in the price lists by Defendants set forth in the following table:

| Year | Part | Charlotte Pipe | AB&I | Tyler Pipe |
|------|------|----------------|------|------------|
| **2006** | 3"x10' No-Hub Pipe | $103.20 | $103.20 | $103.20 |
| | 4"x10' No-Hub Pipe | $134.00 | $134.00 | $134.00 |
| | 5"x10' No-Hub Pipe | $189.10 | $189.10 | $189.10 |
| | 6"x10' No-Hub Pipe | $230.40 | $230.40 | $230.40 |
| | 3" No-Hub 1/4 Bend | $15.10 | $15.10 | $15.10 |
| | 4" No-Hub 1/4 Bend | $21.80 | $21.80 | $21.80 |

| | | | | |
|---|---|---|---|---|
| | 3" No-Hub 1/8 Bend | $12.60 | $12.60 | $12.60 |
| | 4" No-Hub 1/8 Bend | $16.00 | $16.00 | $16.00 |
| | 3"x2" Wye | $15.10 | $15.10 | $15.10 |
| | 4"x 3" Wye | $28.50 | $28.50 | $28.50 |
| | 3"x10' Single Hub Pipe | $103.20 | $103.20 | $103.20 |
| | 4"x10' Single Hub Pipe | $134.00 | $134.00 | $134.00 |
| | 5"x10' Single Hub Pipe | $189.10 | $189.10 | $189.10 |
| | 6"x10' Single Hub Pipe | $230.40 | $230.40 | $230.40 |
| | 3" Hub & Spigot 1/4 Bend | $23.80 | $23.80 | $23.80 |
| | 4" Hub & Spigot 1/4 Bend | $37.20 | $37.20 | $37.20 |
| | 3" Hub & Spigot 1/8 Bend | $19.90 | $19.90 | $19.90 |
| | 4" Hub & Spigot 1/8 Bend | $29.10 | $29.10 | $29.10 |
| **2007** | 3"x10' No-Hub Pipe | $108.60 | $108.60 | $108.60 |
| | 4"x10' No-Hub Pipe | $141.10 | $141.10 | $141.10 |
| | 5"x10' No-Hub Pipe | $199.10 | $199.10 | $199.10 |
| | 6"x10' No-Hub Pipe | $242.50 | $242.50 | $242.50 |
| | 3" No-Hub 1/4 Bend | $15.90 | $15.90 | $15.90 |
| | 4" No-Hub 1/4 Bend | $22.90 | $22.90 | $22.90 |
| | 3" No-Hub 1/8 Bend | $13.30 | $13.30 | $13.30 |
| | 4" No-Hub 1/8 Bend | $16.80 | $16.80 | $16.80 |
| | 3"x2" Wye | $15.90 | $15.90 | $15.90 |
| | 4"x 3" Wye | $30.00 | $30.00 | $30.00 |
| | 3"x10' Single Hub Pipe | $108.60 | $108.60 | $108.60 |
| | 4"x10' Single Hub Pipe | $141.10 | $141.10 | $141.10 |
| | 5"x10' Single Hub Pipe | $199.10 | $199.10 | $199.10 |
| | 6"x10' Single Hub Pipe | $242.50 | $242.50 | $242.50 |
| | 3" Hub & Spigot 1/4 Bend | $25.10 | $25.10 | $25.10 |
| | 4" Hub & Spigot 1/4 Bend | $39.20 | $39.20 | $39.20 |
| | 3" Hub & Spigot 1/8 Bend | $20.90 | $20.90 | $20.90 |
| | 4" Hub & Spigot 1/8 Bend | $30.60 | $30.60 | $30.60 |
| **2008 (1)** | 3"x10' No-Hub Pipe | $113.70 | $113.70 | $113.70 |
| | 4"x10' No-Hub Pipe | $147.70 | $147.70 | $147.70 |
| | 5"x10' No-Hub Pipe | $208.50 | $208.50 | $208.50 |
| | 6"x10' No-Hub Pipe | $253.90 | $253.90 | $253.90 |
| | 3" No-Hub 1/4 Bend | $16.60 | $16.60 | $16.60 |
| | 4" No-Hub 1/4 Bend | $24.00 | $24.00 | $24.00 |
| | 3" No-Hub 1/8 Bend | $13.90 | $13.90 | $13.90 |
| | 4" No-Hub 1/8 Bend | $17.60 | $17.60 | $17.60 |
| | 3"x2" Wye | $16.60 | $16.60 | $16.60 |
| | 4"x 3" Wye | $31.40 | $31.40 | $31.40 |
| | 3"x10' Single Hub Pipe | $113.70 | $113.70 | $122.90 |
| | 4"x10' Single Hub Pipe | $147.70 | $147.70 | $159.70 |
| | 5"x10' Single Hub Pipe | $208.50 | $208.50 | $225.40 |
| | 6"x10' Single Hub Pipe | $253.90 | $253.90 | $274.50 |
| | 3" Hub & Spigot 1/4 Bend | $26.30 | $26.30 | $28.40 |

| | | | | |
|---|---|---|---|---|
| | 4" Hub & Spigot 1/4 Bend | $41.00 | $41.00 | $44.30 |
| | 3" Hub & Spigot 1/8 Bend | $21.90 | $21.90 | $23.70 |
| | 4" Hub & Spigot 1/8 Bend | $32.00 | $32.00 | $34.60 |
| **2008 (2)** | 3"x10' No-Hub Pipe | $113.70 | $113.70 | $113.70 |
| | 4"x10' No-Hub Pipe | $147.70 | $147.70 | $147.70 |
| | 5"x10' No-Hub Pipe | $208.50 | $208.50 | $208.50 |
| | 6"x10' No-Hub Pipe | $253.90 | $253.90 | $253.90 |
| | 3" No-Hub 1/4 Bend | $16.60 | $16.60 | $16.60 |
| | 4" No-Hub 1/4 Bend | $24.00 | $24.00 | $24.00 |
| | 3" No-Hub 1/8 Bend | $13.90 | $13.90 | $13.90 |
| | 4" No-Hub 1/8 Bend | $17.60 | $17.60 | $17.60 |
| | 3"x2" Wye | $16.60 | $16.60 | $16.60 |
| | 4"x 3" Wye | $31.40 | $31.40 | $31.40 |
| | 3"x10' Single Hub Pipe | $122.90 | $122.90 | $122.90 |
| | 4"x10' Single Hub Pipe | $159.70 | $159.70 | $159.70 |
| | 5"x10' Single Hub Pipe | $225.40 | $225.40 | $225.40 |
| | 6"x10' Single Hub Pipe | $274.50 | $274.50 | $274.50 |
| | 3" Hub & Spigot 1/4 Bend | $28.40 | $28.40 | $28.40 |
| | 4" Hub & Spigot 1/4 Bend | $44.30 | $44.30 | $44.30 |
| | 3" Hub & Spigot 1/8 Bend | $23.70 | $23.70 | $23.70 |
| | 4" Hub & Spigot 1/8 Bend | $34.60 | $34.60 | $34.60 |
| **2009** | 3"x10' No-Hub Pipe | $113.70 | $113.70 | $113.70 |
| | 4"x10' No-Hub Pipe | $147.70 | $147.70 | $147.70 |
| | 5"x10' No-Hub Pipe | $208.50 | $208.50 | $208.50 |
| | 6"x10' No-Hub Pipe | $253.90 | $253.90 | $253.90 |
| | 3" No-Hub 1/4 Bend | $16.90 | $16.90 | $16.90 |
| | 4" No-Hub 1/4 Bend | $24.00 | $24.00 | $24.00 |
| | 3" No-Hub 1/8 Bend | $13.90 | $13.90 | $13.90 |
| | 4" No-Hub 1/8 Bend | $17.60 | $17.60 | $17.60 |
| | 3"x2" Wye | $16.60 | $16.60 | $16.60 |
| | 4"x 3" Wye | $31.40 | $31.40 | $31.40 |
| | 3"x10' Single Hub Pipe | $122.90 | $122.90 | $122.90 |
| | 4"x10' Single Hub Pipe | $159.70 | $159.70 | $159.70 |
| | 5"x10' Single Hub Pipe | $225.40 | $225.40 | $225.40 |
| | 6"x10' Single Hub Pipe | $274.50 | $274.50 | $274.50 |
| | 3" Hub & Spigot 1/4 Bend | $28.40 | $28.40 | $28.40 |
| | 4" Hub & Spigot 1/4 Bend | $44.30 | $44.30 | $44.30 |
| | 3" Hub & Spigot 1/8 Bend | $23.70 | $23.70 | $23.70 |
| | 4" Hub & Spigot 1/8 Bend | $34.60 | $34.60 | $34.60 |
| **2010** | 3"x10' No-Hub Pipe | $117.30 | $117.30 | $117.30 |
| | 4"x10' No-Hub Pipe | $152.30 | $152.30 | $152.30 |
| | 5"x10' No-Hub Pipe | $219.50 | $219.50 | $219.50 |
| | 6"x10' No-Hub Pipe | $261.80 | $261.80 | $261.80 |
| | 3" No-Hub 1/4 Bend | $17.50 | $17.50 | $17.50 |
| | 4" No-Hub 1/4 Bend | $25.90 | $25.90 | $25.90 |

| | | | | |
|---|---|---|---|---|
| | 3" No-Hub 1/8 Bend | $14.40 | $14.40 | $14.40 |
| | 4" No-Hub 1/8 Bend | $19.00 | $19.00 | $19.00 |
| | 3"x2" Wye | $17.20 | $17.50 | $17.50 |
| | 4"x 3" Wye | $32.40 | $32.40 | $32.40 |
| | 3"x10' Single Hub Pipe | $129.40 | $129.40 | $129.40 |
| | 4"x10' Single Hub Pipe | $168.20 | $168.20 | $168.20 |
| | 5"x10' Single Hub Pipe | $237.30 | $237.30 | $237.30 |
| | 6"x10' Single Hub Pipe | $289.00 | $289.00 | $289.00 |
| | 3" Hub & Spigot 1/4 Bend | $29.90 | $29.90 | $29.90 |
| | 4" Hub & Spigot 1/4 Bend | $46.70 | $46.70 | $46.70 |
| | 3" Hub & Spigot 1/8 Bend | $25.00 | $25.00 | $25.00 |
| | 4" Hub & Spigot 1/8 Bend | $36.50 | $36.50 | $36.50 |
| **2011** | 3"x10' No-Hub Pipe | $126.80 | $126.80 | $126.80 |
| | 4"x10' No-Hub Pipe | $164.60 | $164.60 | $164.60 |
| | 5"x10' No-Hub Pipe | $237.30 | $237.30 | $237.30 |
| | 6"x10' No-Hub Pipe | $283.00 | $283.00 | $283.00 |
| | 3" No-Hub 1/4 Bend | $18.90 | $18.90 | $18.90 |
| | 4" No-Hub 1/4 Bend | $28.00 | $28.00 | $28.00 |
| | 3" No-Hub 1/8 Bend | $15.60 | $15.60 | $15.60 |
| | 4" No-Hub 1/8 Bend | $20.50 | $20.50 | $20.50 |
| | 3"x2" Wye | $18.60 | $18.60 | $18.60 |
| | 4"x 3" Wye | $35.00 | $35.00 | $35.00 |
| | 3"x10' Single Hub Pipe | $139.90 | $139.90 | $139.90 |
| | 4"x10' Single Hub Pipe | $181.80 | $181.80 | $181.80 |
| | 5"x10' Single Hub Pipe | $256.50 | $256.50 | $256.60 |
| | 6"x10' Single Hub Pipe | $312.40 | $312.40 | $312.40 |
| | 3" Hub & Spigot 1/4 Bend | $32.30 | $32.30 | $32.30 |
| | 4" Hub & Spigot 1/4 Bend | $50.50 | $50.50 | $50.50 |
| | 3" Hub & Spigot 1/8 Bend | $27.00 | $27.00 | $27.00 |
| | 4" Hub & Spigot 1/8 Bend | $39.50 | $39.50 | $39.50 |
| **2012** | 3"x10' No-Hub Pipe | $136.30 | $136.30 | $136.30 |
| | 4"x10' No-Hub Pipe | $177.00 | $177.00 | $177.00 |
| | 5"x10' No-Hub Pipe | $255.20 | $255.20 | $255.20 |
| | 6"x10' No-Hub Pipe | $304.30 | $304.30 | $304.30 |
| | 3" No-Hub 1/4 Bend | $20.30 | $20.30 | $20.30 |
| | 4" No-Hub 1/4 Bend | $30.10 | $30.10 | $30.10 |
| | 3" No-Hub 1/8 Bend | $16.80 | $16.80 | $16.80 |
| | 4" No-Hub 1/8 Bend | $22.00 | $22.00 | $22.00 |
| | 3"x2" Wye | $20.00 | $20.00 | $20.00 |
| | 4"x 3" Wye | $37.60 | $37.60 | $37.60 |
| | 3"x10' Single Hub Pipe | $150.40 | $150.40 | $150.40 |
| | 4"x10' Single Hub Pipe | $195.50 | $195.50 | $195.50 |
| | 5"x10' Single Hub Pipe | $275.80 | $275.80 | $275.80 |
| | 6"x10' Single Hub Pipe | $335.90 | $335.90 | $335.90 |
| | 3" Hub & Spigot 1/4 Bend | $34.70 | $34.70 | $34.70 |

| | | | | |
|---|---|---|---|---|
| | 4" Hub & Spigot 1/4 Bend | $54.30 | $54.30 | $54.30 |
| | 3" Hub & Spigot 1/8 Bend | $29.00 | $29.00 | $29.00 |
| | 4" Hub & Spigot 1/8 Bend | $42.50 | $42.50 | $42.50 |
| **2013** | 3"x10' No-Hub Pipe | $143.50 | $143.50 | $143.50 |
| | 4"x10' No-Hub Pipe | $186.30 | $186.30 | $186.30 |
| | 5"x10' No-Hub Pipe | $268.60 | $268.60 | $268.60 |
| | 6"x10' No-Hub Pipe | $320.30 | $320.30 | $320.30 |
| | 3" No-Hub 1/4 Bend | $21.40 | $21.40 | $21.40 |
| | 4" No-Hub 1/4 Bend | $31.70 | $31.70 | $31.70 |
| | 3" No-Hub 1/8 Bend | $17.70 | $17.70 | $17.70 |
| | 4" No-Hub 1/8 Bend | $23.20 | $23.20 | $23.20 |
| | 3"x2" Wye | $21.10 | $21.10 | $21.10 |
| | 4"x 3" Wye | $39.60 | $39.60 | $39.60 |
| | 3"x10' Single Hub Pipe | $158.30 | $158.30 | $158.30 |
| | 4"x10' Single Hub Pipe | $205.80 | $205.80 | $205.80 |
| | 5"x10' Single Hub Pipe | $290.30 | $290.30 | $290.30 |
| | 6"x10' Single Hub Pipe | $353.60 | $353.60 | $353.60 |
| | 3" Hub & Spigot 1/4 Bend | $36.50 | $36.50 | $36.50 |
| | 4" Hub & Spigot 1/4 Bend | $57.20 | $57.20 | $57.20 |
| | 3" Hub & Spigot 1/8 Bend | $30.50 | $30.50 | $30.50 |
| | 4" Hub & Spigot 1/8 Bend | $44.70 | $44.70 | $44.70 |

*Data derived from Defendants' published price lists

71.     Due to the conspiracy, Defendants have been able to maintain and/or raise prices without regard to market demand. Defendants have steadily increased prices since January 1, 2006 even though construction spending—a prime determinant of CISP demand—has fallen significantly during that time. During this period, Defendants raised prices more than 50% although total construction spending declined significantly.

Cast Iron Soil Pipe PPI (Source Bureau of Labor Statistics)

**Producer Price Index Industry Data**

Series Id: PCU3315113315117
Industry:   Iron foundries
Product:    Cast iron soil pipe and fittings, all sizes
Base Date:  200312



72.     As illustrated below, total construction spending trended sharply downward for most of the Class Period.



**Source: Construction Spending**
**Annual Rate for Total Construction: U.S. Total**
**Jan-2006 to Dec-2014**

73.     Even when adjusted to reflect nonresidential construction spending, price increases move dramatically out of synch with demand as reflected in census data. Particularly between 2008 and 2011, when nonresidential construction spending declined by over 30%, the producer price index for CISP remained essentially flat, noticeably unaffected by the huge drop in demand.



74.     These price increases also have significantly exceeded changes in the cost of manufacturing CISP during this time period. The primary cost determinants for CISP—including scrap iron and natural gas—have increased at rates substantially less than the price increases set forth above.

75.     In addition to the aforementioned activities, McWane and Charlotte Pipe also

agreed to limit competition for each other's customers. For example, sales representatives at Tyler were directed by Patrick Starkey and Bill Bliss to stay away from Charlotte Pipe's CISP customers and maintain their market position, rather than trying to seek business from Charlotte Pipe's customers.

**Eliminating Star Pipe's CISP Business Furthered The Conspiracy**

76.     Star Pipe began manufacturing and selling CISP in 2007. Prior to that time, Star Pipe had produced and sold (and currently produces and sells), among other things, ductile iron pipe and pipe fitting products.

77.     Competition from Star Pipe posed a threat to Defendants' ability to maintain their ongoing price-fixing conspiracy. Just as Defendants had made a coordinated effort, through their membership in and control of CISPI, to exclude competition by importers, actions were taken to foreclose competition from Star Pipe. As noted by the FTC, in 2010, Charlotte Pipe commenced steps to eliminate Star Pipe as a competitor in the CISP market and to maintain Defendants' price-fixing conspiracy. Charlotte Pipe's anti-competitive actions were in furtherance of the conspiracy because they eliminated the potential threat to the conspiracy presented by Star Pipe.

78.     Star Pipe sought membership in CISPI but was not permitted to join by Defendants, who controlled CISPI.

79.     On July 14, 2010, Charlotte Pipe executed a confidential Asset Purchase Agreement with Star Pipe, which allowed Charlotte Pipe to acquire the entirety of Star Pipe's CISP business, including Star Pipe's CISP inventory, production equipment, business records and customer lists. Charlotte Pipe paid approximately $19 million for the Star Pipe CISP assets. Shortly after acquiring the Star Pipe assets, Charlotte Pipe had all such equipment destroyed.

The removal of Star Pipe as a CISP competitor eliminated the downward pressure on CISP prices which Star Pipe had caused. Following Charlotte Pipe's acquisition (and liquidation) of Star Pipe's CISP business, prices rose significantly, beginning as early as January 2011.

80. The parties also signed an agreement that prohibited Star Pipe and certain Star Pipe employees from competing with Charlotte Pipe in North America for six years after the date the agreement was signed. And Star Pipe agreed to send a letter to its customer list stating that it had decided to exit the CISP business.

81. Several Star Pipe executives received large cash bonuses following the completion of the sale of the CISP business to Charlotte Pipe.

82. The Star Pipe acquisition was not the only CISP business that Charlotte Pipe had purchased in recent history. According to the FTC Complaint, Charlotte Pipe acquired the CISP assets of other potential competitors in non-reportable transactions, including Matco-Norca in 2009, DWV Casting Company in 2004, and Richmond Foundry, Inc., in 2002. If a small CISP company posed a risk of stimulating price competition in the CISP market, Charlotte Pipe purchased the company in order to shut down production and destroy any CISP assets. The elimination of these competitors, like the activities coordinated through CISPI, has facilitated Defendants' ability to maintain and enforce their price-fixing conspiracy.

83. In 2013, the FTC challenged the acquisition of Star Pipe, alleging that Charlotte Pipe had violated Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45. The FTC issues such complaints when it has "reason to believe that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest."

84. The FTC subsequently entered into a consent agreement with Charlotte Pipe to

"address the anticompetitive effects resulting from Charlotte Pipe's 2010 acquisition of the cast iron soil pipe business of Star Pipe."

85.     The consent agreement mandated that for the ten years following its execution, Charlotte Pipe must notify the FTC before acquiring any additional entities engaged in the manufacture or sale of CISP products in order for the FTC to "guard against future anticompetitive transactions."  It further mandated that Charlotte Pipe inform its customers and the public of the acquisition of Star Pipe, as well as its previous CISP acquisitions.  It also invalidated the non-compete and confidentiality clauses contained in the Star Asset Purchase Agreement.[13]

**Defendants' Have Demonstrated Similar Anticompetitive Conduct in Related Industries**

86.     The Star Pipe acquisition is emblematic of Defendants' determination to eliminate potential competitors and maintain their collusive, supracompetitive prices at all costs and by any means necessary.

87.     In fact, prior to Charlotte Pipe's purchase and destruction of Star Pipe's CISP assets, Defendant McWane targeted Star Pipe's ductile iron pipe fittings ("DIPF") business after Star Pipe announced its entry as a domestic producer of DIPF in 2009.  Although CISP and DIPF products are different, the markets for the two products function similarly in that each market is conducive to collusion due to high concentration, a homogenous product, high barriers to entry, a trade association with very few members, inelastic demand and abundant opportunity to collude.

88.     To forestall Star Pipe's entry in the DIPF market, McWane devised and imposed an exclusionary distribution policy on all of its customers by way of a "full support program."  Specifically, in June 2009, McWane Vice President and General Manager Rick Tatman laid out

---

[13]     *See* FTC News Release.

his strategic vision for protecting McWane's interests in light of Star Pipe's entry in the DIPF market, commenting to fellow McWane executives in an email exchange: "[A]t this stage the chance for profitable cohabitation with Star owning a [piece] of the Domestic market is slim…If their claims are ahead of their actual capabilities we need to make sure that they don't reach any critical market mass that will allow them to continue to invest and receive a profitable return…"[14] Tatman and McWane settled on a draconian "Pick Your Horse" strategy to combat Star Pipe's threat, which Tatman explained in August 2009 as follows: "To protect our domestic brands and market position we are going to adopt a distributor exclusivity program for 2010 wherein we won't provide domestic product to distributors who are not fully supporting our domestic product lines."[15] McWane's management emphasized to its sales staff that the exclusivity program meant that if a customer buys DIPF products from Star Pipe it would no longer have access to McWane products.[16] As McWane's sales force explained to customers, under the "full support program," if even one branch of a distributor "purchased domestic fittings from Star, 'all branches would be cut off'" from purchasing McWane products.[17]

89.    As here, Defendants' anticompetitive conduct in the DIPF market drew the scrutiny of the FTC, which investigated McWane's conduct and determined, among other things, that its "Pick Your Horse" strategy was intended to be, and was interpreted by distributor-customers as, "a threat that McWane would terminate their ability to purchase any of McWane's

---

[14]    *See* In the Matter of MCWANE, INC., a corporation, and Star Pipe Products, Ltd. Docket No. 9351, Opinion of the Commission, January 30, 2014 ("Commission Opinion") at 8, available at http://www.ftc.gov/system/files/documents/cases/140206mcwaneopinion_0.pdf.    (last   visited August 11, 2014).

[15]    *Id*. at 9.

[16]    *Id*.

[17]    *Id*.

domestic fittings if they purchased any domestic fittings from Star."[18] The FTC enjoined McWane from engaging in this exclusionary/monopolistic conduct, finding that "McWane violated Section 5 of the FTC Act, 15 U.S.C. § 45, by adopting an unlawful exclusive dealing policy to maintain its monopoly power in the domestic fittings market."[19]

90. McWane's anticompetitive conduct towards Star Pipe in the DIPF market is instructive in understanding the lengths Defendants will go to eliminate prospective competitors and protect supracompetitive prices. The DIPF market is very similar to the CISP market and, upon information and belief, the McWane executives instrumental in devising and enforcing the "Pick Your Horse" strategy with respect to the DIPF market, including Rick Tatman, are the same executives that were charged with the oversight and operation of McWane's CISP business during the Class Period.

## V.     FRAUDULENT CONCEALMENT

91. Plaintiffs and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until on or about April 2, 2013, when the FTC's redacted complaint was filed.

92. Because Defendants' alleged conspiracy was kept secret until April 2, 2013, Plaintiffs and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supracompetitive prices for CISP throughout the United States during the Class Period.

93. The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

94. Defendants' conspiracy was inherently self-concealing. CISP are not exempt from

---

[18] *Id*. at 21.

[19]  *Id*. at 41.

antitrust regulation, and thus, before April 2, 2013, Plaintiffs reasonably considered it to be a well-regulated, competitive industry.

95.     In the context of the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' proffered CISP prices before April 2, 2013.

96.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until on or about April 2, 2013, when the FTC complaint, and its corresponding factual allegations of anti-competitive conduct concerning the CISP industry, was first publicly disseminated.

97.     None of the facts or information available to Plaintiffs and members of the Class prior to April 2, 2013, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.  Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' non-public meetings and communications with each other.  Defendants are alleged to have engaged in a secret conspiracy that necessarily did not give rise to facts that would put Plaintiffs or the Class on inquiry notice that there was a conspiracy to fix prices for CISP.  Defendants fraudulently concealed the conspiracy as alleged herein by various means and methods, including, but not limited to, secret meetings, communications and agreements.  If they were memorialized in records at all, Defendants' contacts and meetings with each other were

memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion. Defendants' contacts and meetings with each other were also concealed from Defendants' customers and other non-conspirators.

98.    Although Defendants' price increase announcements, including in the form of new price lists, during the Class Period sometimes did not contain justifications for price increases, the announcements and price lists nevertheless constituted implicit statements that price increases were legitimate and were the result of competitive market forces. Customers also were told that price increases were needed because raw material costs were increasing. Such statements were false and misleading, because at times costs were not increasing and announcements and price lists never included the real reason for price increases, namely Defendants' secret conspiracy.

99.    For example, Defendants acted in furtherance of the conspiracy, and helped conceal the conspiracy, through communications such as the following:

•    In May 2007, AB&I announced that "[i]t is AB&I's policy to give the market as much notice as possible regarding a price increase, since contractors and others need to plan their jobs so far in advance." This statement was misleading because advance notice of price increases was also important to ensure that the conspirators would adhere to their price-fixing agreement and implement price increases on the same date.

•    In March 2008, AB&I falsely announced that its price increase was "simply a cost pass-through" because earlier increases were insufficient to cover the rise in scrap iron prices. AB&I indicated that "it has become necessary to increase prices to recover these added costs of production." AB&I indicated that future price increases might be necessary to cover cost changes.

•   In November 2009, AB&I falsely announced that it was increasing prices after trying "to put off this price increase for as long as we could." AB&I represented that "[a]s in all price increases, this one came after weeks of deliberation. The disturbance such increases can cause to our valued customers is a regrettable effect, but this effect must be weighed against the impacts of NOT raising prices to stay in line with costs." AB&I told customers that the "scrap iron market is a small subset of the ferrous metals market, and AB&I's scrap iron costs are inextricably linked to world steel demand. Any growth in world steel demand produces upward pressure on scrap iron prices. World demand for steel has steadily increased since April 2009, according to the World Steel Association. In fact, China produced more steel in August, 2009 than in any other month in its history. Despite falling demand in U.S. commercial construction, AB&I is experiencing rising raw material costs."

•   On September 1, 2010, Charlotte Pipe falsely announced that price increases were the result of cost increases in raw materials and operating expenses and that as a result of cost increases, prices would remain at higher levels through 2011.

•   In September 2010, AB&I falsely announced that because of raw material cost increases it was announcing a commensurate increase in CISP prices.

•   On September 7, 2011, Charlotte Pipe announced price increases and falsely attributed these increases to cost increases in scrap iron and other major raw materials.

•   On September 20, 2011, Charlotte Pipe falsely announced that it was increasing prices "[d]ue to cost increases in scrap iron and other major raw materials as well as increases in general operating expenses."

100.   Defendants' statements justifying their price increases throughout the Class

Period were designed to create, and did create the impression that these increases were based on competitive market forces. These statements were false and misleading, and constituted affirmative and overt acts of concealment of the conspiracy, because Defendants' price increases were a result of the affirmatively and fraudulently concealed conspiracy set forth herein. As a result of this misleading conduct, Defendants' customers, including Plaintiffs and members of the Class, were conditioned by experience in dealing with Defendants in what they believed to be a competitive industry to expect price increases from time to time, and to believe that this was the result of normal market forces, rather than the product of an illegal conspiracy.

101. Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning CISP, which they affirmatively concealed at least in the following respects:

- By meeting at trade association meetings where they had the opportunity and incentive to discuss and fix prices;

- By issuing or justifying price increase announcements based on false and/or misleading reasons, including cost increases; and

- By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme.

102. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting Plaintiffs' and the claims of the Class have been tolled.

## VI. ANTITRUST VIOLATIONS

103. Beginning by at least January 1, 2006 and continuing through December 31, 2013, Defendants have engaged in a continuing agreement, understanding, and conspiracy in

restraint of trade to artificially raise, fix, maintain, or stabilize the prices of CISP in the United States.

104. Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of CISP sold in the United States. These activities included: participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of CISP in the United States; agreeing during those meetings, conversations, and communications to charge prices at specified levels, to allocate customers, and to otherwise fix, raise, maintain, or stabilize prices of CISP sold in the United States; and taking numerous steps, as set forth above, to implement and maintain the conspiracy.

105. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

106. Charlotte Pipe's acquisition of Star Pipe's CISP business resulted in decreased market competition and increased concentration in the market for CISP.

107. Throughout the Class Period, Plaintiffs and the other Class members purchased CISP indirectly from Defendants (or their subsidiaries or controlled affiliates) at supracompetitive prices. Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of state antitrust and consumer protections statutes.

108. Defendants' unlawful acts alleged herein substantially affected interstate trade and commerce and caused antitrust injury to Plaintiffs and all Class members.

109. Defendants' unlawful acts alleged herein have had a substantial anticompetitive effect on interstate commerce within the U.S. including by inflating CISP prices.

110. Defendants' unlawful agreement has caused CISP purchasers in the United States

to pay unlawfully and artificially high prices to purchase CISP.

111.    During the Class Period, Defendants manufactured, sold and shipped CISP in a continuous and uninterrupted flow of interstate commerce. The price-fixing conspiracy and other anticompetitive conduct in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## VII.    RELEVANT MARKET

112.    Plaintiffs disclaim the need to plead a relevant market on its antitrust claims. The restraint of trade alleged herein directly inflated price, restricted supply, anti-competitively restrained the free alienability of CISP and otherwise constitutes a *per se* violation of the state antitrust statutes identified herein. In the alternative, Defendants' agreements are unreasonable restraints of trade in violation of the state antitrust statutes identified herein, when viewed under a "quick look" or "rule of reason" mode of analysis.

113.    The relevant product market for purposes of this Complaint is the market for the sale of CISP for use in commercial, industrial, multi-story residential buildings and other construction in the United States.

114.    The relevant geographic market for purposes of this Complaint is the United States.

## VIII.    ANTITRUST INJURY

115.    The restraint of trade and anticompetitive conduct alleged herein and engaged in by Defendants has had severe adverse consequences on the price of CISP. Plaintiffs and other members of the Class were deprived of normal, competitive CISP prices. They were subjected to artificially inflated prices and price-trends as a direct, foreseeable and intended result of the Defendants' unlawful and manipulative conduct. As a consequence thereof, Plaintiffs and the

Class suffered financial losses and were, therefore, injured in their business or property.

## IX.    CLASS ACTION ALLEGATIONS

116.    Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of:

> All Indirect Purchasers that purchased cast iron soil pipes or cast iron soil pipe fittings indirectly from any of the Defendants, their subsidiaries, predecessors, or affiliates, from January 1, 2006 through December 31, 2013 (the "Class Period") in the following states: Alabama, Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

117.    The Class excludes Defendants, their parent companies, subsidiaries, predecessors, and affiliates, any co-conspirators, federal and state governmental entities and instrumentalities of federal and state governments.

118.    The Class is so numerous that joinder of all members is impracticable. On information and belief, hundreds, if not thousands, of individuals and entities purchased CISP from the Defendants during the Class Period.

119.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all Class members share the same injury, as they were all damaged by the actions of Defendants, which caused them to pay artificially inflated prices for CISP.

120.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class members.

121.     Plaintiffs are represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

122.    This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

a.    Whether Defendants engaged in a conspiracy to raise, fix, stabilize, and maintain prices of CISP sold in the United States;

b.    The duration and extent of the conspiracy;

c.    Whether each Defendant was a participant in any such conspiracy;

d.    Whether the actions of Defendants in so conspiring violated state antitrust statutes;

e.    Whether the alleged conspiracy violated state consumer protection and unfair competition statutes;

f.    Whether the conspiracy had the effect of artificially inflating the price of CISP sold in the United States during the Class Period;

g.    Whether Charlotte Pipe's acquisition of Star Pipe's CISP assets substantially increased concentration or decreased competition in the market for CISP, or was undertaken as a method of ensuring the continuing success of the Defendants' price-fixing conspiracy by eliminating a competitor from the market;

h.    Whether the conduct of Defendants caused injury to Class members; and

i.    The measure and amount of damages incurred by the Class.

123.    Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.    This action presents no difficulties in

management that would preclude its maintenance as a class action.

## X.   FIRST CLAIM FOR RELIEF AS AGAINST ALL DEFENDANTS FOR VIOLATIONS OF STATE ANTITRUST STATUTES

124.   Plaintiffs incorporate the preceding allegations by reference.

125.   From at least as early as January 1, 2006, through December 31, 2013, Defendants and their co-conspirators, by and through their officers, directors, employees, agents and/or other representatives, engaged in a continuing contract, combination, or conspiracy with respect to the prices for CISP in unreasonable restraint of trade and commerce and in violation of the various state statutes set forth below.

126.   The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix CISP prices at supracompetitive levels in the United States.

127.   Defendants' anti-competitive acts were intentionally directed at the market for CISP and had a substantial and foreseeable effect on interstate commerce throughout the United States.

128.   Defendants' conspiratorial acts and combinations have harmed competition and caused unreasonable restraints of trade in the CISP market.

129.   As a result of Defendants' unlawful agreement, understanding, combination, contract and conspiracy, Plaintiffs and other members of the Class have been injured in their business and property.  Plaintiffs and other Class members have been harmed by being forced to pay higher prices for CISP than they otherwise would have paid in the absence of Defendants' conspiracy. This injury is of the type the state antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

130.   In formulating and carrying out their unlawful agreement, understanding,

combination, contract and conspiracy, Defendants and their co-conspirators actually did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

131.    Defendants' contract, combination, and conspiracy in restraint of trade had the following effects, among others:

      a.      Price competition in the CISP market has been restrained, suppressed and/or eliminated in the United States;

      b.      Prices for CISP sold by Defendants have been fixed, raised, maintained and stabilized at artificially high, supracompetitive levels throughout the United States; and

      c.      Plaintiffs and members of the Class have been deprived of the benefits of free and open competition.

132.    In furtherance of the unlawful conspiracy, Defendants and their co-conspirators have committed overt acts, including, *inter alia*:

- Agreeing to coordinate and fix prices for CISP at supracompetitive levels throughout the United States;

- Agreeing to eliminate potential competitors in the market for CISP;

- Agreeing not to compete with other Defendants;

- Participating in conversations and communications among themselves to implement, adhere to and police the unlawful agreements they reached.

133.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise or stabilize prices of CISP. As a direct and proximate result of the illegal agreement, contract, combination, or

conspiracy between Defendants, Plaintiffs and the members of the Class have been injured and damaged in their respective businesses and property.

134.    Defendants' conspiratorial agreement can be inferred from, *inter alia*:

- their participation, membership and influence in CISPI;

- near uniformity of pricing throughout the Class Period for hundreds of different products despite competitive advantages of price competition;

- Defendants' conduct in aggressively eliminating competition by way of purchasing and destroying their assets;

- each Defendant's strong motive to collude;

- from Defendants' behavior, which if undertaken unilaterally, would be contrary to each Defendant's economic self-interest, since their behavior did not lead to pro-competitive efficiencies, and since it would have been irrational for any one Defendant to unilaterally engage in such risky conduct without the assurance that other Defendants would support such efforts;

- Defendants' conduct in related markets;

- from the anticompetitive effects of Defendants' agreement;

- the lack of evidence to explain Defendants' behavior other than an agreement to fix and raise the price of CISP.

135.    Plaintiffs assert this claim under similar state indirect purchaser laws such that common questions of law and fact raised in this claim will predominate under FED. R. CIV. P. 23(b)(3).

136.    Defendants engaged in a contract, combination, or conspiracy in unreasonable

restraint of trade and commerce in violation of Ala. Code. § 6-5-60(a), *et seq*.

137. Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Arizona Revised Statutes, §§ 44-101, *et seq*.

138. Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of Ark. Code. Ann. §§ 4-75-211, *et seq*.

139. Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the California Business and Professions Code, §§ 16700, *et seq*.

140. Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of District of Columbia Code Annotated, §§ 28-4501, *et seq*.

141. Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of Haw. Rev. Stat. §§ 480-1 *et seq*.

142. Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Iowa Code, §§ 553.1, *et seq*.

143. Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

144. Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq*.

145. Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Michigan compiled Law Annotated, §§ 445.771, *et seq*.

146.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Minnesota Annotated Statutes, §§ 325D.49, *et seq*.

147.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Mississippi Code Annotated, §§ 75-21-1, *et seq*.

148.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Nebraska Revised Statutes, §§ 59-801, *et seq*.

149.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Nevada Revised Statutes Annotated, §§ 598A.010, *et seq*.

150.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the New Mexico Statutes Annotated, §§ 57-1-1, *et seq*.

151.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the New York General Business Laws, § 340, *et seq*.

152.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the North Carolina General Statutes, §§ 75-1, *et seq*.

153.    Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the North Dakota Century Code, §§ 51-08.1-01, *et seq*.

154.     Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of Or. Rev. Stat. §§ 646.705, *et seq*.

155.     Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of Gen. Laws 1956, RI ST § 6-36-10.

156.     Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of S.C. Code Ann. § 39-3-30.

157.     Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the South Dakota Codified Laws, §§ 37-1-3.1, *et seq*.

158.     Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Tennessee Code Annotated, §§ 47-25-101, *et seq*.

159.     Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Utah Code Annotated, §§ 76-10-3101, *et seq*.

160.     Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Vermont Stat. Ann. 9 §§ 2451, *et seq*.

161.     Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the West Virginia Code, §§ 47-18-1, *et seq*.

162.     Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of the Wisconsin Statutes, §§ 133.01, *et seq*.

163.     Plaintiffs and members of the Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy or agreement.   Plaintiffs and members of the Class have paid more for CISP than

they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

164. In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anti-competitive conduct come at the expense and detriment of Plaintiffs and the members of the Class.

165. Accordingly, Plaintiffs and the members of the Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's applicable law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## XI. SECOND CLAIM FOR RELIEF AS AGAINST ALL DEFENDANTS FOR VIOLATIONS OF STATE CONSUMER PROTECTION AND UNFAIR COMPETITION STATUTES

166. Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

167. From at least as early as January 1, 2006, through December 31, 2013, Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices with respect to the sale of CISP in violation of the following state consumer protection and unfair competition statutes.

168. Defendants' acts or practices adversely affected public policy or interest and was immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

169. Defendants intended that such acts or practices would be relied upon by others and such reliance caused injury.

170. Plaintiffs assert this claim under the laws of their states of residence, California and Florida, and as representative of the proposed Class of indirect purchasers residing in states

with indirect purchaser laws similar to California and Florida such that the common questions of law and fact raised in this claim will predominate under FED. R. CIV. P. 23(b)(3).

171. Defendants have violated Ariz Rev. Stat. §§ 44-1521 *et seq.*

172. Defendants have violated Arkansas Code §§ 4-88-101 *et seq.*

173. Defendants have violated California Bus & Prof. Code §§ 17200 *et seq.*

174. Defendants have violated D.C. Code Ann. §28-3901 *et seq.*

175. Defendants have violated Florida Stat. §§ 501.201 *et seq.*

176. Defendants have violated Hawaii Rev. Stat. § 480-2.

177. Defendants have violated Kan. Stat. Ann. §§ 50-623 *et seq.*

178. Defendants have violated Mass. Gen. Laws chapter 93A §§ 1 *et seq.*

179. Defendants have violated Mich. Comp. Laws § 445.901.

180. Defendants have violated Minn. Stat. §§ 325F.69 *et seq.*

181. Defendants have violated Miss. Code §§ 75-24-1 *et seq.*

182. Defendants have violated Mo. Ann. Stat. 407.020.

183. Defendants have violated Nebraska Rev. Stat. §§ 59-1601 *et seq.*

184. Defendants have violated Nev. Rev. Stat. §§ 598.0903 *et seq.*

185. Defendants have violated New Hampshire Rev. Stat. §§ 358-A:1 *et seq.*

186. Defendants have violated New Mexico Stat. Ann. §§ 57-12-1 *et seq.*

187. Defendants have violated N.Y. Gen. Bus. Law § 349 *et seq.*

188. Defendants have violated North Carolina Gen. Stat. §§ 75-1.1 *et seq.*

189. Defendants have violated Rhode Island Gen. Laws §§ 6-13.1-1 *et seq.*

190. Defendants' intentional and purposeful anti-competitive acts, described above, were intended to and did cause Plaintiffs to pay supracompetitive, artificially inflated prices for

CISP purchased in the states listed above.

191. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their business and property in that they paid more for CISP than they otherwise would have paid in the absence of Defendants' unlawful conduct.

192. Plaintiffs and Class members are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including but not limited to, actual damages, attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

a. That this action be certified as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined above;

b. That the conduct alleged herein be declared, adjudged and decreed:

- A *per se* violation of the state antitrust laws, as set forth herein;

- An unlawful combination, trust, agreement, understanding or concert of action in violation of the state antitrust and consumer and unfair competition laws as set forth herein.

c. That Plaintiffs and the members of the Class recover damages, to the maximum extent allowed under state laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

d.     Costs and disbursements of the action;

e.     Restitution and/or disgorgement of Defendants' ill-gotten gains, and the imposition of an equitable constructive trust over all such amounts for the benefit of the  Class;

f.     Pre- and post-judgment interest;

g.      Reasonable attorneys' fees; and

h.     Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.

Dated:  August 11, 2014

Respectfully submitted,

/s/ Jeremy Cothern
**BERKE, BERKE & BERKE**
Ronald J. Berke
Jeremy Cothern
420 Frazier Avenue
Chattanooga, TN  37405
Telephone:  (423) 266-5171
Facsimile:  (423) 265-5307
ronnie@berkeattys.com
jeremy@berkeattys.com

*Liaison Counsel for Indirect Purchaser Plaintiffs*

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Joseph H. Meltzer
Edward W. Ciolko
Terence S. Ziegler
Kimberly A. Justice
John Q. Kerrigan
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile:  (610) 667-7056
jmeltzer@ktmc.com
tziegler@ktmc.com
kjustice@ktmc.com
qkerrigan@ktmc.com

*Lead Counsel for Indirect Purchaser Plaintiffs*

**HOWARD & ASSOCIATES, P.A.**
Tim Howard, J.D., Ph.D.
Scott Carruthers
2120 Killarney Way, Suite 125
Tallahassee, FL 32309
Telephone: (850) 298-4455
Facsimile: (850) 216-2537
tim@howardjustice.com
scarrutherslaw@gmail.com

*Counsel for Plaintiff Keith McNeill Plumbing
Contractor, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2014 a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court, is available for viewing and downloading from the ECF system, and will be served by operation of the Court's electronic filing system (CM/ECF) upon all counsel of record.

/s/ Jeremy M. Cothern
Jeremy M. Cothern BPR #27166
BERKE, BERKE & BERKE
420 Frazier Avenue
Chattanooga, Tennessee 37405
Telephone: (423) 266-5171
Facsimile: (423) 265-5307
jeremy@berkeattys.com