# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## CHATTANOOGA DIVISION

IN RE: CAST IRON SOIL PIPE AND
FITTINGS ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Case No.: 1:14-md-2508
Judge Harry S. Mattice, Jr.

JURY TRIAL DEMANDED

## DIRECT PURCHASER PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................. 1

II.     BACKGROUND .................................................................................. 3

III.    ARGUMENT ....................................................................................... 8

        A.     The Complaint Need Only Plead Allegations Sufficient "to State a Claim
               to Relief that Is Plausible on Its Face"....................................................... 8

               1.     Federal Rule of Civil Procedure 8 Requires Only "A Short and
                      Plain Statement of the Claim" that Provides Notice of the Claim
                      and a Plausible Basis for Relief ..................................................... 8

               2.     Defendants Misstate and Misapply the Controlling Legal Standards....... 10

                      a.     Defendants Improperly Rely on Summary Judgment
                             Standards.................................................................. 10

                      b.     Defendants Improperly Dismember the Allegations ................... 12

                      c.     Defendants Incorrectly Impose a Heightened Pleading
                             Standard .................................................................. 13

                      d.     Defendants Ignore that an Antitrust Conspiracy May Be
                             Proven by Circumstantial Evidence............................... 14

                      e.     Defendants Erroneously Challenge the Facts and Demand
                             that Inferences Be Drawn in Their Favor at the Pleading
                             Stage ...................................................................... 14

        B.     The Complaint Plausibly Pleads that Defendants Engaged in a Conspiracy........ 15

               1.     The Allegations that McWane and Charlotte Engaged in Parallel
                      Pricing Get the Complaint "Close to Stating a Claim," While the
                      Additional Allegations  "Nudge" Plaintiffs' Claims "Across the
                      Line from Conceivable to Plausible"......................................... 15

               2.     The Allegations in the CAC Strongly Support the Conclusion that
                      Defendants Were Meeting and Agreeing on Pricing ............................... 17

               3.     McWane and Charlotte Restrained Competition by Not Soliciting
                      "Each Other's Customers".................................................... 21

               4.     McWane and Charlotte Implemented Supra-Competitive Price
                      Increases That Exceeded Cost Increases and Were Imposed
                      Despite Declining Demand.................................................... 22

               5.     Structural Features Made the CISP Market Particularly Susceptible
                      to Collusion............................................................... 23

               6.     Courts Have Declined to Dismiss Similarly-Pleaded Complaints............ 25

i

# TABLE OF CONTENTS

**Page**

    C.    Plaintiffs Have Adequately Pleaded Fraudulent Concealment ............................ 28

    D.    The Acquisition and Elimination of Star as a Competitor Violates Section 1 of the Sherman Act and Section 7 of the Clayton Act ........................................ 34

        1.    Plaintiffs Have Standing to Seek Damages Resulting from Actions Taken to Eliminate Price Competition by Star ......................... 35

        2.    McWane Is Liable Under Section 1 of the Sherman Act for Actions in Furtherance of the Conspiracy to Eliminate Star as a Competitor ............................................................................. 37

        3.    Defendants' Remaining Arguments Are Unavailing ................................ 39

    E.    If the Complaint is Insufficient in Any Respect, Plaintiffs Should Be Granted Leave to Amend. ....................................................................................... 40

IV.    CONCLUSION ................................................................................................................ 40

Case 1:14-md-02508-HSM-CHS    Document 201    Filed 11/10/14    Page 3 of 52
PageID #: 2106

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Aftermarket Filters Antitrust Litigation,*
No. 08-cv-4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ............................................9, 24

*American Chiropractic Ass'n v. Trigon Healthcare, Inc.,*
367 F.3d 212 (4th Cir. 2004) ...............................................................................................11

*American Tobacco Co. v. United States,*
328 U.S. 781 (1946)..............................................................................................................15

*Anderson News, L.L.C. v. American Media, Inc.,*
680 F.3d 162 (2d Cir. 2012)...............................................................................11, 14, 26

*Apex Oil Co. v. DiMauro,*
822 F.2d 246 (2d Cir. 1987)..................................................................................................12

*In re Automotive Parts Antitrust Litig,*
No. 12-md-2311, 2014 WL 4272784 (E.D. Mich. Aug. 29, 2014) ............................13, 18, 32

*In re Baby Food Antitrust Litigation,*
166 F.3d 112 (3d Cir. 1999)..................................................................................................12

*Bassett v. NCAA,*
528 F.3d 426 (6th Cir. 2008) .................................................................................................8

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)....................................................................................................*passim*

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan,*
203 F.3d 1028 (8th Cir. 2000) ........................................................................................11, 12

*In re Blood Reagents Antitrust Litigation,*
756 F. Supp. 2d 623 (E.D. Pa. 2010) .............................................................................23, 24, 26

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977)...........................................................................................................39, 40

*Cal. v. American Stores Co.,*
495 U.S. 271 (1990)...............................................................................................................40

*Campbell v. Upjohn Co.,*
676 F.2d 1122 (6th Cir. 1982) ...............................................................................................30

*Carrier Corp. v. Outokumpu Oyj,*
673 F.3d 430 (6th Cir. 2012) .............................................................................28, 30, 32, 33

# TABLE OF AUTHORITIES

**Page(s)**

*In re Chocolate Confectionary Antitrust Litigation,*
    602 F. Supp. 2d 538 (M.D. Pa. 2009) ..........................................................23, 24, 26

*Chrysler Corp. v. Fedders Corp.,*
    643 F.2d 1229 (6th Cir. 1981) ...........................................................................37

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.,*
    851 F.2d 478 (1st 1988) ....................................................................................12

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.,*
    846 F.2d 284 (5th Cir. 1988) .............................................................................12

*Consolidated Gold Fields PLC v. Minorco, S.A.,*
    871 F.2d 252 (2d Cir. 1989)....................................................................37, 39, 40

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962)..........................................................................................12

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation,*
    782 F. Supp. 487 (C.D. Cal. 1991) ...................................................................30

*In re Copper Antitrust Litigation,*
    436 F.3d 782 (7th Cir. 2006) .............................................................................32

*Crawford-El v. Britton,*
    951 F.2d 1314 (D.C. Cir. 1991) ........................................................................19

*Dayco Corp. v. Goodyear Tire & Rubber Co.,*
    523 F.2d 389 (6th Cir. 1975) .......................................................................31, 32

*In re Delta/AirTran Baggage Fee Antitrust Litigation,*
    733 F. Supp. 2d 1348 (N.D. Ga. 2010)..............................................................18

*In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litigation,*
    No. 12-711, 2014 WL 3971620 (D.N.J. Aug. 13, 2014) ............................20, 23, 26

*In re Electronic Books Antitrust Litigation,*
    859 F. Supp. 2d 671 (S.D.N.Y. 2012)..........................................................11, 26

*In re Elevator Antitrust Litigation,*
    502 F. Cir. 47 (2d Cir. 2007)..............................................................................27

*Erickson v. Pardus,*
    551 U.S. 89 (2007)............................................................................................15

*Erie County, Ohio v. Morton Salt, Inc.,*
    702 F.3d 860 (6th Cir. 2012) .................................................................10, 14, 22

# TABLE OF AUTHORITIES

**Page(s)**

*In re Facebook, Inc., IPO Securities & Derivative Litigation*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013)......................................................................19

*In re Flash memory Antitrust Litigation*,
643 F. Supp. 2d 1133 (N.D. Cal 2009) ....................................................................26

*Foman v. Davis*,
371 U.S. 178 (1962)..................................................................................................40

*Gerlinger v. Amazon.com*,
526 F.3d 1253 (9th Cir. 2008) ..................................................................................36

*In re Graphics Processing Units Antitrust Litigation*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007)....................................................................27

*Haley v. City of Boston*,
657 F.3d 39 (1st Cir. 2011)........................................................................................15

*Hall v. United Air Lines, Inc.*,
296 F. Supp. 2d 652 (E.D.N.C. 2003), *aff'd*, 118 F. App'x 680 (4th Cir. 2004)....................27

*In re High Fructose Corn Syrup Antitrust Litigation*,
295 F.3d 651 (7th Cir. 2002) ....................................................................12, 24, 25, 28

*Hinds County, Mississippi v. Wachovia Bank N.A.*,
700 F. Supp. 2d 378 (S.D.N.Y. 2010)................................................................14, 19

*Hodges v. WSM, Inc.*,
26 F.2d 36 (6th Cir. 1994) ........................................................................................37

*Hooks v. Hooks*,
771 F.2d 935, 943-44 (6th Cir. 1985) .......................................................................38

*Hospital Building. Co. v. Trustees. of Rex. Hospital*,
425 U.S. 738 (1976)..................................................................................................13

*Hyland v. Homeservices*,
No. 3:05-cv-612, 2007 WL 2407233 (W.D. Ky. Aug. 17, 2007)..........................26

*In re Infant Formula Antitrust Litigation*,
No. MDL 878, 1992 WL 503465 (N.D. Fla. Jan. 13, 1992)....................................33

*Jones v. TransOhio Sav. Ass'n*,
747 F.2d 1037 (6th Cir. 1984) ..................................................................................33

*King & King Enters. v. Champlin Petroleum Co.*,
657 F.2d 1147 (10th Cir. 1981) ...............................................................................32

**Page(s)**

*In re LTL Shipping Services Antitrust Litigation,*
No. 1:08-md-1895, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ..............................................27

*In re Magnesium Oxide Antitrust Litigation,*
No. 10-cv-5943, 2011 WL 5008090 (D.N.J. Oct. 20, 2011) ...................................................13

*Mitchael v. Intracorp., Inc.,*
179 F.3d 847 (10th Cir. 1999) ................................................................................................12

*In re Mushroom Direct Purchaser Antitrust Litigation,*
514 F. Supp. 2d 683 (E.D. Pa. 2007) ......................................................................................35

*Newman v. Warnaco Grp., Inc.,*
335 F.3d 187 (2d Cir. 2003) ....................................................................................................33

*In re Nine West Shoes Antitrust Litigation,*
80 F. Supp. 2d 181 (S.D.N.Y. 2000) .......................................................................................33

*In re Packaged Ice Antitrust Litigation,*
723 F. Supp. 2d 987 (E.D. Mich. 2010) ........................................................................ *passim*

*Peace Software, Inc. v. Ha. Elec. Co.,*
No. 09-cv-00408, 2009 WL 3923350 (D. Haw. Nov. 17, 2009) .............................................19

*Pinney Dock & Transport Co. v. Penn Cent. Corp.,*
838 F.2d 1445 (6th Cir. 1988) ......................................................................................28, 29, 30

*In re Polyurethane Foam Antitrust Litigation,*
799 F. Supp. 2d 777 (N.D. Ohio 2011) ...............................................................................13, 34

*In re Pressure Sensitive Labelstock Antitrust Litigation,*
566 F. Supp. 2d 363 (M.D. Pa. 2008) ..................................................................................21, 26

*In re Processed Egg Prods. Antitrust Litigation,*
821 F. Supp. 2d 709 (E.D. Pa. 2011) ......................................................................................21

*In re Rail Freight Fuel Surcharge Antitrust Litigation,*
587 F. Supp. 2d 27 (D.D.C. 2008) ..........................................................................................26

*Re/Max Intern., Inc. v. Realty One, Inc.,*
173 F.3d 995 (6th Cir. 1999) ..................................................................................................21

*In re Refrigerant Compressors Antitrust Litigation,*
795 F. Supp. 2d 647 (E.D. Mich. 2011) ...............................................................................12, 33

*Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.,*
971 F.2d 37 (7th Cir. 1992) ..................................................................................................12, 22

Case 1:14-md-02508-HSM-CHS    Document 201    Filed 11/10/14    Page 7 of 52
PageID #: 2110

*RPS Corp. v. Owens-Corning Fiberglas Corp.*,
No. 83-cv-9625, 1984 WL 1260 (N.D. Ill. Oct. 30, 1984) ......................................33

*In re Rubber Chems. Antitrust Litigation*,
504 F. Supp. 2d 777 (N.D. Cal. 2007) ..................................................................32

*Ruth v. Unifund CCR Partners*,
604 F.3d 908 (6th Cir. 2010) ...............................................................................33

*Scottsdale Ins. Co. v. Flowers*,
513 F.3d 546 (6th Cir. 2008) ...............................................................................29

*In re Southeastern Milk Antitrust Litigation*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008)...............................................12, 13, 26, 27

*In re Southeastern Milk Antitrust Litigation*,
801 F. Supp. 2d 705, 742 (E.D. Tenn. 2011)........................................................38

*Seagood Trading Corp. v. Jerrico, Inc.*,
924 F.2d 1555 (11th Cir. 1991) ...........................................................................14

*In re Skelaxin (Metaxalone) Antitrust Litigation*,
No. 1:12-md-2343, 2013 WL 2181185 (E.D. Tenn. May 20, 2013)............11, 12, 33

*Standard Iron Works v. ArcelorMittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009) .....................................................12, 18, 24, 26

*Starr v. Sony BMG Music Entertainment*,
592 F.3d 314 (2d Cir. 2010)...................................................11, 13, 23, 25

*In re Static Random Access Memory (SRAM) Antitrust Litigation*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) ..................................................................26

*Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*,
71 F.3d 119 (4th Cir. 1995) ...........................................................................28, 30

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ...............................................................................11

*In re Tamoxifen Citrate Antitrust Litigation*, 466 F.3d 187 (2d Cir. 2006), *rev'd on other*
*grounds*, *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013)..........................................12

*In re Text Messaging Antitrust Litigation*,
630 F.3d 622 (7th Cir. 2010) .......................................................................14, 23, 25

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................................26

Case 1:14-md-02508-HSM-CHS   Document 201   Filed 11/10/14   Page 8 of 52
PageID #: 2111

# TABLE OF AUTHORITIES

**Page(s)**

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
    599 F. Supp. 2d 1179 (N.D. Cal. 2009) ...................................................26

*In re Titanium Dioxide Antitrust Litigation*,
    959 F. Supp. 2d 799 (D. Md. 2013) .........................................................32

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..............................................................20, 24

*Toledo Mack Sales & Services, Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008)...............................................................18, 20

*In re Travel Agent Commission Antitrust Litigation*,
    583 F.3d 896 (6th Cir. 2009) .......................................................16, 27, 28

*United States v. Container Corp. of America*,
    393 U.S. 333 (1969)..............................................................................20

*United States v. Hayter Oil Co.*,
    51 F.3d 1265 (6th Cir. 1995) ................................................................38

*United States v. Murphy*,
    937 F.2d 1032 (6th Cir. 1991) ..............................................................38

*United States v. Snow*,
    462 F.3d 55 (2d Cir. 2006).....................................................................14

*Venture Global Engineering, LLC v. Satyam Computer Services, Ltd.*,
    730 F.3d 580 (6th Cir. 2013) ................................................................30

*In re Vitamins Antitrust Litigation*,
    No. 99-misc-197, 2000 WL 1475705 (D.D.C. May 9, 2000)...................32

*Wallach v. Eaton Corp.*,
    814 F. Supp. 2d 428 (D. Del. 2011)......................................................26

*Weit v. Continental Illinois National Bank & Trust Co. of Chicago*,
    641 F.2d 457 (7th Cir. 1981) ................................................................12

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ............................................................11

**STATUTES**

15 U.S.C. § 1.............................................................................................*passim*

15 U.S.C. § 15.................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

15 U.S.C. § 18.................................................................................34, 35, 39, 40

Federal Rule of Civil Procedure Procedure 8 ................................................. *passim*

Federal Rule of Civil Procedure Procedure 9 ...........................................................13

Federal Rule of Civil Procedure Procedure 12 ................................................. *passim*

## OTHER AUTHORITIES

ABA Section of Antitrust Law, *Antitrust Law Developments* (7th ed. 2012) .............................35

Andrel I. Gavil *et al.*, *Antitrust Law in Perspective: Cases, Concepts and Problems in Competition Policy*..................................................................16

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ...........................................11, 21, 22, 25

Richard A. Posner, *Antitrust Law* (2d ed. 2001)..................................................17, 23

W. Holmes, *Antitrust Law Handbook* (2009–10 ed.) ...........................................17, 23

# I.   INTRODUCTION

The Consolidated Amended Complaint ("CAC" or "Complaint") filed by the Direct Purchaser Plaintiffs ("DPPs" or "Plaintiffs") satisfies the notice pleading requirements set forth in Federal Rule of Civil Procedure 8 and explained by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  In arguing to the contrary, McWane's, Charlotte Pipe's and CISPI's (collectively, "Defendants") motions and briefs[1] make fundamental mistakes about the controlling legal principles, disregard or dispute the CAC's factual allegations, and seek to have inferences drawn in Defendants' favor despite well-established law requiring the opposite.

In *Twombly*, the Supreme Court established that parallel conduct, *standing alone*, "gets [a 15 U.S.C.] § 1 complaint *close* to stating a claim" under Rule 8.  *Twombly*, 550 U.S. at 546 (emphasis added).  To defeat a motion to dismiss, plaintiffs need only include some "factual enhancement," *id.* at 558, to "nudge[] their claims across the line from conceivable to plausible," *id.* at 570 (emphasis added).  The CAC more than satisfies that standard.  The CAC is not only replete with specific allegations of *identical* conduct, but it also goes far beyond that, alleging:

- Defendants met directly at least twice a year under the cover of the Cast Iron Soil Pipe Institute ("CISPI").  Defendants and their subsidiaries are the sole members and funders of CISPI and control the organization;[2]
- Shortly after these meetings, senior officials at McWane's Tyler Pipe Division told Tyler employees—before Charlotte had publicly announced any price increases—that Charlotte would be implementing price increases;[3]
- McWane and Charlotte implemented identical price increases;[4]

---

[1]  This brief responds to McWane's Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint, (Dkt. No. 178); McWane's Consolidated Brief in Support of Defendant McWane's Motions to Dismiss, (Dkt. No. 179); Charlotte Pipe's Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint, (Dkt. No. 181); Charlotte Pipe's Brief in Support of Its Motions to Dismiss, (Dkt. 184); and the Cast Iron Soil Pipe Institute's Amended Motion for Joinder, (Dkt. No. 191) (collectively, "Motions to Dismiss").

[2]  Dkt. No. 122 ¶¶ 56–57, at PageID# 1155–53.

[3]  Dkt. No. 122 ¶ 59, at PageID# 1153.

- A Senior Vice President of McWane confirmed to other employees that McWane and Charlotte were discussing and agreeing on prices at the bi-annual CISPI meeting;[5]

- CISPI was used as a tool to forward information about prices, bidding, and potential threats to the ostensible "competitors," McWane and Charlotte;[6]

- McWane's sales representatives were trained and directed to "stay away from Charlotte Pipe's CISP customers and maintain their current market position, rather than trying to seek business from Charlotte Pipe's customers" as would be expected in a truly competitive market;[7]

- When threatened by a price-cutting CISP producer, Star Pipe Products, Ltd. ("Star Pipe" or "Star"), actions were taken to foreclose and eliminate the new competitive threat by refusing Star membership to CISPI, then acquiring Star's assets and dismantling its operations;[8]

- As a result of the conspiracy, McWane and Charlotte were able to increase prices more than 50% during the class period, even though demand for CISP declined significantly during the same time period;[9]

- McWane and Charlotte were able to impose price increases that substantially exceeded increases in their costs during the same period;[10]

These detailed allegations satisfy—indeed, exceed—Rule 8's pleading requirements.

Defendants' alternative arguments are equally meritless. Defendants' contention that parallel price lists alone should have put Plaintiffs on notice of their antitrust claims directly contradicts Defendants' assertion that these same facts are "unremarkable," a "common occurrence," and "not unlawful."[11] Moreover, the CAC contains ample uncontested allegations of Defendants' affirmative acts to conceal the conspiracy. There is no basis for Defendants to claim that facts in the public record put Plaintiffs on notice of illegal conduct (or, for that matter,

---

[4] Dkt. No. 122 ¶¶ 64–65, at PageID# 1154.

[5] Dkt. No. 122 ¶ 63, at PageID# 1154.

[6] Dkt. No. 122 ¶ 58, at PageID# 1153.

[7] Dkt. No. 122 ¶ 68, at PageID# 1158.

[8] Dkt. No. 122 ¶¶ 69–72, at PageID# 1158–59.

[9] Dkt. No. 122 ¶ 66, at PageID# 1157.

[10] Dkt. No. 122 ¶ 67, at PageID# 1158.

[11] Dkt. No. 184, at 1–2, 12, at PageID# 1896–97, 1907.

that further inquiry would have uncovered Defendants' unlawful conspiracy). Similarly, Defendants' assertions that Plaintiffs were not injured by the elimination of Star—a new price-cutting player in the CISP market—or that Plaintiffs' damages claims based on that misconduct are "moot" or barred by "laches,"[12] disregard both the CAC's allegations and well-established law. Accordingly, Plaintiffs respectfully submit that Defendants' Motions to Dismiss be denied.

## II.     BACKGROUND

The CAC alleges a multi-faceted conspiracy that includes the hallmarks of a traditional antitrust scheme (price-fixing and customer-allocation agreements formed and enforced at secret meetings) and actions to exclude competitors who threatened to undermine this scheme.

**Defendants' Price-Fixing Activities.** Defendants McWane and Charlotte were the sole members of Defendant CISPI, an entity they funded and controlled.[13] Star, which entered the market in 2007, was not permitted to join. Defendants' executives held significant leadership positions in CISPI, which provided opportunities for senior executives from both companies to meet directly, discuss and coordinate their pricing plans, and then release identical prices. Throughout the Class Period, Defendants met twice a year at CISPI, as well as at other events. McWane and Charlotte "often announced identical price increases very close in time to one another and soon after [a CISPI] meeting occurred."[14] The prices they announced for the most common sizes of CISP were all effective on the same date and "mirror each other exactly."[15]

Tellingly, McWane was aware that Charlotte would be increasing prices before Charlotte had made any public announcement that it would do so. For instance, at McWane's Tyler Pipe

---

[12] Dkt. No. 184, at 49 n.22, at PageID# 1944.

[13] Dkt. No. 122 ¶ 56, at PageID# 1152–53.

[14] Dkt. No. 122 ¶ 64, at PageID# 1154.

[15] Dkt. No. 122 ¶ 65, at PageID# 1154.

Division, "[s]hortly after certain [CISPI] meetings, and before any public announcement," senior Tyler executives Peter Starkey, Bill Bliss, or Sterling Bowman told Tyler employees that Tyler would be increasing CISP prices and Charlotte "would do the same."[16] At nearly the same time, and shortly after trade association meetings, Charlotte and McWane did, in fact, increase CISP prices in identical fashion.[17]

The CAC further alleges that during a meeting at Charlotte's North Carolina foundry in either 2005 or 2006, a Senior Vice President of Charlotte's Cast Iron Division, Marshall Coble, told other employees "that the CISP manufacturers met at the bi-annual trade association meeting that Summer or Fall to discuss and agree on pricing for CISP. When [one] employee challenged Coble about the legality of such actions, Coble quickly brushed his concerns aside and moved on to another topic."[18]

CISPI was more than just a forum for collusive conversations: it had its own, important role to play in the conspiracy. CISPI was "used by defendants McWane and Charlotte Pipe as a mechanism to facilitate communication and coordination of their activities, including price fixing, maintaining their market shares, and excluding foreign competition."[19] Bill LeVan, CISPI's Executive Vice President "communicated—in writing or by telephone—to Defendants McWane and Charlotte Pipe on numerous occasions for the purpose of alerting them that CISP customers were being solicited by foreign manufacturers."[20] LeVan also "provided weekly reports to defendants McWane and Charlotte Pipe that provided information concerning bidding

---

[16] Dkt. No. 122 ¶ 59, at PageID# 1153 (emphasis added). Starkey (Tyler's Vice President of Sales) and Bliss (Tyler's Executive Vice President) attended CISPI meetings.

[17] Dkt. No. 122 ¶ 65 & fig.5, at PageID# 1154–57.

[18] Dkt. No. 122 ¶ 63, at PageID# 1154.

[19] Dkt. No. 122 ¶ 58, at PageID# 1153.

[20] *Id.*

and pricing information."[21]  Moreover, CISPI was "used to communicate information directly between defendants McWane and Charlotte Pipe about potential competitive threats posed by importers."[22]

**Restraining Competition for Each Other's Customers.** The success of Defendants' price-fixing agreements was facilitated in part by agreements between Charlotte and McWane to limit competition for "each other's" customers.[23]  Tyler's Patrick Starkey and Bill Bliss—two of the senior executives who, <u>prior</u> to any public announcement, told Tyler personnel that Charlotte would increase prices along with Tyler—trained and directed Tyler sales representatives to "stay away from Charlotte's CISP customers and maintain [Tyler's] current market position, rather than trying to seek business from Charlotte Pipe's customers."[24]  These are not merely allegations of "an intra-company discussion."[25]  They are facts detailing one of the ways Defendants carried out their conspiracy.  The inference of an agreement is clear: it would have been in Tyler's self-interest to go after new business, and it is plausible to infer that training and instructing its sales representatives <u>to do the exact opposite</u> indicates an agreement to allocate customers or market share.

**Actions to Acquire and Dismantle a Potential Threat to the Conspiracy.** Despite barriers that made new entry difficult, by 2007, Defendants' collusion had artificially raised prices to a level that attracted a new market player: Star.[26]  That year, with prices at a supra-

---

[21] *Id.*

[22] *Id.*

[23] Doc. 122, ¶ 68, at PageID #: 1158.

[24] *Id.*

[25] Dkt. No. 184, at 15, at PageID# 1910.

[26] Dkt. No. 122 ¶ 69, at PageID# 1158–59.

competitive level, Star entered the U.S. CISP market.[27]  Eager to gain market share, Star exerted downward pressure on CISP prices by selling its products below Charlotte's and McWane's pricing levels.  This created a direct threat to Defendants' efforts to restrain competition and fix prices.[28]

Charlotte and McWane recognized the threat that Star posed to their cartel, and "actions were taken to foreclose competition by Star Pipe" and eliminate it as a viable competitor.[29]  The Defendants did not permit Star to join or participate in CISPI.  Charlotte subsequently acquired Star's CISP assets, dismantled its operations, and forced an agreement that restricted the ability of Star's former employees to compete for the next six years.  The elimination of Star as a competitor removed the most immediate threat to Defendants' ongoing conspiracy.  After eliminating Star as a competitor, the conspirators were able to implement even greater price increases.[30]

The purchase agreement further prevented Star from disclosing the transaction's existence.  With CISP customers kept in the dark about the Star transaction, and the role it played in maintaining and effectuating Defendants' secret conspiracy, Defendants could continue to mislead Plaintiffs about the reasons for the post-acquisition price increases, falsely telling CISP buyers in September 2010 and September 2011 that prices were increasing because of rising raw material costs or increased operating expenses.[31]

---

[27] Dkt. No. 122 ¶¶ 69–70, at PageID# 1158–59.

[28] Dkt. No. 122 ¶¶ 70–71, at PageID# 1159.

[29] Dkt. No. 122 ¶¶ 71–74, at PageID# 1159–60.

[30] Dkt. No. 122 ¶ 72, at PageID# 1159.

[31] Dkt. No. 122 ¶ 88(c)–(f), at PageID# 1163–64.

Charlotte's acquisition and dismantling of Star's operations ultimately spurred a non-public investigation by the Federal Trade Commission ("FTC").  The investigation was first disclosed in April 2013, when the FTC exacted a decade-long consent decree from Charlotte to "address the anticompetitive effects" resulting from the elimination of Star (described by the FTC as a "maverick firm . . . acting as a disruptive force") from the CISP market.[32]

**Defendants' Conspiracy Succeeds in a CISP Market Ripe for Collusion.**  Defendants were able to implement their conspiracy successfully because the CISP market includes many characteristics widely recognized as facilitating collusion. First, Charlotte and McWane dominated the industry, accounting for over 90% of the U.S. CISP market.[33]  In industries with fewer players, it is easier for a conspiracy like the one alleged in the CAC to succeed.  Second, the CISP market posed significant barriers for potential new entrants, which helped Defendants' conspiracy succeed by lessening the risk of new competition.  The substantial costs associated with either building or acquiring a CISP foundry, coupled with the expensive specialty equipment needed to make the full line of CISP products demanded by customers, discouraged most potential competitors from entering the CISP market during the Class Period.[34]  Third, the standardization and homogeneity of CISP enhanced Defendants' ability to collude on prices, and to detect deviations from those collusively-set prices.  Fourth, because there are no functional substitutes for CISP, demand for CISP is "inelastic," meaning that a given change in the price of

---

[32] Complaint at 4, *In the Matter of Charlotte Pipe and Foundry Company and Randolph Holding Company LLC*, FTC Matter No. 1110034 (Apr. 2, 2013), *available at* http://www.ftc.gov/enforcement/cases-proceedings/1110034/charlotte-pipe-foundry-company-et-al; Analysis to Aid Public Comment at 1, *In the Matter of Charlotte Pipe and Foundry Company and Randolph Holding Company LLC*, FTC Matter No. 1110034 (Apr. 2, 2013), *available at* http://www.ftc.gov/enforcement/cases-proceedings/1110034/charlotte-pipe-foundry-company-et-al.

[33] Dkt. No. 122 ¶¶ 23–25, 48–49, 56, at PageID# 1145, 1151–52.

[34] Dkt. No. 122 ¶¶ 51–53, at PageID# 1151.

CISP triggers a smaller proportionate change in the quantity of CISP demanded by the market.[35] Demand inelasticity like that seen in the CISP market has long been found to facilitate price collusion among competitors.

As set forth in the CAC, Defendants succeeded in raising prices substantially more than market conditions supported. McWane and Charlotte increased prices more than 50% during the Class Period, even though demand for CISP declined significantly during that time.[36] These price increases greatly exceeded changes in costs during the Class Period.[37] In short, despite market conditions that should have led to relatively stable or declining prices, Defendants were able to effectuate the goals of their conspiracy by restraining competition and substantially increasing CISP prices to the Class.

## III. ARGUMENT

### A. The Complaint Need Only Plead Allegations Sufficient "to State a Claim to Relief that Is Plausible on Its Face"

#### 1. Federal Rule of Civil Procedure 8 Requires Only "A Short and Plain Statement of the Claim" that Provides Notice of the Claim and a Plausible Basis for Relief

Under Rule 8, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In deciding a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted).

The Supreme Court applied Rule 8 in an antitrust matter in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In *Twombly*, the Court held that a complaint that includes

---

[35] Dkt. No. 122 ¶¶ 55–56, at PageID# 1152.

[36] Dkt. No. 122 ¶ 66, at PageID# 1157.

[37] Dkt. No. 122 ¶ 67, at PageID# 1158.

"allegations *plausibly* suggesting" an agreement is sufficient to survive a Rule 12(b)(6) motion to dismiss. *Id*. at 557 (emphasis added). The Court explained that, to satisfy this plausibility standard, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555 (internal citation omitted). The Court explicitly rejected any suggestion that there is a requirement of "heightened fact pleading of specifics" in antitrust cases and instead held that a plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.

According to the Court, "[a]sking for plausible grounds to infer an agreement does *not* impose a probability requirement at the pleading stage." *Id*. at 556 (emphasis added). The purpose of the plausibility standard is to require that a complaint include "enough fact to raise a *reasonable* expectation that discovery will reveal evidence of illegal agreement." *Id*. (emphasis added). This is because a plaintiff "cannot be expected to know or allege such details at this early stage in the case; [and] neither *Twombly* nor any case decided under that holding suggests otherwise." *In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883, 2009 WL 3754041, at *4 (N.D. Ill. Nov. 5, 2009).

The Supreme Court has explained that, even if there are *no* additional allegations, "[a]n allegation of parallel conduct . . . gets [a] complaint *close* to stating a claim" under Rule 8. *Twombly*, 550 U.S. at 557 (emphasis added). Accordingly, to prevail on a motion to dismiss, plaintiffs need only include some "factual enhancement," *id.* at 548, to "nudge[] their claims across the line from conceivable to plausible," *id.* at 570. In *Twombly*, the Court dismissed the plaintiffs' complaint because it "proceed[ed] *exclusively* via allegations of parallel conduct." *Id.* at 565 n.11 (emphasis added); *see also id. at* 564 ("[T]he complaint leaves no doubt that

plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on *any* independent allegation of actual agreement." (emphasis added)).  Here, the CAC alleges much more.

2.  <u>Defendants Misstate and Misapply the Controlling Legal Standards</u>

The allegations in the CAC meet the standards described above.  In making a contrary argument, Defendants disregard clear precedent from the Supreme Court (and guidance from appellate and district courts) and instead base their argument on legal positions inconsistent with well-established law.  Specifically, Defendants: (1) rely on legal standards governing *summary judgment* motions, which the Sixth Circuit and other courts have made clear are inapplicable to Rule 12(b)(6) motions to dismiss; (2) "dismember" the conspiracy allegations by failing to evaluate them "as a whole"; (3) attempt to impose heightened pleading requirements; (4) demand direct evidence of each aspect of the conspiracy, despite contrary precedent; and (5) dispute factual allegations, ignore allegations that contradict their position, and seek to have factual inferences drawn in their favor.

a.  *Defendants Improperly Rely on Summary Judgment Standards*

Defendants incorrectly rely on summary judgment standards in place of the correct standards for evaluating a motion to dismiss.  Tellingly, Defendants omit the phrase, "at the summary judgment stage," *Twombly*, 550 U.S. at 554, which comes prior to the quote they borrow from *Twombly* that "a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."[38]  Defendants also fail to cite binding Sixth Circuit precedent rejecting the application of this stricter standard at the pleading stage.  *See Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012) ("[I]n order to state a Section One claim, a plaintiff need not allege a fact pattern that 'tends to exclude the

_____

[38] Dkt. No. 184, at 10, at PageID# 1905 (quoting *Twombly*, 550 U.S. at 554).

10

possibility' of lawful, independent conduct.").

As the authors of the treatise relied on by Defendants have explained, in *Twombly*, "[t]he Supreme Court did *not* hold that the same standard applies to a complaint and a discovery record." 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*, § 307d1 (3d ed. 2007) (emphasis added). Rather, "[t]he 'plausibly suggesting' threshold for a conspiracy complaint remains *considerably less* than the 'tends to rule out the possibility' standard for summary judgment." *Id.* (emphasis added). Most courts evaluating motions to dismiss antitrust claims have likewise held that "'[p]lausibility' in this context *does not* imply that the district court should decide whose version to believe, or which version is more likely than not." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (emphasis added).[39] Despite the clear distinction between the standards that apply at the pleading stage and at summary judgment, Defendants repeatedly rely on decisions addressing the sufficiency of evidence (after completion of all fact discovery) at *summary judgment*.[40]

---

[39] *See, e.g.*, *In re Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-md-2343, 2013 WL 2181185, at *16 (E.D. Tenn. May 20, 2013) ("Plaintiffs are not required to eliminate all possible alternative sources of injury to plead causation."); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) ("Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible."); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) ("For purposes of summary judgment a plaintiff must present evidence that tends to exclude the possibility of independent action, . . . to survive a motion to dismiss, plaintiffs need only enough factual matter (taken as true) to suggest that an agreement was made."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("As we understand it, the [Supreme] Court is saying instead that the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not did they happen."); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 688 (S.D.N.Y. 2012) ("So long as a plaintiff states a plausible claim, a complaint may not be dismissed on a Rule 12(b)(6) motion even if a court believes it is more likely than not that the defendants reacted independently to 'common stimuli.'").

[40] Defendants rely on the following decisions resolved on summary judgment. *See, e.g.*, *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th Cir. 2004); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003); *Blomkest Fertilizer, Inc. v. Potash*

### b. *Defendants Improperly Dismember the Allegations*

Defendants' briefs disregard the Supreme Court's instruction that conspiracy allegations must be evaluated holistically: "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (quotation marks and citation omitted). As Judge Posner observed, courts should avoid the "trap" of "suppos[ing] that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot" do so. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002). Following the Supreme Court, appellate and district courts—including courts in this District—have repeatedly rejected antitrust defendants' use of this common, but invariably ineffectual, strategy. *See, e.g.*, *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) ("Defendants' attempt to parse the complaint and argue that none of the allegations (i.e., quoted public statements, parallel capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy is contrary to the Supreme Court's admonition.").[41]

---

*Corp. of Saskatchewan*, 203 F.3d 1028 (8th Cir. 2000); *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999); *Mitchael v. Intracorp., Inc.*, 179 F.3d 847 (10th Cir. 1999); *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37 (7th Cir. 1992); *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478 (1st 1988); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284 (5th Cir. 1988); *Apex Oil Co. v. DiMauro*, 822 F.2d 246 (2d Cir. 1987); *Weit v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 641 F.2d 457 (7th Cir. 1981).

[41] *See also Skelaxin*, 2013 WL 2181185, at *13 (E.D. Tenn. May 20, 2013) ("The Court will determine whether Plaintiffs have adequately alleged an antitrust injury viewing the factual allegations as a whole."); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008) ("[D]efendants attempt to parse and dismember the complaints, contrary to the Supreme Court's admonition [in *Continental*]."); *In re Refrigerant Compressors Antitrust Litig.*, 795 F. Supp. 2d 647, 661 (E.D. Mich. 2011) ("*Twombly* does not support such a 'dismemberment' or 'carve out' approach to assessing the sufficiency of a complaint."); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 201 (2d Cir. 2006), *rev'd on other grounds*, *FTC v. Actavis, Inc.*, 133 S. Ct. 2223 (2013) ("[P]laintiffs should be given the full benefit of their proof without tightly

c.      *Defendants Incorrectly Impose a Heightened Pleading Standard*

Defendants incorrectly attempt to impose a heightened pleading requirement on Plaintiffs' antitrust claims.[42]  The Supreme Court cautioned in *Twombly*: "we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9."  550 U.S. at 569 n.14; *id*. at 555 ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations.").  As another court in this circuit has explained, this "plausibility pleading standard does not require a court to construct a mandatory checklist of the 'who, what, where, when, and how' of an antitrust agreement for each defendant."  *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 795 (N.D. Ohio 2011).  This is because "[r]equiring Plaintiffs to set forth the full details of an antitrust conspiracy at this stage of the litigation would present an onerous burden . . . 'in antitrust cases [where] the proof is largely in the hands of the alleged conspirators.'"  *In re Magnesium Oxide Antitrust Litig.*, No. 10-cv-5943, 2011 WL 5008090, at *13 (D.N.J. Oct. 20, 2011) (quoting *Hosp. Bldg. Co. v. Trs. of Rex. Hosp.*, 425 U.S. 738, 746 (1976) (citation omitted)).[43]

---

compartmentalizing the various factual components and wiping the slate clean after scrutiny of each" (internal quotation marks and citation omitted)).

[42] Dkt. No. 184, at 11, 12, 18, 19, at PageID# 1906–07, 1913–14.

[43] *See also Se. Milk*, 555 F. Supp. 2d at 943 ("These complaints, while not answering all specific questions about 'who, what, when, and where' do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist."); *Starr*, 592 F.3d at 325 ("Defendants next argue that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation. This is also incorrect."); *In re Auto. Parts Antitrust Litig*, No. 12-md-2311, 2014 WL 4272784, at *6 (E.D. Mich. Aug. 29, 2014) ("[T]here is no heightened pleadings requirement for stating an antitrust claim. Allegations of who, what, when and where are not the litmus test for determining whether a defendant is on notice of the claims."); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005–08 (E.D. Mich. 2010) (explaining, at length, that *Twombly* does not require specific allegations of time, place, or person).

    d. *Defendants Ignore that an Antitrust Conspiracy May Be Proven by Circumstantial Evidence*

Defendants demand that Plaintiffs point to direct evidence of every aspect of the conspiracy,[44] when circumstantial evidence supporting an inference of a plausible conspiracy is all that is required. Because a "conspiracy by its very nature is a secretive operation," *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006), courts recognize that, at the pleading stage, "it is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators," *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1573 (11th Cir. 1991). The Sixth Circuit, like other courts, has held that "[a]n agreement, either tacit or express, may ultimately be proven either by direct evidence of communications between the defendants or by circumstantial evidence of conduct that, in the context," raises an inference of conspiracy. *Erie Cnty*, 702 F.3d at 867–68.[45]

    e. *Defendants Erroneously Challenge the Facts and Demand that Inferences Be Drawn in Their Favor at the Pleading Stage*

Although at the pleading stage the non-conclusory allegations in a complaint are accepted as true, and all reasonable inferences must be drawn in <u>Plaintiffs'</u> favor, Defendants take the opposite approach by making arguments that go to credibility, weight, and conflicting inferences

---

 [44] Dkt. No. 184, at 11, 12, 18, 19, at PageID# 1906–07, 1913–14.

 [45] *See also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("Direct evidence of conspiracy is not a sine qua non, however. Circumstantial evidence can establish an antitrust conspiracy."); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) ("[C]onspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators." (internal quotation marks and citation omitted)); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("A § 1 complaint must adequately allege the plausible involvement of each defendant and put defendants on notice of the claims against them, but it need not be detailed with overt acts by each defendant.").

that might be drawn.[46]  These are factual disputes that are not properly resolved on a motion to dismiss.  *See, e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").  The pleading stage is "neither the time nor the place to resolve the factual disputes between the parties."  *Haley v. City of Boston*, 657 F.3d 39, 52 (1st Cir. 2011).

### B.      The Complaint Plausibly Pleads that Defendants Engaged in a Conspiracy

Section 1 of the Sherman Act broadly prohibits "*[e]very* contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1 (emphasis added).  An agreement to form a conspiracy in violation of the antitrust laws may be made in writing or through spoken word; and it may be express or established through an informal course of dealing.  *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 800, 809 (1946) (holding that because "no formal agreement is necessary to constitute an unlawful conspiracy," the government could prove the existence of a conspiracy even absent a "written or express agreement," by showing that the defendants' "practices included a clear course of dealing").  The allegations in the CAC properly allege a conspiracy in violation of Section 1 of the Sherman Act.

### 1.      The Allegations that McWane and Charlotte Engaged in Parallel Pricing Get the Complaint "Close to Stating a Claim," While the Additional Allegations  "Nudge" Plaintiffs' Claims "Across the Line from Conceivable to Plausible"

The CAC alleges, in detail, that McWane and Charlotte engaged in a consistent pattern of parallel pricing, involving their list prices, rebates, and multipliers, beginning at least as early as 2006 and continuing until 2013.[47]  Indeed, the parallel changes in list price were not merely

---

[46] Dkt. No. 184, at 11, 19, at PageID# 1906, 1914.

[47] Dkt. No. 122 ¶ 62, 64, 65, at PageID# 1154.

similar but "identical."[48]  As noted above, in *Twombly*, the Supreme Court held that parallel pricing allegations like these get a Section 1 "complaint close to stating a claim."  550 U.S. at 557.

Defendants devote much of their *Twombly* briefing to the straw-man argument that allegations of parallel pricing <u>alone</u> are typically insufficient to survive a motion to dismiss.[49] Unlike the complaint at issue in *Twombly*, the CAC includes numerous additional allegations supporting an inference of conspiracy.  Specifically, the CAC pleads multiple "plus factors"—as courts have called them—any one of which is sufficient to "nudge" the Section 1 claims "across the line from conceivable to plausible."  *Id*. at 570; *see, e.g.*, *In re Travel Agent Comm'n Antitrust Litig*., 583 F.3d 896, 907 (6th Cir. 2009) (recognizing the following "plus factors": "(1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to conspire.").[50]

---

[48] Dkt. No. 122 ¶ 6, at PageID# 1142.

[49] Dkt. No. 184, at 12–16, at PageID# 1907–11.

[50] Courts and commentators have recognized a broad set of "plus factors" that render an allegation of conspiracy plausible.  *See* Andrel I. Gavil *et al*., *Antitrust Law in Perspective: Cases, Concepts and Problems in Competition Policy*, 310–11 (recognizing the following factors: (1) "Actions contrary to each defendant's self-interest unless pursued as part of a collective plan"; (2) "Phenomena that can be explained rationally only as the result of concerted action"; (3) "Evidence that the defendants created the opportunity for regular communication"; (4) "Industry performance data, such as extraordinary profits, that suggest coordination"; and (5) "The absence of a plausible, legitimate business rationale for suspicious conduct (such as certain communications with rivals) or the presentation of contrived rationales for certain conduct").

The Allegations in the CAC Strongly Support the Conclusion that Defendants Were Meeting and Agreeing on Pricing

The CAC sets forth detailed allegations indicating that Defendants used CISPI "as a mechanism to facilitate communications and coordination of their activities, including price fixing, maintaining their market shares, and excluding foreign competition."[51] Specifically:

- **Opportunity:** The CAC alleges that CISPI was funded and controlled by Defendants. They are the only entities that participated in these meetings (competitor Star was excluded). CISPI provided an opportunity for "[e]xecutives and managers from defendants McWane and Charlotte Pipe"—who are named in the CAC—to meet "at least twice per year."[52]

- **Prior Knowledge of Competitor Price Increases:** Shortly after CISPI meetings, Tyler's Executive Vice President, Vice President of Sales, or National Sales Manager "reported to Tyler employees that Tyler would increase CISP prices and that Charlotte would do the same."[53]

- **Price Increases Proximate to Meetings:** "McWane and Charlotte Pipe often announced identical price increases very close in time to one another and soon after trade association meetings occurred."[54]

- **CISPI's Direct Role:** CISPI's Executive Vice President "provided weekly reports to defendants McWane and Charlotte Pipe that provided information concerning bidding and pricing information" and, on multiple occasions, alerted McWane and Charlotte "that CISP customers were being solicited by foreign manufacturers."[55]

- **Use of CISPI to Communicate Market Information:** McWane and Charlotte used CISPI to relay information "about potential competitive threats posed by importers."[56]

For purposes of a motion to dismiss, these factual allegations are assumed to be true and all reasonable inferences from these facts are drawn in Plaintiffs' favor.

Courts in this circuit and others regularly conclude that allegations similar to those in the CAC plausibly support a conspiracy.[57] That is especially clear here where *only* the Defendants

---

[51] Dkt. No. 122 ¶ 58, at PageID# 1153.

[52] Dkt. No. 122 ¶ 57, at PageID# 1153.

[53] Dkt. No. 122 ¶ 59, at PageID# 1153.

[54] Dkt. No. 122 ¶ 64, at PageID# 1154.

[55] Dkt. No. 122 ¶ 58, at PageID# 1153.

[56] *Id.*

were participating in these meetings (and competitor Star was excluded); Charlotte employees were told that Defendants were discussing and agreeing on prices at industry meetings; McWane employees were informed, shortly after certain CISPI meetings, that Charlotte would be increasing prices <u>before</u> any public announcement of a price increase; and Defendants after those same CISPI meetings proceeded to implement identical prices. Defendants' assertion that a bare allegation of "opportunity," without more, is insufficient to infer an agreement, ignores the substance of Plaintiffs' detailed allegations relating to CISPI and the larger factual context.

The CAC provided further corroboration by alleging that Marshall Coble, a Senior Vice President of Charlotte's Cast Iron Division, made statements to other employees confirming that McWane and Charlotte were "agree[ing] on pricing" at trade association meetings.[58] The CAC describes *who* made the statement ("Marshall Coble"), *what* was said ("CISP manufacturers met at the bi-annual trade association meeting that Summer or Fall to discuss and agree on pricing for CISP"), *where* the comment was made ("at the foundry"), and, although it does not include a

---

[57] *Compare Auto. Parts*, 2014 WL 4272772, at *9 (E.D. Mich. Aug. 29, 2014) ("allegations demonstrating Defendants' opportunity to meet and collude" contributed to an inference of conspiracy); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1360 (N.D. Ga. 2010) ("Courts have . . . found that unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices, such as new pricing practices."); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1017 (E.D. Mich. 2010) ("When viewed in the context of the allegations of the CAC as a whole, these opportunities bolster the plausibility of a conspiracy and . . . there is a reasonable expectation that discovery may reveal evidence [from meeting records] of the alleged illegal conspiracy"); *Standard Iron*, 639 F. Supp. 2d at 897 (the proximity of trade meetings to parallel market changes plausibly suggests agreement); *and* Richard A. Posner, *Antitrust Law* 170 (2d ed. 2001) ("[T]hat the exchange is 'laundered' through a trade association should be no defense, especially since an empirical study of price-fixing cases found that trade associations have figured as defendants in a surprising number of cases."), *with Travel Agent*, 583 F.3d at 910–11 (holding that mere allegations that defendants "gathered at industry trade association meetings" were insufficient to "weigh heavily in favor of suspecting collusion").

[58] Dkt. No. 122 ¶ 63, at PageID# 1154. *See, e.g., Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 214 (3d Cir. 2008) (holding that comments by a company's regional vice president to a district manager that the company was "not going to let" a dealer of its trucks "sell trucks all over the place" was direct evidence of an unlawful agreement).

specific date, generally *when* Coble made it ("[i]n 2005 or 2006").[59]  The CAC provides

additional context, stating both the position of the speaker and how the conversation proceeded.

Confronted with these details, Defendants resort to various factual quarrels,[60] arguing, for

example, that the CAC does not explain how the Senior Vice President acquired this knowledge

or whether he directly participated in the conspiracy.  There will, of course, be ample opportunity

for the parties to explore such issues during the discovery process, but there is no "heightened

pleading" requirement for antitrust cases, and Defendants' factual questions do not provide any

basis for challenging the sufficiency of a complaint pursuant to Rule 12.

Defendants alternatively assert that Coble's statements were prior to the "relevant time

period."[61]  However, the CAC alleges that Defendants' price-fixing conspiracy "began *at least as*

*early as* January 1, 2006."[62]  As Defendants' briefing makes plain, their argument hinges entirely

---

[59] Dkt. No. 122 ¶ 63, at PageID# 1154.  Defendants quibble that the Complaint does not identify the Charlotte employee who learned of Defendants' price-fixing from Coble.  Dkt. No. 184, at 19, at PageID# 1914.  Plaintiffs are not obligated to identify the sources of their allegations in their pleadings.  *See, e.g.*, *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 396, n.5 (S.D.N.Y. 2010) (rejecting defendants' argument that antitrust plaintiffs must describe confidential witnesses with "particularity" and holding that "the Court, taking Named Plaintiffs' averments regarding the Confidential Witness as true, accepts that the Confidential Witness would possess the information alleged for the purposes of this motion to dismiss.").  In any event, Defendants have served discovery seeking this information, and Plaintiffs have responded to that discovery.

[60] For example, Defendants challenge Plaintiffs' Coble-related allegations for purportedly failing to meet the rules that apply to trial evidence.  Dkt. No. 184, at 19, at PageID# 1914 (stating that the Coble allegations "contain[] at least one level of hearsay").  But "[t]he fact that [an allegation] may or may not constitute 'hearsay' is . . . misplaced" because "allegations in a complaint are not tested against the rules of evidence."  *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 467 n.24 (S.D.N.Y. 2013); *see also Peace Software, Inc. v. Ha. Elec. Co.*, No. 09-cv-00408, 2009 WL 3923350, at *9 (D. Haw. Nov. 17, 2009) (same); *cf. Crawford-El v. Britton*, 951 F.2d 1314, 1320 (D.C. Cir. 1991) (holding that allegations of "[i]nadmissible hearsay reports of the defendant's specific statements" are sufficient to satisfy even heightened pleading requirements).

[61] Dkt. No. 184, at 19, at PageID# 1914.

[62] Dkt. No. 122 ¶ 2, at PageID# 1142 (emphasis added).

on their challenge to Plaintiffs' fraudulent concealment allegations, which toll the limitations period. Even then, Defendants' argument incorrectly assumes—again, without citation to any authority—that pre-class-period allegations and evidence cannot be used to support intra-class-period claims. An antitrust plaintiff "is entitled to present evidence from outside [the limitations] period to sustain its burden of proof" and is "not required to prove an illegal conspiracy with evidence restricted to the limitations period." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 217–18 (3d Cir. 2008).

The CAC further alleges that the price-fixing conspiracy was implemented in part through regular reports about pricing and bidding that CISPI's Executive Vice President, Bill LeVan, provided to the other conspirators. Defendants respond by attempting to dismember the allegations, including by noting that an exchange of pricing information, standing alone, is not *always* illegal. But this misunderstands both the significance of this allegation and the standards applicable at the pleading stage. The CAC does not allege that the exchanges of price information was *per se* illegal but that they facilitated Defendants' price-fixing conspiracy. Moreover, the CAC need only point to circumstantial evidence that, in context, raises a plausible inference of a conspiracy. Other courts evaluating allegations involving the exchange of pricing information under similar market conditions have held that "participation in information exchanges in highly concentrated markets involving a fungible product with inelastic demand can be indicative of anticompetitive behavior." *In re Ductile Iron Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*, No. 12-711, 2014 WL 3971620, at *9 (D.N.J. Aug. 13, 2014) (citing *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969)).[63] Defendants' case citations

---

[63] *See also Todd v. Exxon Corp.*, 275 F.3d 191, 211 (2d Cir. 2001) ("The Supreme Court has made clear that exchanges of current price information, of course, have the greatest potential for generating anti-competitive effects and although not per se unlawful have consistently been

Case 1:14-md-02508-HSM-CHS    Document 201    Filed 11/10/14    Page 30 of 52
PageID #: 2133

purportedly to the contrary are, once again, to summary judgment decisions reached after full discovery and based on a different legal standard.[64]

### 3. McWane and Charlotte Restrained Competition by Not Soliciting "Each Other's Customers"

Defendants "agreed to limit competition for 'each other's' customers."[65] The CAC includes specific allegations that "sales representatives at Tyler were trained and directed by Patrick Starkey and Bill Bliss to stay away from Charlotte Pipe's CISP customers and maintain their current market position, rather than trying to seek business from Charlotte Pipe's customers."[66] Horizontal market allocation agreements are especially easy for duopolists like McWane and Charlotte to implement and monitor because the "crossing of market division lines is often more readily observable than secret price concessions." 13 Areeda and Hovenkamp, ¶ 2031 (3d ed.).[67] Moreover, restraining this competition facilitated Defendants' efforts to implement and maintain their price-fixing conspiracy.

---

held to violate the Sherman Act." (internal quotations marks and citations omitted)); *Re/Max Intern., Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) (noting that an important factor is "whether the defendants have exchanged . . . information relative to the alleged conspiracy").

[64] Dkt. No. 184, at 18, at PageID# 1913. Given the direct and circumstantial allegations showing CISPI's central role in the conspiracy, CISPI's request for dismissal in its "amended joinder" should be denied. Indeed, as CISPI acknowledges, it may be liable as long as the complaint "can allege facts establishing a plausible basis to infer that CISPI . . . participated in" the conspiracy. Dkt. No. 191, at 3, at PageID# 2038. Moreover, "[p]articipation by each conspirator in every detail in the execution of the antitrust conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 732 (E.D. Pa. 2011) (internal quotation marks, citations, and brackets omitted).

[65] Dkt. No. 122 ¶ 68, at PageID# 1158.

[66] *Id.*

[67] *See also In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1014–15 (E.D. Mich. 2010); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 371 (M.D. Pa. 2008).

Defendants incorrectly assert that the Court may not infer the plausibility of a conspiracy from an "intra-company discussion."[68] Conspiracies are often inferred from conduct by a company that is against its independent interest in the absence of a conspiracy. Instructing a company's employees *not to compete* for business is precisely such conduct. The Sixth Circuit and other courts have made clear that the plausibility of an antitrust conspiracy may be shown by "*circumstantial* evidence of conduct that, in the context, negates the likelihood of independent action and raises an inference of coordination." *Erie Cnty.*, 702 F.3d at 868 (emphasis added); *see also* 6 Areeda & Hovenkamp, ¶ 1425a (2d ed.) ("Ordinarily . . . it will be necessary to infer from the circumstances that parallel action depends upon advance communication and understanding"). Moreover, the present case is distinguishable from the only two cited by Defendants. In *Reserve Supply Corp. v. Owens-Corning Fiberglass Corp.*, 971 F.2d 37 (7th Cir. 1992), the court was reviewing a summary judgment decision and did not address market allocation, and, in *Twombly*, 550 U.S. at 567–69, the defendants' lack of competition was explained by conditions that are not present here, including that the *Twombly* defendants were insulated from competition in large part by government regulations that had ensured that "monopoly was the norm in telecommunications, not the exception."

        4.    McWane and Charlotte Implemented Supra-Competitive Price Increases That Exceeded Cost Increases and Were Imposed Despite Declining Demand

McWane and Charlotte raised prices in lockstep "despite declining demand in the United States."[69] Prices increased "more than 50%" even though "construction spending—a prime determinant of CISP demand—[fell] significantly," and these increases "significantly exceeded

---

[68] Dkt. No. 184, at 15, at PageID# 1910.

[69] Dkt. No. 122 ¶ 12, at PageID# 1143.

changes in the cost of manufacturing CISP during this time period."[70]  It is widely recognized that "[s]imultaneous price increases and output reductions unexplained by any increases in cost may . . . be good evidence of the initiation of a price-fixing scheme."  Posner, *Antitrust Law* 88 (2d ed. 2001).  Similarly, the simultaneous imposition of price increases, or maintenance of prices in the face of declining demand—as alleged in the CAC—is a well-accepted "plus factor" supporting the plausibility of an alleged price-fixing conspiracy.[71]

     5.     Structural Features Made the CISP Market Particularly Susceptible to Collusion

The plausibility of the alleged price-fixing conspiracy finds additional support in the allegations relating to structural characteristics of the market.  "[A]n industry structure that facilitates collusion constitutes supporting evidence of collusion."  *Text Messaging*, 630 F.3d at 627–28.[72]  Courts and scholars alike have generally concluded that certain structural market features—"highly concentrated, . . . high barriers to entry, . . . inelastic demand, . . . lack[ of] reasonable substitutes, . . . a standardized product—are each conducive to transforming [a motive to price-fix] into action."  *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D.

---

[70] Dkt. No. 122 ¶¶ 66–67, at PageID# 1157–58.

[71] *See In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 576 (M.D. Pa. 2009) (complaint alleging "waning demand as a result of consumer trends" depicted "a prototypical market susceptible to conspiratorial price-fixing"); *Ductile Iron*, 2013 WL 812143, at *12 (holding, in a pipe price-fixing case involving one of the same defendants as this case, that increasing prices during a time of flagging demand was indicative of a conspiracy); *cf. Text Messaging*, 630 F.3d at 628 (concluding that the practice of increasing prices despite falling costs "is anomalous behavior because falling costs increase a seller's profit margin at the existing price, motivating him, in the absence of agreement, to reduce his price slightly in order to take business from his competitors, and certainly not to increase his price"); *Starr*, 592 F.3d at 323.

[72] *See also Packaged Ice*, 723 F. Supp. 2d at 1014 ("Allegations that a market is characterized by economic factors that courts and antitrust experts and economists have found are conducive to collusive behavior, support an inference of plausibility.").

Pa. 2010).[73]

The U.S. cast iron soil pipe market has these very features: (1) **a high degree of concentration** ("McWane and Charlotte Pipe control over 90% of the market");[74] (2) **inelastic demand** ("Demand for CISP is inelastic because there is no functional substitute for CISP");[75] (3) **high entry barriers** (high costs of foundry and manufacturing tools and large energy investment in developing distribution network and full product line);[76] and (4) **product homogeneity** ("Because all CISP is standardized . . . manufacturers of CISP compete mainly on price").[77]

Courts have concluded that a market with few sellers is conducive to price fixing because "elaborate communications, quick to be detected, would not have been necessary" and "if one seller broke ranks, the others would quickly discover the fact, and so the seller would have gained little from cheating on his coconspirators." *High Fructose*, 295 F.3d at 656; *see generally Todd v. Exxon Corp.*, 275 F.3d 191, 208 (2d Cir. 2001) ("Generally speaking, the possibility of

---

[73] *See also Standard Iron*, 639 F. Supp. 2d at 883 ("[C]ourts, antitrust experts, and economists agree [on the economic factors that] make an industry conducive to collusion: high concentration on the supply side . . . and diffusion on the demand side, high barriers to entry . . . , a commodity good . . . , high fixed costs, and a natural capacity shortage in the domestic market that made a supply cartel particularly likely to succeed in inflating price."); *Chocolate Confectionary*, 602 F. Supp. 2d at 567 ("[A] market is ripe for collusion due to the presence of oligarchic sellers, diffuse buyers, prohibitive entry barriers, and standardized products."); *Aftermarket Filters*, 2009 WL 3754041, at *3 ("The plausibility of the conspiracy is . . . buttressed by the allegations concerning the concentration of the filters industry, the maturity of the market, the fungibility of the products, the lack of brand loyalty, and the importance of price in determining consumer purchasing decisions."); Posner, at 69–79 (noting market factors "favorable to collusion," including (1) a market concentrated on the selling side, (2) inelastic demand at the competitive price, (3) entry into the market takes a long time, (4) standardized product, and (5) a high ratio of fixed to variable costs).

[74] Dkt. No. 122 ¶¶ 3, 49, at PageID# 1142, 1151.

[75] Dkt. No. 122 ¶¶ 54–56, at PageID# 1151–52.

[76] Dkt. No. 122 ¶¶ 51–54, at PageID# 1151.

[77] Dkt. No. 122 ¶ 54, at PageID# 1151.

anticompetitive collusive practices is the most realistic in concentrated industries.").[78]  The sale

of standardized products is similarly conducive to collusion because conspiring sellers may limit

their communications since they "would not have to agree not only on price but also on quality,

design, post-sale services, and the like."  *High Fructose*, 295 F.3d at 657.  Finally, the presence

of high entry barriers means that "[a]n attempt to raise price above cost would not be likely to

come to grief by causing a hemorrhage of business to sellers in other markets."  *Id.*

Defendants, who rely largely on three-decade-old caselaw,[79] overstate those decisions in

asserting that the CAC's allegations about the structure of the CISP industry "make their

conspiracy *less* plausible."[80]  The illogical extension of Defendants' argument is that a

conspiracy to fix prices would be <u>more</u> likely to occur in an unconcentrated market, with low

barriers to new market entrants, and involving products with clear substitutes.  This position is

inconsistent not only with scholarly research and the relevant caselaw, but also with common

sense.  While Defendants are free to contest these factual issues at trial, such factual disputes

provide no basis for granting a motion to dismiss.

6.     Courts Have Declined to Dismiss Similarly-Pleaded Complaints

The allegations in the CAC are easily sufficient to meet the standards set forth in Rule 8

and *Twombly* for alleging a plausible conspiracy.  While the allegations of virtually identical

---

[78] *See also Text Messaging*, 630 F.3d at 628 ("[T]he complaint in this case alleges that the four defendants sell 90 percent of U.S. text messaging services, and it would not be difficult for such a small group to agree on prices and to be able to detect 'cheating' (underselling the agreed price by a member of the group) without having to create elaborate mechanisms, such as an exclusive sales agency, that could not escape discovery by the antitrust authorities."); *Starr*, 592 F.3d at 323–23; 7 Areeda & Hovenkamp, ¶ 1431a (2d ed.) ("[E]mpirical studies considering many industries have suggested that noncompetitive pricing [that may be the result of price coordination] is likely to appear when the four leading firms account for some 50 to 80 percent of the market.").

[79] Dkt No. 184, at 13, at PageID# 1908.

[80] Dkt No. 184, at 12, at PageID# 1907.

actions—repeated year-after-year—would themselves be "close" to sufficient, there is far more here. The allegations described above—*e.g.*, numerous meetings between Defendants, knowledge of price actions they intended to take after those meetings, implementation of price increases shortly thereafter, statements by senior officials acknowledging what was transpiring, and numerous additional facts—all go well beyond what is required to allege a plausible conspiracy. That is especially clear when these allegations are considered in their totality, as well-established law requires.

Courts have repeatedly applied *Twombly* to reject similarly pleaded motions to dismiss antitrust complaints.[81]  For instance, in *Ductile Iron*, 2013 WL 812143, a district court judge recently denied a motion to dismiss a case against McWane for engaging in a price-fixing conspiracy and other illegal conduct in the ductile iron pipe and fittings market.  In another case, *In re Southeastern Milk Antitrust Litigation*, 555 F. Supp. 2d 934 (E.D. Tenn. 2008), a judge in this district refused to dismiss a complaint alleging a conspiracy to fix prices through an agreement not to compete for the purchase of raw milk.  The Court concluded in that case:

> These complaints, while not answering all specific questions about "who, what, when and where," do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist. While viewing each of these factual allegations in isolation may lead one to the conclusion drawn by the defendants, i.e., that there is a legitimate business

---

[81] *See, e.g.*, *Anderson News*, 680 F.3d at 181–91; *Elec. Books*, 859 F. Supp. 2d at 681–90; *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428, 439–40 (D. Del. 2011); *Blood Reagents*, 756 F. Supp. 2d at 628–33; *Packaged Ice*, 723 F. Supp. 2d at 1001–13; *In re Flash memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1141–50 (N.D. Cal 2009); *Standard Iron*, 639 F. Supp. 2d at 879–900; *Chocolate Confectionary*, 602 F. Supp. 2d at 574–78; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1183–85 (N.D. Cal. 2009); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 31–35 (D.D.C. 2008); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1114–16 (N.D. Cal. 2008); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 900–04 (N.D. Cal. 2008); *Pressure Sensitive Labelstock*, 566 F. Supp. 2d at 368–75; *Se. Milk*, 555 F. Supp. 2d at 940–44; *Hyland v. Homeservices*, No. 3:05-cv-612, 2007 WL 2407233, at *3 (W.D. Ky. Aug. 17, 2007) (all denying motions to dismiss antitrust complaints under Rule 8).

justification for each of the acts, a view of the complaint as a whole, which this Court must take, and accepting all of the factual allegations as true, does support a plausible inference of a conspiracy or agreement made illegal under § 1 of the Sherman Act.

*Id*. at 943.

Despite these decisions, Defendants argue that *Travel Agent*, 583 F.3d 896, counsels dismissal here.[82]  As another court in this circuit noted, however, in rejecting a similar attempt in a different case, "*Travel Agent*, like *Twombly*, is a parallel conduct case, with *only bare, collective assertions of conspiracy and nothing more*."  *Packaged Ice*, 723 F. Supp. 2d at 1007 n.12 (emphasis added).  By comparison, the CAC alleges far more than mere parallel conduct.  Additionally, *Travel Agent* arose under unique procedural circumstances that are not present in this case.  The complaint there was filed by plaintiffs who had opted out of a class action brought in the Fourth Circuit, in which summary judgment had already been granted to the defendants.  *See Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652 (E.D.N.C. 2003), *aff'd*, 118 F. App'x 680 (4th Cir. 2004).  Accordingly, in *Travel Agent*, the Sixth Circuit explained, in dismissing the opt-

---

[82] The other cases cited by Defendants support <u>denying</u> their motions to dismiss.  The complaint in *In re Elevator Antitrust Litigation*, 502 F.3d 47 (2d Cir. 2007), advanced only conclusory allegations that defendants "(a) [p]articipated in meetings in the United States and Europe to discuss pricing and market divisions; (b) [a]greed to fix prices for elevators and services; (d) [e]xchanged price quotes; (e) [a]llocated markets for sales and maintenance; (f) [c]ollusively required customers to enter long-term maintenance contracts; and (g) [c]ollectively took actions to drive independent repair companies out of business," *id*. at 51 n.5, and that the defendants had engaged in "anticompetitive wrongdoing in Europe—absent any evidence of linkage between such foreign conduct and conduct here," *id*. at 52.  Likewise, the complaint in *In re LTL Shipping Services Antitrust Litigation*, No. 1:08-md-1895, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009), pleaded parallel pricing in a formerly regulated industry (as in *Twombly*), *id*. at *13, and the existence of trade association meetings (but without any allegation that the defendants even attended those meetings), *id*. at *14.  Lastly, in *In re Graphics Processing Units Antitrust Litigation*, 527 F. Supp. 2d 1011, 1023–24 (N.D. Cal. 2007), the district court dismissed a complaint because the plaintiffs failed even to plead that the defendants met at the trade shows they attended and made "no attempt to correlate the trade shows to the release of products at certain price points."  Here, the CAC pleads both types of allegations.

out's identical complaint, that "[o]nly the gravest of reasons should lead [a] court in [an] opt-out suit to come to a conclusion that departs from that in the class suit."  583 F.3d at 909 n.8 (internal quotation marks and citation omitted); *see also Packaged Ice*, 723 F. Supp. 2d at 1007 n.12 (distinguishing *Travel Agent* on the basis of its unique procedural posture).[83]

### C.    Plaintiffs Have Adequately Pleaded Fraudulent Concealment

The CAC sufficiently pleads fraudulent concealment, which tolls the statute of limitations.  "In the context of private anti-trust actions the doctrine of fraudulent concealment is well recognized by the federal courts, including by [the Sixth Circuit]."  *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1466 (6th Cir. 1988).  The fraudulent concealment doctrine "ensures that wrongdoers are not permitted, or encouraged, to take advantage of the limitations period to commit secret illegal conduct without penalty." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc*., 71 F.3d 119, 125 (4th Cir. 1995). A limitations period is tolled by fraudulent concealment when there is: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts."  *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 446 (6th Cir. 2012).

---

[83] Defendants suggest, without explicitly stating, that the FTC's decision to close one of its investigations is relevant to their motions to dismiss. Dkt. No. 184, at 6, at PageID# 1901.  It is well understood, however, that the government may decline to pursue an investigation for reasons that do not cast doubt on the merits of a private antitrust case. *See, e.g.*, *High Fructose*, 295 F.3d at 664–65 (holding that the government's decision not to take action against a conspiracy does not imply that no such conspiracy exists because the government has limited resources and may assume that the antitrust class action bar will vigorously prosecute a private suit).  Indeed, the FTC indicated by letter that the closure of its investigation should not be construed as a determination that a violation did not occur.

Defendants do not dispute that the CAC has sufficiently pleaded the first element of fraudulent concealment—that Defendants wrongfully concealed, through affirmative acts, their participation in a price-fixing and market-allocation conspiracy.[84]   An affirmative act of concealment can be any "trick or contrivance intended to exclude suspicion and prevent inquiry." *Pinney Dock*, 838 F.2d at 1467.  Here, there are specific examples of the false and misleading justifications that Defendants provided to their customers:

- AB&I/McWane falsely told customers in March of 2008 that its price increase was "simply a cost pass through" related to increased scrap iron prices and "added costs of production."[85]

- AB&I/McWane falsely told customers in November 2009 that it was increasing prices after trying "to put off this price increase for as long as we could" because it needed to "stay in line with costs."  AB&I explained to its customers that "[d]espite falling demand in U.S. commercial construction, AB&I is experiencing rising raw material costs."[86]

- Charlotte falsely told customers in September 2010 that its price increases were the result of cost increases in raw material and operating expenses.[87]

- AB&I/McWane falsely told customers in September 2010 that it was raising prices due to increased costs of raw materials.[88]

- Charlotte falsely told customers in September 2011 that its price increase was due to the increased cost of scrap iron, other raw materials and "increases in general operating expenses."[89]

Collectively, these statements (and others like them) "were designed to create, and did create the impression that [price] increases were based on competitive market forces."[90]   In

---

[84] Defendants have waived any challenge to this first element of fraudulent concealment by failing to make it in their opening brief.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (holding that an issue was waived in the district court because it was first raised in a reply brief).

[85] Dkt. No. 122 ¶ 88(a), at PageID# 1162–63.

[86] Dkt. No. 122 ¶ 88(b), at PageID# 1163.

[87] *Id.*

[88] *Id.*

[89] Dkt. No. 122 ¶ 88(e)–(f), at PageID# 1163–64.

[90] Dkt. No. 122 ¶ 89, at PageID# 1164.

addition, the CAC alleges, in detail, how Defendants concealed their conspiracy: by communicating secretly to discuss customers and prices of CISP; by meeting at trade association meetings to discuss and fix prices; and by agreeing among themselves not to discuss publicly, or otherwise reveal, their unlawful agreement.[91]

Defendants' sole argument with respect to fraudulent concealment is that Charlotte and McWane's parallel pricing activity—despite their affirmative acts of concealment and even without additional publicly-available information suggesting a conspiracy—was sufficient to require Plaintiffs to investigate possible violations of antitrust law. But the duty to investigate a possible claim is not triggered until there is sufficient information available to a prospective plaintiff to place it on "inquiry notice." *Carrier Corp.*, 673 F.3d at 448. "The upshot is that doing nothing might be reasonable where nothing suggests to a reasonable person that wrongdoing is afoot." *Venture Global Eng'g, LLC v. Satyam Computer Servs., Ltd*., 730 F.3d 580, 588 (6th Cir. 2013) (emphasis added).[92] Moreover, "in evaluating the due-diligence element, the court should evaluate . . . acts of active concealment as a factor in determining whether the plaintiff's investigation was reasonable under the circumstances." *Carrier Corp.*, 673 F.3d at 447.[93]

---

[91] *Id*.

[92] *See also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig*., 782 F. Supp. 487, 498 (C.D. Cal. 1991) ("Plaintiffs are not under a duty continually to scout around to uncover claims which they have no reason to suspect they might have.").

[93] *See also Campbell v. Upjohn Co*., 676 F.2d 1122 (6th Cir. 1982) ("Active concealment by the defendant will be considered in determining the reasonableness of the behavior of the plaintiff under the circumstances. Actions such as would deceive a reasonably diligent plaintiff will toll the statute."); *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc*., 71 F.3d 119, 128 (4th Cir. 1995) ("[W]ith regard to the . . . due diligence requirement, it is possible for a plaintiff to satisfy that element without demonstrating that it engaged in any specific inquiry. If the plaintiff establishes that it was not (and should not have been) aware of facts that should have excited further inquiry on its part, then there is nothing to provoke inquiry. Furthermore, if

Here, Plaintiffs did not possess information that would have caused them to reasonably believe that Defendants had violated the antitrust laws, until the FTC released its complaint to the public on April 2, 2013. Defendants' contrary argument, based entirely on the assumption that "lock step" price increases alone give rise to inquiry notice, is incorrect for several reasons. First, Defendants do not contest at the pleading stage that they took affirmative steps to conceal their conduct, including by misrepresenting that price increases were driven by increasing costs. In light of Defendants' misrepresentations, Plaintiffs did not reasonably suspect that Defendants were engaged in a conspiracy to violate antitrust laws. Second, Defendants' position is flatly contradicted by their own repeated assertions, in their *Twombly* briefing, that parallel price increases are "unremarkable,"[94] "a common occurrence,"[95] "not unlawful,"[96] "normal,"[97] "natural,"[98] and "hardly indicative of a conspiracy."[99] Third, as the CAC alleges, Charlotte and McWane avoided competing with one another, limiting the availability to Plaintiffs of Defendants' pricing information.

The notion that parallel pricing alone does not trigger inquiry notice is well-supported by the caselaw. Indeed, courts—including the Sixth Circuit—have repeatedly concluded, in antitrust cases presenting similar facts to those here, that price increases do not trigger a duty to

---

reasonable further inquiry would not have revealed the basis for the antitrust claim, the plaintiff's claim is not time-barred." (internal citations omitted)).

[94] Dkt No. 184, at 12, at PageID# 1907.

[95] Dkt No. 184, at 1, at PageID# 1896.

[96] Dkt No. 184, at 2, 13, at PageID# 1897, 1908.

[97] Dkt No. 184, at 13, at PageID# 1908.

[98] Dkt No. 184, at 12, at PageID# 1907.

[99] Dkt No. 184, at 13, at PageID# 1908. As detailed in the background and *Twombly* sections of this brief, the CAC includes numerous allegations that go beyond parallel price increases and are based on previously non-public information.

inquire when colluding defendants have misrepresented the reasons behind those increases.  *See*

*Carrier Corp.*, 673 F.3d at 448 (noting, despite allegations of elevated pricing, that inquiry

notice was not triggered until the plaintiff "was aware that the [European Commission] was

investigating [the Defendant] for antitrust violations").[100]   Conversely, Defendants have not

pointed to a single antitrust case from the Sixth Circuit in which, despite the pleading of

affirmative acts of concealment, parallel rising prices alone were found to be sufficient to

constitute inquiry notice.  In those cases in which courts concluded there was a duty by plaintiffs

to investigate an antitrust violation, that duty was triggered by stronger indicators of illegal

conduct, such as litigation, a publicly-disclosed government investigation, or a national news

story disclosing the conspiracy.[101]   Plaintiffs do not contest that, as in these cases, the FTC's

---

[100] *See also In re Copper Antitrust Litig.*, 436 F.3d 782, 789–90 (7th Cir. 2006) (rise in price of primary copper by 50% over a two-year period did not trigger inquiry notice); *King & King Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1156 (10th Cir. 1981) ("Mere knowledge that [defendant] was raising and lowering prices does not provide knowledge that [defendant] was agreeing with other members of the gasoline industry to fix prices . . . .  The evidence pertaining to price fixing points to concealment of those activities."); *Auto. Parts*, 2013 WL 2456584, at *13 (E.D. Mich. June 6, 2013) (no inquiry notice where the defendants "could not have discovered the conduct earlier because of the secret meetings, misrepresentations regarding the prices charged, secret conversations concerning the allocation of customers, the bid-rigging, and the price-fixing."); *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 832 (D. Md. 2013) (inquiry notice was not triggered where the plaintiffs "proffer[ed] numerous pieces of evidence suggesting that the Defendants attempted to minimize the appearance of collusion"); *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 788 (N.D. Cal. 2007) ("pretextual justifications for the inflated prices" and other secret conduct "would not give rise to any information that would excite the inquiry of a reasonable person and thereby require Plaintiffs to engage in affirmative steps to attempt to discover the conspiracy" (internal quotation marks and citation omitted)); *In re Vitamins Antitrust Litig.*, No. 99-misc-197, 2000 WL 1475705, at *54 (D.D.C. May 9, 2000) ("Some defendants suggest that market trends, such as price increases and output reductions, should have put these plaintiffs on notice of their claims. However, . . . market trends as a matter of law do not constitute notice that particular defendants were engaged in acts of price fixing.").

[101] *See, e.g.*, *Carrier Corp.*, 673 F.3d at 448–49 (Plaintiff's awareness "that the [European Commission] was investigating [the defendant] for antitrust violations as early as 2001 . . . would appear to be enough to place the [plaintiff] on inquiry notice, which in turn would require [the plaintiff] diligently to investigate its possible claim."); *Dayco Corp. v. Goodyear Tire & Rubber*

---

April 2, 2013 complaint sufficed to place them on notice that Defendants might have violated antitrust law.

Moreover, "defendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law." *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194–95 (2d Cir. 2003). Because of the fact-bound nature of the fraudulent concealment inquiry,[102] the Sixth Circuit has repeatedly cautioned that courts should be reluctant to dismiss such allegations "without the benefit of discovery." *Carrier Corp.*, 673 F.3d at 448–49.[103]

---

*Co.*, 523 F.2d 389, 394 (6th Cir. 1975) ("As the district court held, the congressional proceedings should have aroused Dayco's suspicions, and its failure to investigate further at that time was not the exercise of due diligence required in order to employ the fraudulent concealment doctrine to avoid the bar of the statute of limitations."); *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 193 (S.D.N.Y. 2000) ("Once plaintiffs were alerted to their potential claims by the media, they promptly filed suit and thus have satisfied the due diligence requirement."); *see also Skelaxin*, 2013 WL 2181185, at *31 (holding that, where "there was not a hearing or lawsuit comparable to those in *Dayco*[,] Plaintiffs allege they were not put on notice of the alleged conspiracy [until a prior lawsuit] was filed in 2010[, i]t was through [that suit] that Plaintiffs learned of the secret meeting in 2005 and the nature of the [problematic] payments . . . [, and] Defendants made several efforts . . . to conceal the nature of the conspiracy, none of their public acts would have excited suspicion.").

[102] *See also Jones v. TransOhio Sav. Ass'n*, 747 F.2d 1037, 1043 (6th Cir. 1984); *Packaged Ice*, 723 F. Supp. 2d at 1019 (rejecting motion to dismiss even "rather conclusory allegations" of fraudulent concealment and preserving their evaluation for the jury); *In re Infant Formula Antitrust Litig.*, No. MDL 878, 1992 WL 503465, at *2 (N.D. Fla. Jan. 13, 1992) ("While it is true that the allegations of fraudulent concealment . . . are absent many specifics, it is similarly true that such details cannot be ascertained until discovery is undertaken. At the heart of plaintiffs' claims . . . is an allegation that any price-fixing was kept secret. This secrecy forms the basis of the claim, and cannot be used as a way to defeat the claim.").

[103] The decisions referenced by Defendants do not support taking the unusual step of dismissing Plaintiffs' fraudulent concealment allegations at the pleading stage. The first case cited by Defendants for their argument that pricing patterns should have excited Plaintiffs' suspicion, *Ruth v. Unifund CCR Partners*, 604 F.3d 908 (6th Cir. 2010), is not an antitrust case and is factually inapposite. In that case, fraudulent concealment was unavailable because the plaintiff's own prior state court proceeding showed that she was aware of the basis for the claims she alleged in a subsequent federal suit. The only other case Defendants cite, *RPS Corp. v. Owens-Corning Fiberglas Corp.*, No. 83-cv-9625, 1984 WL 1260, at *1 (N.D. Ill. Oct. 30, 1984), is a short, unpublished decision in which the court noted that the plaintiff failed to allege "active steps by the defendants to conceal their alleged price-fixing." Defendants also cite *In re Refrigerant Compressors Antitrust Litigation,* 795 F. Supp. 2d 647, 666 (E.D. Mich. 2011), for

**D.** **The Acquisition and Elimination of Star as a Competitor Violates Section 1 of the Sherman Act and Section 7 of the Clayton Act**

The conspirators effectively thwarted the efforts of Star to compete in the CISP market

by eliminating it as a competitor in the following ways:

- After Star entered the market in 2007, it was not permitted to participate in CISPI, which Defendants controlled;[104]

- McWane and Charlotte had significant concerns about the impact of Star's entry, the potential for Star to gain market share over time, and Star's effect on the conspiracy—especially, McWane's and Charlotte's ability to maintain supra-competitive prices;[105]

- To eliminate this threat to the conspiracy, Charlotte acquired Star's CISP business, including its production equipment, and "had all such equipment destroyed."[106] Star employees were prohibited from competing, and Star sent a letter to its customer list stating that it had decided to exit the CISP business;[107]

- "The elimination of Star Pipe as a CISP competitor eliminated the downward pressure on CISP prices which Star Pipe had caused." Following these actions to eliminate Star, "CISP prices rose significantly, beginning as early as January 2011.[108]

The elimination of Star as a competitive threat to the conspiracy violates both Section 1 of the

Sherman Act—because it was an act in furtherance of the illegal price-fixing conspiracy—and

Sherman Act—because it was an act in furtherance of the illegal price-fixing conspiracy—and

---

the proposition that fraudulent concealment allegations must be pleaded with particularity. Caution should be exercised in relying on *Refrigerant Compressors* for any further purpose. Another court in this circuit has rightly called into question the *Refrigerant Compressors* court's apparent holding that a plaintiff must exercise due diligence even in the absence of inquiry notice, explaining that "[i]f, in fact, the conspiracy alleged in *Refrigerants*, when accepted as true, contained no aspects that should have triggered the plaintiff's suspicions, it makes little sense to require a plaintiff to inquire of each of his vendors whether a refrigerant compressor's price was determined by market forces or a concealed, multi-year, multi-member antitrust conspiracy." *In re Polyurethane Foam Antitrust Litig.,* 799 F. Supp. 2d 777, 804 (N.D. Ohio 2011). This is because fraudulent concealment's due diligence requirement mandates "reasonable diligence, not constant cynicism." *Id.*

[104] Dkt. No. 122 ¶ 69, at PageID# 1158–59.

[105] Dkt. No. 122 ¶ 70, at PageID# 1159.

[106] Dkt. No. 122 ¶ 72, at PageID# 1159.

[107] Dkt. No. 122 ¶¶ 72–73, at PageID# 1159.

[108] Dkt. No. 122 ¶ 72, at PageID# 1159.

Section 7 of the Clayton Act, 15 U.S.C. § 18—which prohibits mergers and acquisitions that substantially lessen competition.[109]

      1.      <u>Plaintiffs Have Standing to Seek Damages Resulting from Actions Taken to Eliminate Price Competition by Star</u>

It is well established that direct purchasers have standing to challenge actions by suppliers to suppress competition and thereby maintain higher prices, both under Section 1 of the Sherman Act and Section 7 of the Clayton Act. Courts have routinely found, for instance, that direct purchasers, such as Plaintiffs here, have standing to bring Section 7 claims.[110] Defendants, nevertheless, advance two misplaced arguments that the direct purchaser plaintiffs lack standing.

First, Defendants incorrectly assert that Plaintiffs have failed to "allege that any Plaintiff actually purchased CISP from Charlotte Pipe *after the acquisition*."[111] In fact, Paragraph 96 of the CAC alleges that "*[t]hroughout the Class Period*, Plaintiffs and the other Class members purchased CISP from Defendants (or their subsidiaries or controlled affiliates) at supra-

---

[109] The Section 7 claim applies to Charlotte and seeks damages on behalf of all Plaintiffs who purchased CISP following the merger agreement between Charlotte and Star in July 2010. Dkt. No. 122 ¶ 72, at PageID# 1159. Plaintiffs do not contend that McWane is liable under Section 7. However, McWane is jointly and severally liable, together with Charlotte, under Section 1 of the Sherman Act for damages arising from all acts in furtherance of the conspiracy, including the unlawful acquisition and other actions that were taken to eliminate Star as a threat to Defendants' conspiracy to fix prices and restrain competition.

[110] *See In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 702–03 (E.D. Pa. 2007) (denying motion to dismiss Section 7 claims of direct purchasers of mushrooms); *see also* 2 ABA Section of Antitrust Law, *Antitrust Law Developments*, 433 & n.635 (7th ed. 2012) (explaining that "[c]ustomers and consumers have been held to incur the requisite antitrust injury" to confer standing to challenge mergers and acquisitions that adversely impact competition).

[111] Dkt. No. 184, at 8, at PageID# 1903.

competitive prices."[112] If despite liberal notice pleading standards, a greater level of specificity were required, Plaintiffs would seek leave to amend the CAC to include additional detail.

Second, Defendants erroneously contend that "Plaintiffs [d]o [n]ot [a]llege [t]hat the Star Pipe [a]cquisition [c]aused [p]rices to [i]ncrease."[113] The CAC plainly includes such allegations. Although Defendants increased prices throughout the Class Period, these price increases accelerated after Star was eliminated as a competitor. ("[F]ollowing Charlotte Pipe's acquisition of Star's CISP production equipment and customer lists, CISP prices rose significantly, beginning as early as January, 2011.").[114] The CAC also includes a chart showing the dramatic rise in CISP prices (both absolutely and relative to costs) starting around January 1, 2011.[115] Plaintiffs further allege that before the illegal acquisition, Star's presence in the CISP market had created downward pressure on CISP prices—limiting the ability of Defendants to implement larger price increases—and that this pressure was reversed by Defendants' actions to eliminate Star as a competitor.[116]

The absence of any basis for Defendants' challenge to the CAC's factual allegations at the pleading stage is evident from the only two cases Defendants rely on.[117] *Gerlinger v. Amazon.com*, 526 F.3d 1253 (9th Cir. 2008), for instance, is *not* a Rule 12(b)(6) case, but was decided on *summary judgment* based on factual declarations that were not properly rebutted. The other case relied on by Defendants, *Hodges v. WSM, Inc.,* 26 F.2d 36 (6th Cir. 1994), is not

---

[112] Dkt. No. 122 ¶ 96, at PageID# 1165; *see also* Dkt. No. 122 ¶ 100, at PageID# 1166 (class period includes time period from at least January, 2006 through December 31, 2013).

[113] Dkt. No. 184, at 47, at PageID# 1942.

[114] Dkt. No. 122 ¶ 72, at PageID# 1159.

[115] *See* Dkt. No. 122 ¶¶ 66–67 & fig.6, at PageID# 1157–58.

[116] Dkt. No. 122 ¶ 72, at PageID# 1159.

[117] Dkt. No. 184, at 47–48, at PageID# 1942–43.

a merger case, and does not even involve injuries to *purchasers*. Instead, *Hodges* involved a competitor's allegation that it was injured by a "market division conspiracy" because of the "defendants' lawful refusal to grant plaintiffs access to their private property." *Id.* at 39. The case was dismissed on the ground that this injury "was not an 'antitrust injury' because it did not result from a decrease in competition among shuttle operators." *Id.* That is *the opposite* of the situation presented here, where Plaintiffs allege that purchasers have paid higher prices because the challenged acts were intended to, and did in fact, decrease competition in the CISP market.[118]

2.    <u>McWane Is Liable Under Section 1 of the Sherman Act for Actions in Furtherance of the Conspiracy to Eliminate Star as a Competitor</u>

Star's entry into the market threatened Defendants' conspiracy to fix prices and restrain trade because Star was seeking to gain market share by offering lower prices. Defendants first prevented Star from participating in CISPI, and then Charlotte eliminated Star as a competitor by acquiring its operations, dismantling its equipment, and precluding its employees from resuming competition. These actions were taken to "eliminate Star Pipe as a competitor in the CISP market and to maintain Defendants' price-fixing conspiracy and inflated prices."[119] Defendants' actions had the intended effect. After Star was eliminated as a competitor, the conspirators were

---

[118] To the extent that Defendants suggest that Plaintiffs must allege a "quantifiable price increase" at the pleading stage, Dkt. No. 184, at 48, at PageID# 1943, that is a factual matter that is appropriately addressed through discovery and expert analysis—not a Rule 12(b)(6) motion. *See Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 260 (2d Cir. 1989) ("There is no requirement that Plaintiffs must have a 'winning claim' in order to have standing to challenge anticompetitive conduct, only that Plaintiffs have an injury 'of the type the antitrust laws were designed to prevent.'"); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1234 (6th Cir. 1981) ("[W]e reiterate here our admonition against making a determination on the merits under the guise of assessing the standing of the claimant."). Plaintiffs have alleged antitrust injury in the form of increased prices. At this stage of the litigation that is all that is required.

[119] Dkt. No. 122 ¶ 71, at PageID# 1159.

able to accelerate their price increases because Star was no longer a threat to the continuing conspiracy.[120]

These allegations state a claim against McWane, as well as Charlotte, for violating Section 1 of the Sherman Act. As discussed above, it is well established that a co-conspirator is liable for overt actions by other conspirators undertaken in furtherance of a conspiracy. *United States v. Hayter Oil Co.*, 51 F.3d 1265, 1271 (6th Cir. 1995). It is not necessary that the defendant personally commit those acts, *see, e.g.*, *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991), know the details involved, or even know all of the participants involved. *Id.*, 937 F.2d at 1039; *Hooks v. Hooks*, 771 F.2d 935, 943–44 (6th Cir. 1985). As another judge in this district explained in *In re Southeastern Milk Antitrust Litigation*:

> Assuming that plaintiffs can establish the existence of a conspiracy, a coconspirator is liable for all acts performed in furtherance of the conspiracy. Each conspirator is liable for the overt acts committed by any member of the conspiracy, even if the defendant did not personally commit the acts. It is not necessary that each conspirator know all the details of the conspiracy or all the participants involved.

801 F. Supp. 2d 705, 742 (E.D. Tenn. 2011) (internal citations omitted).

One such overt act was Charlotte's illegal acquisition and dismantling of Defendants' only significant competitor—a competitor that had embarked on a strategy that threatened to undercut the supra-competitive prices being imposed by the conspirators. After the conspirators had already foreclosed Star from participation in CISPI, the dismantling of Star's operations furthered the conspiracy and allowed Defendants to maintain and increase the supra-competitive prices that were the central goal of that conspiracy. McWane (and Charlotte) are, of course, free to dispute these facts as discovery proceeds, and ultimately before a jury, but the CAC alleges a

---

[120] *See* Dkt. No. 122 ¶¶ 71–72, at PageID# 1159.

plausible claim that the actions to eliminate Star as a low-price competitor furthered the conspiracy and are actionable against all Defendants under Section 1 of the Sherman Act.

### 3. Defendants' Remaining Arguments Are Unavailing

McWane argues that the Section 7 claim is "moot" because Section 7 exists "primarily to prevent unlawful mergers before they occur."[121] The fact that this is a "primary" goal of Section 7 is irrelevant for purposes of a motion to dismiss, because Section 7 permits parties injured by a <u>consummated</u> merger to recover damages resulting from reduced competition. *See, e.g.*, W. Holmes, *Antitrust Law Handbook*, § 6:2, at 672–74 (2009–10 ed.) ("[P]rivate parties may bring treble damages actions for three times the damages they sustain as a result of a Section 7 violation."). Indeed, the need for such relief—and the evidentiary basis for obtaining it—will be clearer after a merger has, in fact, reduced competition and resulted in damages from higher prices. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 n.14 (1977) ("Of course, the case for relief will be strongest where competition has been diminished."); *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 260 (2d Cir. 1989), *amended by* 890 F.2d 569 ("Consumers are unlikely to face the prospect of suffering a sufficient amount of damage to justify the cost of seeking a pre-acquisition injunction."). Moreover, the fact that a four-year statute of limitations is applicable to Section 7 directly undermines any argument that a damages claim must be made before or at the time of the merger. *See* 15 U.S.C. § 15b (providing that a claim must be asserted "within four years after the cause of action accrued").

McWane also asserts that Plaintiffs' Section 7 claim is barred by the doctrine of laches because, in merger cases, "divestiture is often the only potentially available remedy."[122] This argument makes little sense here because Plaintiffs are not seeking divestiture. Rather, Plaintiffs

---

[121] Dkt. No. 179, at 37, at PageID# 1871.

[122] Dkt. No. 179, at 38, at PageID# 1872.

seek damages resulting from the acquisition and dismantling of Star and its concomitant effect on competition. The Clayton Act specifically authorizes recovery of damages, and McWane does not provide any basis for concluding that the doctrine of laches precludes such relief here. *See Brunswick*, 429 U.S. at 485–86 (discussing the availability of treble damages in a Section 7 case).[123]

E. **If the Complaint is Insufficient in Any Respect, Plaintiffs Should Be Granted Leave to Amend.**

Defendants' motions to dismiss should be denied because the CAC satisfies the applicable pleading standards. Nevertheless, assuming *arguendo* that the CAC were deemed factually insufficient in any respect, the Court should dismiss that portion of the CAC without prejudice and grant Plaintiffs leave to amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Since the CAC was filed, Plaintiffs' review of documents produced by the Defendants has yielded additional facts supporting an inference of conspiracy.

IV. <u>CONCLUSION</u>

For the reasons stated above, this Court should deny Defendants' motions to dismiss.

---

[123] To the extent that Defendants imply that the mere fact that the FTC took enforcement action forecloses a private suit for damages by injured purchasers, there is no basis for such a position. Government investigations and enforcement actions do not constrain the private right of Plaintiffs to seek compensation for injuries resulting from conduct that violates antitrust law. To the contrary, the antitrust laws were designed with just such private enforcement in mind. *See, e.g.*, *Cal. v. Am. Stores Co.*, 495 U.S. 271, 280–81 (1990) (Clayton Act "manifest[s] a clear intent to encourage vigorous private litigation against anticompetitive mergers"); *Consolidated Gold Fields*, 871 F.2d at 260 ("The government, with its limited resources, cannot be relied upon as the sole initiator of enforcement actions. That is why Congress authorized private enforcement of the antitrust laws."). Defendants do not cite a single case, from any jurisdiction, that has barred injured consumers from recovering damages based on government enforcement actions seeking injunctions or other equitable relief.

Dated: November 10, 2014          Respectfully submitted,

/s/ Scott N. Brown, Jr.
Scott N. Brown, Jr., BPR No. 1212
Joseph R. White, BPR No. 13459
Joseph A. Jackson, II, BPR No. 30203
**SPEARS, MOORE, REBMAN & WILLIAMS,
P.C.**
801 Broad Street, Sixth Floor, P.O. Box 1749
Chattanooga, TN 37401-1749
Tel: (423) 756-7000
Fax: (423) 756-4801

*Interim Liaison Counsel for the Direct Purchaser
Class Plaintiffs*
/s/ Solomon B. Cera
Solomon B. Cera
C. Andrew Dirksen
**GOLD BENNETT CERA & SIDENER LLP**
595 Market Street - Suite 2300
San Francisco, CA 94105-2835
Tel: (415) 777-2230
Fax: (415) 777-5189

/s/ Kit A. Pierson
Kit A. Pierson
Christopher J. Cormier
Robert A. Braun
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, NW, Suite 500 East
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699

/s/ Robert N. Kaplan
Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
Matthew P. McCahill
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

*Interim Co-Lead Counsel for the Direct Purchaser
Class Plaintiffs*

41

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2014, a true and correct copy of the foregoing was served electronically. Notice of this filing will be sent by operation of the Court's CM/ECF system to all parties shown on the electronic filing receipt.

/s/ Scott N. Brown, Jr.
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Scott N. Brown, Jr.
