UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

IN RE:  CAST IRON SOIL PIPE AND FITTINGS
ANTITRUST LITIGATION                                    No. 1:14-md-2508

## ORDER

Before the Court is Defendant McWane, Inc.'s Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Doc. 178), Motion to Dismiss Indirect Purchaser Plaintiffs' Consolidated Amended Complaint (Doc. 176), and Motion to Dismiss Consumer Plaintiffs' Consolidated Amended Complaint (Doc. 177); Defendant Charlotte Pipe's Motion to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Doc. 181), Motion to Dismiss Indirect Purchaser Plaintiffs' Consolidated Amended Complaint (Doc. 182), and Motion to Dismiss Consumer Plaintiffs' Consolidated Amended Complaint (Doc. 183); Defendants' Motion to Strike Indirect Purchaser Plaintiffs' Class Action Allegations (Doc. 151) and Motion to Strike Consumer Plaintiffs' Class Action Allegations (Doc. 154); and Defendant Cast Iron Soil Pipe Institute's Motions for Joinder (Docs. 162, 163, 185, 191).

## I.    BACKGROUND[1]

Cast iron soil pipe ("CISP") is manufactured predominantly from cast iron and is primarily used in residential, commercial, industrial, and government buildings for sanitary and storm drain, waste, and vent piping applications.  (Doc. 122 at 7; Doc. 124 at 7; Doc. 121 at 13).  It replaced wooden systems and has been used in the United States since the beginning of the Nineteenth Century.  (Doc. 122 at 7; Doc. 121 at 13).  CISP is

---

[1] In large part, the allegations stated within the Consolidated Amended Complaints share similar facts. Thus, the Court has combined the background section for the Motions, and it will differentiate between the Consolidated Amended Complaints only when necessary to its analysis.

standardized and must meet the requirements of the American Society for Testing and Materials. (Doc. 122 at 11; Doc. 124 at 10; Doc. 121 at 17). CISP is a versatile product and it can be installed above flooring, below flooring, and underground. (Doc. 122 at 7; Doc. 124 at 13; Doc. 121 at 14). The most frequent purchasers of CISP are plumbing wholesalers, although it is also purchased by end users such as construction companies, plumbers and developers. (Doc. 122 at 10; Doc. 124 at 14; Doc. 121 at 16).

Plastic or polymer pipes are not a functional substitute for CISP because (1) CISP is more effective at reducing plumbing noise; (2) cast iron has a high degree of strength and resistance to tree roots, penetration by rodents, and failure because of ground shifts; (3) cast iron expands and contracts far less than other materials; and (4) CISP is non-combustible and will not burn if there is a building fire. (Doc. 122 at 12; Doc. 124 at 11; Doc. 121 at 18). State, municipal, and local codes often require the use of CISP rather than plastic piping for certain types of construction. (Doc. 122 at 7; Doc. 124 at 11; Doc. 121 at 14, 18).

There are three producers of CISP in the United States: Defendant Charlotte Pipe, Defendant AB&I Foundry ("AB&I"), and Defendant Tyler Pipe Company ("Tyler Pipe").[2] (Doc. 122 at 11; Doc. 124 at 9; Doc. 121 at 2, 16). The Court will refer to McWane and its divisions collectively as "McWane". (Doc. 122 at 11; Doc. 124 at 9). Defendant Randolph Holding Company, LLC is a wholly-owned subsidiary of Charlotte Pipe, and the Court will refer to Charlotte Pipe and its subsidiaries collectively as "Charlotte Pipe." (Doc. 124 at 6). Together, McWane and Charlotte Pipe account for 90 percent of the market for CISP. (Doc. 122 at 11; Doc. 124 at 7; Doc. 121 at 2, 16). To enter the CISP market, a producer would need to build or acquire a foundry and the specialty

---

[2] Defendants AB&I, Tyler Pipe, AB&I Service Center, Tyler Coupling, and Tyler Pipe Penn are divisions of Defendant McWane.

manufacturing tools to produce CISP and develop a distribution network and relationships with plumbing distributors and consumers. (Doc. 122 at 11; Doc. 124 at 10; Doc. 121 at 17).

In 1949, the Cast Iron Soil Pipe Institute ("CISPI") was organized by CISP manufacturers and consisted of 24 CISP manufacturers. (Doc. 122 at 12; Doc. 124 at 6; Doc. 121 at 9). CISPI has its headquarters in Hixson, Tennessee. (Doc. 121 at 11). As of August 2014, CISPI consists solely of Defendants of McWane and Charlotte Pipe and their entities. (Doc. 122 at 12-13; Doc. 124 at 7, 12; Doc. 121 at 9). Charlotte Pipe and McWane are CISPI's sole funders. (Doc. 122 at 13; Doc. 121 at 9). Executives of McWane and Charlotte Pipe attend CISPI events together at least twice a year. (Doc. 122 at 13; Doc. 124 at 6, 12; Doc. 121 at 11).

There are three groups of plaintiffs in this multidistrict litigation: (1) Direct Purchasers of CISP; (2) Indirect Purchasers of CISP for resale; and (3) Consumer Purchasers of CISP.

The Direct Purchasers consist of A&S Liquidating, Inc., Aaron & Co., Hi Line Supply Company, Ltd., and Red River Supply, Inc. ("Direct Purchaser Plaintiffs" or "Direct Purchasers"). A&S Liquidating, Inc. is a corporation located in Grand Blanc, Michigan that purchased CISP manufactured by at least one of the Defendants. (Doc. 122 at 4). Aaron & Co. is a corporation located in Piscataway, New Jersey that purchased CISP manufactured by at least one of the Defendants. (Doc. 122 at 4). Hi Line Supply Company, Ltd. is a corporation located in Peoria, Illinois that purchased CISP manufactured by at least one of the Defendants. (Doc. 122 at 5). Red River Supply, Inc. is a corporation located in Shreveport, Louisiana that purchased CISP manufactured by at least one of the Defendants. (Doc. 122 at 5).

3

The Indirect Purchasers consist of Craig Mechanical, Inc. and Keith McNeill Plumbing Contractor, Inc. ("Indirect Purchaser Plaintiffs" or "Indirect Purchasers"). Craig Mechanical, Inc. is a plumbing contractor located in Riverside, California, that performs commercial and industrial plumbing projects and purchased CISP manufactured by at least one of the Defendants. (Doc. 124 at 4-5). Keith McNeill Plumbing Contractor, Inc. is a plumbing contractor located in Tallahassee, Florida, that purchased CISP manufactured by at least one of the Defendants. (Doc. 124 at 5).

The Consumer Purchasers consist of Jerry Adkins and Rena Lundmark ("Consumer Plaintiffs" or "Consumer Purchasers"). Jerry Adkins is an Arkansas resident who purchased CISP from one or more of the Defendants for his personal use. (Doc. 121 at 6). Rena Lundmark is an Arkansas resident who purchased CISP from one or more of the Defendants for her personal use. (Doc. 121 at 6).

Plaintiffs allege that McWane and Charlotte Pipe have been fixing prices of CISP since at least January 1, 2006 through December 31, 2013. (Doc. 122 at 14; Doc. 124 at 14; Doc. 121 at 20). In 2005 or 2006, an employee of Charlotte Pipe's cast iron foundry in North Carolina learned from Charlotte Pipe's Senior Vice President of the Cast Iron Division, Marshall Coble, that McWane and Charlotte Pipe were fixing prices of CISP. (Doc. 122 at 14; Doc. 124 at 15; Doc. 121 at 20). Coble stated that Charlotte Pipe and McWane were meeting at the bi-annual trade association meeting that summer or fall to agree on pricing for CISP. (Doc. 122 at 14; Doc. 121 at 20).

McWane and Charlotte Pipe often announced identical price increases at close intervals after a trade association meeting. In early September 2010, Charlotte Pipe and AB&I announced a future price increase of 7.5%, which would take effect on January 1, 2011. (Doc. 122 at 14; Doc. 124 at 15; Doc. 121 at 21). Additionally, Charlotte Pipe and

McWane had identical prices for the years 2006, 2007, 2009, 2010, 2011, 2012, and 2013 for the 3"x 10' No-Hub Pipe, 4" x 10' No-Hub Pipe, 3" No-Hub 1/4 Bend, 4" No-Hub 1/8 Bend, 4" x 3" Wye, 3" x 10' Single Hub Pipe, 4" x 10' Single Hub Pipe, 3" Hub & Spigot 1/4 Bend, and 4" Hub & Spigot 1/8 Bend. (Doc. 122 at 15-17; Doc. 121 at 21-22). These prices have "steadily increased" since January 1, 2006 even though total spending on construction has declined significantly during that time period. (Doc. 122 at 17; Doc. 124 at 19; Doc. 121 at 22). Additionally, the primary cost determinants for CISP such as scrap iron and natural gas have increased at rates "substantially less" than the price increases made by the Defendants. (Doc. 124 at 22; Doc. 121 at 23).

McWane and Charlotte Pipe agreed not to compete for one another's CISP customers. (Doc. 124 at 23; Doc. 121 at 23). Sales representatives at Tyler Pipe were directed to "stay away from Charlotte Pipe's CISP customers" and instead maintain their current market position. (Doc. 122 at 18; Doc. 124 at 23; Doc. 121 at 23).

Star Pipe entered the CISP market in 2007. (Doc. 122 at 18; Doc. 124 at 8; Doc. 121 at 24). Star Pipe sought membership to CISPI, but Defendants did not permit it to join. (Doc. 122 at 19; Doc. 124 at 23; Doc. 121 at 24). To gain market share in the CISP market, Star Pipe priced its CISP lower than the prices of McWane and Charlotte Pipe. (Doc. 122 at 19). On July 14, 2010, Charlotte Pipe executed a confidential Asset Purchase Agreement with Star Pipe, which permitted it to acquire all of Star Pipe's CISP business including its inventory, production equipment, business records, and customer lists for $19 million. (Doc. 122 at 19; Doc. 124 at 23; Doc. 121 at 24). After acquiring Star Pipe's CISP business, it destroyed all of Star Pipe's equipment. (Doc. 124 at 23; Doc. 121 at 24).

Along with the Asset Purchase Agreement, the parties signed a confidential agreement that prohibited Star Pipe and certain of its employees from competing with Charlotte Pipe in North America for six years after the agreement was signed. (Doc. 122 at 19; Doc. 124 at 8; Doc. 121 at 24-25). Star Pipe also agreed to send a letter to its CISP customers letting them know that it was out of the CISP business. (Doc. 122 at 19; Doc. 124 at 24; Doc. 121 at 25). Following Charlotte Pipe's acquisition of Star Pipe's CISP business, CISP prices "rose significantly" in January 2011. (Doc. 122 at 19). In addition to the Star Pipe acquisition, Charlotte Pipe had also purchased other CISP businesses "in recent history." (Doc. 122 at 20; Doc. 124 at 8). These businesses included Matco-Norca in 2009, DWV Casting Company in 2004, and Richmond Foundry, Inc. in 2002. (Doc. 124 at 24).

In 2013, the Federal Trade Commission ("FTC") challenged Charlotte Pipe's acquisition of Star Pipe. (Doc. 122 at 20; Doc. 124 at 24; Doc. 121 at 25). The FTC ultimately entered into a consent agreement with Charlotte Pipe to "address the anticompetitive effects resulting from Charlotte Pipe's 2010 acquisition of the [CISP] business of Star Pipe." (Doc. 122 at 20; Doc. 124 at 24-25; Doc. 121 at 25). The consent agreement provided that, for ten years following the execution of the agreement, Charlotte Pipe must notify the FTC before acquiring other entities engaged in the manufacture or sale of CISP products so that the FTC could "guard against future anticompetitive transactions." (Doc. 124 at 25; Doc. 121 at 25). The agreement also required Charlotte Pipe to inform its customers and the public about the acquisition of Star Pipe and other CISP acquisitions and invalidated the non-compete and confidentiality clauses set forth in the Star Pipe Asset Purchase Agreement. (Doc. 122 at 20; Doc. 124 at 25; Doc. 121 at 25-26).

The FTC's redacted complaint regarding Charlotte Pipe's acquisition of Star Pipe's CISP business was filed on April 2, 2013, which is when Plaintiffs allege they became aware of the existence of the conspiracy. (Doc. 122 at 20-21; Doc. 124 at 27; Doc. 121 at 26). Plaintiffs generally allege that Defendants concealed the existence of their CISP conspiracy by communicating secretly with one another regarding CISP prices, meeting at trade association meetings to discuss and fix CISP prices, justifying price increases based on false reasons, and agreeing with one another not to reveal the nature of their conspiracy. (Doc. 122 at 25; Doc. 124 at 31; Doc. 121 at 27). Plaintiffs submit in their Consolidated Amended Complaints that these actions amount to fraudulent concealment and permit Plaintiffs' claims to be tolled. (Doc. 122 at 25; Doc. 124 at 31; Doc. 121 at 30).

Regarding fraudulent concealment, Plaintiffs allege that Defendants took the following actions to conceal their conspiracy: (1) AB&I falsely informed its customers in March 2008 that its price increase was "simply a cost pass through" because earlier increases were insufficient to cover the rise in scrap iron prices; (2) AB&I falsely informed its customers in November 2009 after a price increase that it had tried to "put off this price increase for as long as [it] could"; (3) Charlotte Pipe falsely informed its customers on September 1, 2010 that price increases were the result of cost increases in raw materials and operating expenses; (4) AB&I falsely informed its customers in September 2010 that it was raising its prices for CISP because of raw material cost increases; (5) Charlotte Pipe announced price increases on September 7, 2011, and falsely attributed them to cost increases in raw materials; and (6) Charlotte Pipe falsely informed customers on September 20, 2011 that price increases were on account of cost

7

increases in raw materials and operating expenses. (Doc. 122 at 23-24; Doc. 124 at 29-30; Doc. 121 at 28-29).

This multidistrict litigation was transferred to the undersigned on February 18, 2014. (Doc. 7). On June 9, 2014, the Court entered the Initial Case Management and Scheduling Order, in which it set forth the timeline for filing consolidated amended complaints and motions to dismiss. (Doc. 89 at 2, 3). Plaintiffs filed their respective Consolidated Amended Complaints on August 11, 2014. (Docs. 121, 122, 124).

Direct Purchaser Plaintiffs are bringing their claims pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) for themselves and a class consisting of:

> All persons or entities that purchased cast iron soil pipe or cast iron soil pipe fittings in the United States directly from any of the Defendants, their subsidiaries, predecessors, or affiliates, from January 1, 2006 through December 31, 2013 (the "Class Period"). Excluded from the Class are Defendants, their parent companies, subsidiaries, predecessors, and affiliates, any co-conspirators, federal and state governmental entities and instrumentalities of federal and state governments.

(Doc. 122 at 26). Direct Purchaser Plaintiffs seek to bring their claims as a class action because (1) the class is numerous and joinder of all members is impracticable; (2) the Direct Purchaser Plaintiffs share the same injury and were damaged by the same Defendants as the class members; (3) Direct Purchaser Plaintiffs will fairly and adequately represent and protect the interests of the class; (4) the counsel for Direct Purchaser Plaintiffs are experienced in this type of litigation; and (5) this action presents common issues of law and fact that predominate over questions that would affect individual members of the class. (Doc. 122 at 27). The common questions of law and fact that Direct Purchaser Plaintiffs identify include: (1) whether Defendants engaged in a conspiracy to fix CISP prices and the duration of that conspiracy; (2) whether the existence of such a conspiracy violated Section 1 of the Sherman Act; (3)

whether the conspiracy artificially inflated the price of CISP; (4) whether Charlotte Pipe's acquisition of Star Pipe was done in furtherance of the conspiracy; (5) whether Defendants agreed to allocate CISP customers; (6) whether Defendants' conduct caused injury to class members; and (7) the measure and amount of damages incurred by the class. (Doc. 122 at 27).

Direct Purchaser Plaintiffs have identified two claims in their Consolidated Amended Complaint. First, Direct Purchaser Plaintiffs claim that Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to unreasonably restrict trade by agreeing to fix, raise, maintain, and stabilize the price of CISP in the United States. (Doc. 122 at 28). Second, Direct Purchaser Plaintiffs claim that Defendants violated Section 7 of the Clayton Act by substantially lessening competition and creating a monopoly in the CISP market. (Doc. 122 at 29). Direct Purchaser Plaintiffs allege that Defendants violated the Clayton Act by acquiring Star Pipe's CISP business, which caused severe anticompetitive effects in the CISP market. (Doc. 122 at 30).

Indirect Purchaser Plaintiffs are bringing their claims pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) for themselves and a class consisting of:

> All Indirect Purchasers that purchased cast iron soil pipes or cast iron soil pipe fittings indirectly from any of the Defendants, their subsidiaries, predecessors, or affiliates, from January 1, 2006 through December 31, 2013 (the "Class Period") in the following states: Alabama, Arizona, Arkansas, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

(Doc. 124 at 34). Indirect Purchaser Plaintiffs seek to bring their claims as a class action because (1) the class is numerous and joinder of all members is impracticable; (2) the Indirect Purchaser Plaintiffs share the same injury and were damaged by the same

Defendants as the class members; (3) Indirect Purchaser Plaintiffs will fairly and adequately represent and protect the interests of the class; (4) the counsel for Indirect Purchaser Plaintiffs are experienced in this type of litigation; and (5) this action presents common issues of law and fact that predominate over questions that would affect individual members of the class. (Doc. 124 at 34-35). The common questions of law and fact that Indirect Purchaser Plaintiffs identify include: (1) whether Defendants engaged in a conspiracy to fix CISP prices and the duration of that conspiracy; (2) whether the existence of such a conspiracy violated state antitrust statutes and state consumer and unfair competition statutes; (3) whether the conspiracy artificially inflated the price of CISP; (4) whether Charlotte Pipe's acquisition of Star Pipe was done in furtherance of the conspiracy; (5) whether Defendants' conduct caused injury to class members; and (6) the measure and amount of damages incurred by the class. (Doc. 124 at 35).

Indirect Purchaser Plaintiffs have identified two claims in their Consolidated Amended Complaint. First, Indirect Purchaser Plaintiffs claim that Defendants have violated the antitrust statutes of the states of Alabama, Arizona, Arkansas, California, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (Doc. 124 at 38-41). Second, Indirect Purchaser Plaintiffs claim that Defendants have violated state consumer protection and unfair competition statutes in the states of Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Kansas, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, Nevada,

New Hampshire, New Mexico, New York, North Carolina, and Rhode Island.  (Doc. 124 at 43).

Consumer Plaintiffs are bringing their claims pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) for themselves and a nationwide class consisting of:

> All persons in the United States who purchased products for personal use and not for resale containing, in some form, CISP manufactured by one or more of the Defendants or co-conspirators, or any predecessors, parents, subsidiaries, or affiliates thereof, during the Class Period.

> Excluded from the Class are Defendants, their parent companies, subsidiaries, predecessors, and affiliates, any co-conspirators, federal and state governmental entities and instrumentalities of federal and state governments.

(Doc. 121 at 31-32).  Alternatively, Consumer Plaintiffs bring this action on behalf of a multistate class consisting of:

> All persons who lived in the Consumer States who purchased products for personal use and not for resale containing, in some form, CISP manufactured by one or more of the Defendants or co-conspirators, or any predecessors, parents, subsidiaries, or affiliates thereof, during the Class Period.

(Doc. 121 at 32).  The "Consumer States" are listed in the Consumer Consolidated Amended Complaint as Arizona, Arkansas, California, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  (Doc. 121 at 32 n. 1).

Consumer Plaintiffs seek to bring their claims as a class action because (1) the class is numerous and joinder of all members is impracticable; (2) the Consumer Plaintiffs share the same injury and were damaged by the same Defendants as the class

members; (3) the Consumer Plaintiffs will fairly and adequately represent and protect the interests of the class; (4) the counsel for the Consumer Plaintiffs are experienced in this type of litigation; and (5) this action presents common issues of law and fact that predominate over questions that would affect individual members of the class. (Doc. 121 at 32-33). The common questions of law and fact that Consumer Plaintiffs identify include: (1) whether Defendants engaged in a conspiracy to fix CISP prices and the duration of that conspiracy; (2) whether Defendants engaged in unfair, false, deceptive or unconscionable behavior; (3) whether Defendants' conduct artificially inflated the price of CISP; (4) whether Charlotte Pipe's acquisition of Star Pipe was done in furtherance of the conspiracy; (5) whether Defendants agreed to allocate CISP customers; (6) whether Defendants' conduct caused injury to class members; and (7) the measure and amount of damages incurred by the class. (Doc. 121 at 34).

Consumer Plaintiffs have identified five claims in their Consolidated Amended Complaint. First, Consumer Plaintiffs claim that Defendants have violated the Tennessee Trade Practices Act ("TTPA") by entering into a conspiracy which lessened the full and free competition in the market for CISP. (Doc. 121 at 35). Second, Consumer Plaintiffs claim that Defendants have violated the antitrust statutes of the states of Arizona, California, the District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. (Doc. 121 at 34-54). Third, Consumer Plaintiffs claim that Defendants have violated the state consumer protection statutes of the states of Arkansas, California, the District of Columbia, Florida, Massachusetts, Missouri, Montana, New Mexico, New York, North Carolina, Rhode Island, South

Carolina, and Vermont. (Doc. 121 at 55-66). Fourth, Consumer Plaintiffs claim that Defendants have been unjustly enriched under the law of the Consumer States. (Doc. 121 at 66). Fifth, Consumer Plaintiffs claim that Charlotte Pipe's acquisition of Star Pipe violated Section 7 of the Clayton Act. (Doc. 121 at 67).

On September 22, 2014, McWane and Charlotte Pipe filed a Motion to Strike the Indirect Purchaser Plaintiffs' Class Action Allegations and a Motion to Strike the Consumer Plaintiffs' Class Action Allegations. (Docs. 151, 154). McWane and Charlotte Pipe each filed motions to dismiss the consolidated amended complaints of each Plaintiffs group. (Docs. 176, 177, 178, 181, 182, 183). CISPI filed motions for joinder regarding these motions. (Docs. 162, 185). On December 19, 2014, the Court held a hearing on these motions. (Doc. 230).

## II. MOTIONS TO DISMISS

### A. Standard of Law

The Federal Rules of Civil Procedure provide, in relevant part, that all pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). While Rule 8(a) does not require plaintiffs to set forth detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). At a minimum, Rule 8(a) requires the plaintiff to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" – that is, Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 556 n.3 (2007). A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) is thus not a challenge to the

plaintiff's factual allegations, but rather, a "test of the plaintiff's cause of action as stated in the complaint." *Flanory v. Bonn*, 604 F.3d 249, 252 (6th Cir. 2010).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The reviewing court must determine not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679; *Twombly*, 550 U.S. at 570 (holding that a complaint is subject to dismissal where plaintiffs failed to "nudg[e] their claims across the line from conceivable to plausible"). Although the Court must take all of the factual allegations in the complaint as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice," and a plaintiff's legal conclusions couched as factual allegations need not be accepted as true. *Iqbal*, 556 U.S. at 678; *see Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). Therefore, to survive a motion to dismiss under 12(b)(6), plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

### B. Analysis

In its Motion to Dismiss, Charlotte Pipe moves the Court to dismiss the Plaintiffs' Consolidated Class Action Complaints on the grounds that (1) the Complaints do not

establish an agreement sufficient to comply with *Twombly*; (2) Plaintiffs' claims are subject to statutes of limitations because they failed to plead due diligence; (3) the Indirect Purchaser and Consumer Plaintiffs lack Article III standing to invoke laws of states in which they do not reside or were not injured; (4) the Indirect Purchaser and Consumer Plaintiffs' injuries are too remote and attenuated to establish antitrust standing; (5) the Indirect Purchaser and Consumer Plaintiffs fail to address essential elements of the state antitrust claims; (6) the Indirect Purchaser and Consumer Plaintiffs' consumer protection and unfair competition claims must be dismissed for numerous reasons; (7) the Consumer Plaintiffs' unjust enrichment claims fail to allege that the Consumer Plaintiffs conferred any benefit on the Defendants and do not meet particular state pleading requirements; (8) the Direct Purchasers' Clayton Act claim fails because they were not injured by the Star Pipe acquisition; and (9) the Consumer's Clayton Act claim is barred by black letter law. (Doc. 184).

In its Motion to Dismiss, McWane moves the Court to dismiss Plaintiffs' Consolidated Class Action Complaints on the grounds that (1) the Indirect Purchaser Plaintiffs lack standing to assert their claims and thus the Court lacks subject matter jurisdiction over those claims; (2) the Indirect Purchaser Plaintiffs remaining claims should be dismissed for failure to state a claim under California and Florida law; (3) Consumer Plaintiffs cannot pursue a claim under the TTPA; (4) Consumer Plaintiffs lack standing to assert their claims and thus the Court lacks subject matter jurisdiction over those claims; (5) Consumer Plaintiffs have failed to state a claim for relief under Arkansas law; (6) Consumer Plaintiffs cannot maintain an illegal merger claim against McWane as a matter of law; (7) Direct Purchaser Plaintiffs have not alleged facts to state

a plausible conspiracy claim under the Sherman Act; and (8) Direct Purchaser Plaintiffs cannot maintain an illegal merger claim against McWane as a matter of law. (Doc. 179).

In their Motions, Defendants McWane and Charlotte Pipe each submit that they have incorporated each other's briefs and arguments where appropriate. (Doc. 179 at 9; Doc. 184 at 6 n.2). Defendant CISPI has also filed several Motions for Joinder (Docs. 185, 162) and an Amended Motion for Joinder (Doc. 191) wherein it adopts by reference and relies upon the Defendants' Motions to Dismiss and Motions to Strike. In its Amended Motion for Joinder, in addition to adopting and relying on Defendants' Motions, CISPI also argues for dismissal of Plaintiffs' claims. *See* Doc. 191. CISPI's Motions for Joinder (Docs. 185, 162, 191) are hereby **GRANTED** to the extent that they are seeking joinder, and the Court will consider CISPI's arguments for dismissal along with the other Defendants' positions.[3] The Court will turn to each Plaintiffs' Consolidated Amended Complaint and the arguments for dismissal associated with it in turn.

1. Direct Purchaser Plaintiffs

a. Sherman Act Conspiracy Allegations under *Twombly*

In their Motions, Defendants argue that the Direct Purchaser Plaintiffs have failed to state a claim for conspiracy pursuant to the standard required under *Twombly*. Specifically, Charlotte Pipe submits that (1) the Direct Purchaser Plaintiffs fail to allege facts showing any agreement between the Defendants; (2) parallel pricing between the Defendants was the result of the CISP industry being an oligopoly; (3) Direct Purchaser Plaintiffs' allegations regarding the Defendants' trade association membership does not plausibly suggest a conspiracy; (4) Direct Purchaser Plaintiffs' allegations regarding

---

[3] CISPI's Motion for Joinder (Doc. 163) that was based on previously-filed motions to dismiss is hereby **DENIED AS MOOT**.

conspiratorial discussions is a conclusory assertion that is not sufficient to "save" their claims; (5) and the United States Supreme Court and the United States Court of Appeals for the Sixth Circuit have "routinely dismissed" complaints with similar allegations. (Doc. 184 at 13-23). McWane also argues that Direct Purchaser Plaintiffs have failed to state a conspiracy under Section 1 of the Sherman Act because their Consolidated Amended Complaint does not suggest that there was a conspiracy between McWane and Charlotte Pipe, but rather alleges "conduct that is entirely consistent with independent decision-making." (Doc. 179 at 42). In response, Direct Purchaser Plaintiffs argue that Defendants rely on legal standards governing summary judgment motions rather than motions under 12(b)(6), fail to evaluate the conspiracy allegations as a whole, attempt to impose heightened pleading requirements, demand direct evidence of conspiracy despite precedent holding otherwise, ignore allegations that contradict their positions, and seek to have factual inferences drawn in their favor. (Doc. 201 at 20).

Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The United States Court of Appeals for the Sixth Circuit has described the essential elements of a Sherman Act claim as "(1) a contract, combination or conspiracy; (2) affecting interstate commerce; (3) which imposes an unreasonable restraint of trade." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir. 1983) (citing *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982) and *Davis-Watkins Co. v. Serv. Merch.*, 686 F.2d 1190, 1195-96 (6th Cir. 1982)).

The agreement between the conspiring parties may "ultimately be proven either by direct evidence of communications between the defendants or by circumstantial evidence of conduct that, in the context, negates the likelihood of independent action and raises an inference of coordination." *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012). Evidence of a conspiracy must be evaluated as a whole rather than "dismembering it and viewing its separate parts." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *see also In re Refrigerant Compressors Antitrust Litig.*, 795 F. Supp. 2d 647, 661 (E.D. Mich. 2011) ("this Court concludes that *Twombly* does not support such a dismemberment or carve out approach to assessing the sufficiency of a complaint."); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008). Once a conspiracy is established, "it is presumed to continue until there is an affirmative showing that it has been abandoned." *United States v. Hayter Oil Co. of Greeneville, Tenn.*, 51 F.3d 1265, 1270-71 (6th Cir. 1995).

The United States Supreme Court case *Bell Atlantic v. Twombly* specifically addressed the level of detail in which a plaintiff must plead a claim brought pursuant to Section 1 of the Sherman Act. 550 U.S. at 556. The Court provided that to state a plausible claim for conspiracy, there must be "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* With respect to parallel conduct by competitors, the Court found that "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Thus, although parallel conduct "gets the complaint close to stating a claim," in order to establish plausibility, a plaintiff must provide further "factual enhancement." *Id.* Accordingly, if a plaintiff pleads only

parallel conduct allegations without a context demonstrating "a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.*

At the outset of this discussion, the Court is cognizant that the issue before it does not fall under a heightened pleading standard and is not presented at the summary judgment stage of this litigation. *See In re Auto. Parts Antitrust Litig.*, 2014 WL 4272784, at *6 (E.D. Mich. Aug. 29, 2014) ("there is no heightened pleadings requirement for stating an antitrust claim"); *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d at 943 ("These complaints, while not answering all specific questions about 'who, what, when and where,' do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist."). Accordingly, as the Direct Purchaser Plaintiffs discuss in their brief, the Court will analyze Defendants' requested relief under the appropriate 12(b)(6) standard rather than the legal standard applicable for determining summary judgment. *See* Doc. 201 at 21.

Turning to the merits of Defendants' arguments, the parties appear to agree that parallel pricing, standing alone, is not sufficient to state a claim under Section 1 of the Sherman Act. However, in cases such as the instant one, where plaintiffs assert allegations of parallel pricing as well as additional allegations, the United States Court of Appeals for the Sixth Circuit has identified "plus factors" for a district court to consider when evaluating the additional allegations. Specifically, it is important for a district court to consider:

> (1) whether the defendants' actions, if taken independently, would be contrary to their economic self-interest; (2) whether defendants have been uniform in their actions; (3) whether defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and (4) whether defendants have a common motive to

conspire. Ordinarily, an affirmative answer to the first of these factors will consistently tend to exclude the likelihood of independent conduct.

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009) (quoting *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999)). Considering all of the allegations in the Direct Purchasers Consolidated Amended Complaint, the Court must determine whether the stated facts "plausibly suggest, rather than [are] merely consistent with, an agreement to restrain trade in violation of the Sherman Act." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011) (internal quotation omitted).

In their brief, the Direct Purchaser Plaintiffs argue that the following allegations are sufficient to plausibly state a claim for conspiracy under Section 1 of the Sherman Act: (1) Charlotte Pipe and McWane engaged in parallel pricing beginning at least as early as 2006 and continuing until 2013; (2) the Defendants used CISPI at least twice a year to communicate and coordinate CISP price fixing, maintain their market share, and exclude foreign competition; (3) Defendants would increase prices shortly after meeting at CISPI; (4) CISPI's Executive Vice President provided weekly reports about bidding and pricing information to Defendants and alerted them when customers were being solicited by foreign manufacturers; (5) Senior Vice President of Charlotte Pipe's Cast Iron Division, Marshall Coble, made statements to employees stating that Charlotte Pipe and McWane were agreeing on pricing; (6) McWane and Charlotte Pipe agreed to limit competition for each other's customers; (7) McWane and Charlotte Pipe raised prices despite a decline in construction spending; and (8) the CISP market in the United States is susceptible to collusion because it has a high degree of concentration, an inelastic demand for CISP, high entry barriers, and homogeneity. (Doc. 201 at 25-36).

Considering the allegations stated within the Direct Purchaser Plaintiffs' Consolidated Amended Complaint, the Court finds Defendants' position that it fails to state a claim to be unconvincing. While it is true that the most concrete allegations lie in Defendants' uniform conduct of years of parallel pricing, the Court finds that there is sufficient factual enhancement elsewhere in the Consolidated Amended Complaint to state a claim under Section 1 of the Sherman Act. As the Direct Purchaser Plaintiffs identify, the Defendants had an agreement to limit competition with one another's customers, which is clearly against their economic self-interest. Additionally, the particularized setting of the CISP market—namely that Defendants control 90 percent of the CISP market with there being no comparable substitute for CISP—further supports Direct Purchaser Plaintiffs' claim alleging a conspiracy. Further, not only did Defendants act uniformly and against their economic self-interest, but they also had opportunity to exchange information regarding the price-fixing conspiracy at CISPI, an organization at which they were the only members. If these factors were not enough on their own, Defendant employee Marshall Coble also allegedly confirmed the price-fixing. Based on these factors as well as the other allegations stated in the Direct Purchaser Plaintiffs' Consolidated Amended Complaint, the Court is unable to conclude that Defendants' actions were the result of independent conduct at this stage in the litigation. Rather, the Court finds that Direct Purchaser Plaintiffs have stated a plausible claim under Section 1 of the Sherman Act, and Defendants' Motions to Dismiss will be **DENIED** as to this claim.

### b. Statutes of Limitations

Defendants next move the Court to dismiss any Direct Purchaser Plaintiff claim for a purchase made prior to the statute of limitations because the Direct Purchaser

Plaintiffs have not pled due diligence in their Consolidated Amended Complaint. (Doc. 184 at 26). Direct Purchaser Plaintiffs submit that the statute of limitations must be tolled because their Complaint adequately pleads fraudulent concealment. (Doc. 201 at 38).

The initial Direct Purchaser Plaintiff complaint was filed on October 2, 2013, and the Direct Purchaser Plaintiffs allege that the conspiracy ran from January 1, 2006, through December 31, 2013. However, a plaintiff may only bring a claim arising under the Sherman Act "within four years after the cause of action accrued." 15 U.S.C. § 15b. Thus, in order for Direct Purchaser Plaintiffs to recover damages for conduct relating back to the beginning of the alleged conspiracy, they rely on the doctrine of fraudulent concealment.

As a general matter, a court should not extend a statute of limitation "by even a single day" absent "compelling equitable circumstances." *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 561 (6th Cir. 2000); *see also Wood v. Carpenter*, 101 U.S. 135, 139 (1879) ("Statutes of limitation are vital to the welfare of society and are favored in the law."). The doctrine of fraudulent concealment is a "longstanding exception," which permits a court to toll a statute of limitations if a defendant has concealed a cause of action from a plaintiff. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988). In the Sixth Circuit, a Plaintiff alleging fraudulent concealment must establish that "1) defendants concealed the conduct that constitutes the cause of action; 2) defendants' concealment prevented plaintiffs from discovering the cause of action within the limitations period; and 3) until discovery, plaintiffs exercised due diligence in trying to find out about the cause of action." *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 422 (6th Cir. 2009). The

burden of proving the elements falls on the plaintiff seeking to toll the statute of limitations. *Pinney Dock & Transp. Co.*, 838 F.2d at 1465; *see also Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 475 (6th Cir. 2013).

Regarding a defendant's acts of concealment, the Sixth Circuit requires that a defendant engage in "affirmative acts of concealment." *Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 319 (6th Cir. 2007). Thus, fraudulent concealment is "invoked in cases where the defendant takes active steps to prevent the plaintiff from suing in time, such as by hiding evidence or promising not to plead the statute of limitations." *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004). Put another way, to meet this element, "mere silence or unwillingness to divulge wrongful activities is not sufficient." *Helmbright v. City of Martins Ferry, Ohio*, 61 F.3d 903 (6th Cir. 1995).

As for the due diligence element of fraudulent concealment, only "[a]ctions such as would deceive a reasonably diligent plaintiff will toll the statute; but those plaintiffs who delay unreasonably in investigating circumstances that should put them on notice will be foreclosed from filing, once the statute has run." *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir. 1982). For a plaintiff to establish that he was reasonably diligent in discovering his claim, he must show "that he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense." *In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d 777, 802 (N.D. Ohio 2011) (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195 (1997)). Whether a plaintiff acted with due diligence depends on "the circumstances, and that reasonableness turns in part on how well the defendant has hidden its wrongdoing." *Venture Global Eng'g, LLC v. Satyam Computer Servs.*, Ltd., 730 F.3d 580, 588 (6th Cir. 2013). Based on this standard, it is

possible that doing nothing may be reasonable "where nothing suggests to a reasonable person that wrongdoing is afoot." *Id.*

A plaintiff alleging fraudulent concealment must plead the requisite elements with particularity pursuant to Federal Rule of Civil Procedure 9(b). *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975). Rule 9 of the Federal Rules of Civil Procedure addresses pleading special matters. Fed. R. Civ. P. 9. To plead a claim for fraud or mistake under Rule 9, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Although Rule 9 heightens the pleading standard for special pleadings, it "does not require a plaintiff to be omniscient, . . . . [and] the main purpose behind Rule 9(b) is to provide notice of a plaintiff's claim to a defendant so that the defendant may be able to prepare an informed responsive pleading." *BAC Home Loans Servicing LP v. Fall Oaks Farm LLC*, 848 F. Supp. 2d 818, 827 (S.D. Ohio 2012) (citing *Coffey v. Foamex, L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993).

In support of their allegation of fraudulent concealment, Plaintiffs submit that Defendants concealed their actions by giving customers false information regarding why prices were increasing in 2008, 2009, 2010, and 2011. *See* Doc. 201 at 39. Plaintiffs also argue that the secretive and exclusive nature of CISPI permitted Defendants to conspire and communicate with one another regarding the price-fixing conspiracy. *Id.* at 40. Defendants, however, take the position that the parallel pricing activity, which was publically available, was sufficient to put Direct Purchaser Plaintiffs on notice that they may have a cause of action against Defendants. (Doc. 184 at 28).

Turning to the elements of fraudulent concealment, and taking all well-pled allegations of the Consolidated Amended Complaint as true, the Court finds that Defendants did affirmatively act to conceal the alleged price-fixing conspiracy in such a way that a reasonable purchaser would not be put on notice of a cause of action. Although Defendants argue that the evidence of parallel pricing could have arguably put Direct Purchaser Plaintiffs on notice of their cause of action, Direct Purchaser Plaintiffs are able to identify with sufficient specificity several instances of Defendants allegedly misrepresenting their reasons for raising prices. *See* Doc. 122 at 22-23. The Court finds it noteworthy that the reasons Defendants gave for raising prices, such as increased costs of materials, were credible justifications for price increases since CISP price is in part determined by the cost of scrap iron and other metals. As Defendants affirmatively misrepresented these price increases with a veil of credible justifications, the Court finds it unlikely that a reasonable purchaser of CISP would discern that they might have a cause of action against Defendants. Additionally, if Defendants had not concealed their reasons for raising prices in this manner, it is likely that Direct Purchaser Plaintiffs would have discovered their cause of action within the applicable statute of limitations by exercising reasonable diligence. Accordingly, the Court finds that Direct Purchaser Plaintiffs have met their burden of establishing fraudulent concealment, and the statute of limitations will be tolled.

c. Clayton Act Claim

Regarding the Direct Purchaser Plaintiffs' Clayton Act claim, the Defendants take separate positions. Charlotte Pipe argues that the Direct Purchaser Plaintiffs' Clayton Act claim must be dismissed because it does not plausibly allege that they were injured by the Star Pipe acquisition. (Doc. 184 at 48). Specifically, Charlotte Pipe argues that

Direct Purchaser Plaintiffs fail to allege that they purchased CISP after the acquisition or that the acquisition caused prices of CISP to increase. (*Id.* at 49). McWane, on the other hand, submits that the Clayton Act claim against McWane should be dismissed because it did not acquire Star Pipe. (Doc. 179 at 43-44).

The Clayton Act is "designed to arrest and prohibit mergers and acquisitions that lessen competition or tend to create a monopoly." *Z Technologies Corp. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014) (internal quotation omitted). Section 7 of the Clayton Act provides in relevant part:

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

15 U.S.C. § 18. To state a claim under Section 7, a plaintiff must allege that: "(1) a person or entity; (2) engages in commerce or an activity affecting commerce; (3) merges with another person also engaged in commerce, and (4) the effect of the merger is to substantially lessen competition or tend to create a monopoly." *HTC Sweden AB v. Innovatech Products & Equip. Co.*, 2008 WL 4510710, at *14 (E.D. Tenn. Sept. 30, 2008). The Sixth Circuit has described Section 7 of the Clayton Act as dealing in "probabilities, not certainties" because of Congress's inclusion of the term "may" when discussing the effect of an acquisition. *ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 564 (6th Cir. 2014) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)); *see United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 858 (6th Cir. 2005) ("The Supreme Court has explained that Congress used the words may be

substantially to lessen competition to indicate that its concern was with probabilities, not certainties.") (internal quotation omitted). Thus, it is not a requirement that "anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play." *Dairy Farmers of Am., Inc.*, 426 F.3d at 858.

The Court finds Charlotte Pipe's arguments to be unpersuasive. While Charlotte Pipe submits that the Direct Purchaser Plaintiffs have failed to allege that they were injured by the Star Pipe acquisition, this position is directly refuted by the language of the Consolidated Amended Complaint. Specifically, Direct Purchaser Plaintiffs allege that the acquisition of Star Pipe eliminated the downward pressure on CISP prices and resulted in CISP prices rising "significantly" in January 2011. *See* Doc. 122 at 19. Direct Purchaser Plaintiffs have also alleged that they have bought CISP from Charlotte Pipe after the Star Pipe acquisition, which further refutes Charlotte Pipe's arguments. *Id.* at 25. Accordingly, as Defendant has not identified any other reasons why this claim should be dismissed, Charlotte Pipe's Motion to Dismiss will be **DENIED** as to this claim.

As for McWane, Direct Purchaser Plaintiffs clarify in their response brief that they "do not contend that McWane is liable under Section 7." (Doc. 201 at 45). Direct Purchaser Plaintiffs also confirmed this at the December 19, 2015 Hearing on the instant Motion. (Doc. 235 at 48) ("We're not making the illegal acquisition claim under Section 7 of the Clayton Act against McWane."). Based on Direct Purchaser Plaintiffs' submission, the Court finds that they have expressly abandoned any claim arising under Section 7 of the Clayton Act against McWane. Accordingly, McWane's Motion to Dismiss as to that claim will be **GRANTED**, and this claim will be **DISMISSED WITH PREJUDICE**.

2. Indirect Purchaser Plaintiffs and Consumer Plaintiffs

In their Motions, Defendants frequently address the Indirect Purchaser Plaintiffs and Consumer Plaintiffs together as "Downstream Plaintiffs." Additionally, the Indirect Purchaser Plaintiffs and the Consumer Plaintiffs have filed a consolidated response brief. Thus, the Court will discuss the arguments and responses as they are raised, discussing the two plaintiff groups together as "Downstream Plaintiffs" and distinguishing between them when appropriate.

a. Standing Issues

Before the Court turns to the Defendants' arguments regarding the sufficiency of the Downstream Plaintiffs' Complaints, the Court will first address the issues the Defendants raise regarding standing. Article III standing and antitrust standing "are not one and the same, and [a court] not only may—but [it] must—reject claims under Rule 12(b)(6) when antitrust standing is missing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007); *see also Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters ("AGC")*, 459 U.S. 519, 535 (1983) ("the focus of the doctrine of antitrust standing is somewhat different from that of standing as a constitutional doctrine").

In their Motions to Dismiss, Defendants submit that the Downstream Purchasers lack Article III standing and antitrust standing. (Doc. 184 at 29; Doc. 179 at 10). In Response, the Downstream Plaintiffs argue that Defendants' position (1) conflates Article III standing with the requirements for class certification under Federal Rule of Civil Procedure 23; (2) is not supported by the Sixth Circuit or by the overwhelming case

law from federal courts; and (3) is an issue that is properly deferred until the Court makes a ruling on class certification. (Doc. 202 at 15).

### i. Article III Standing

"Article III of the Constitution gives federal courts subject matter jurisdiction over actual cases or controversies, neither of which exists unless a plaintiff establishes his standing to sue." *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 748 (6th Cir. 2012); *see Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies"). Article III standing is a threshold question in federal cases and concerns whether a plaintiff is the proper party to bring a lawsuit. *Raines v. Byrd*, 521 U.S. 811, 818 (1997).

Article III standing, or "constitutional standing," has three elements. First, a plaintiff must have suffered "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir. 1996). This element is often interpreted as the plaintiff having a "personal stake" in the outcome of the controversy. *Baker v. Carr*, 369 U.S. 186, 204 (1962); *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007). Second, the injury must be "fairly traceable to the challenged action of the defendant." *Cleveland Branch, N.A.A.C.P. v. City of Parma, OH*, 263 F.3d 513, 524 (6th Cir. 2001). Third, it must be likely rather than speculative that "the injury will be redressed by a favorable decision. *White v. United States*, 601 F.3d 545, 551-51 (6th Cir. 2010) (internal quotation marks omitted).

It is a plaintiff's burden to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs must support each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Fednav, Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir. 2008). As this issue is before the Court on a motion to dismiss, the Court must construe the Complaints in the light most favorable to Plaintiffs and accept as true all well-pleaded factual allegations. *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999).

With regard to Article III standing, Defendants argue that the Indirect Purchasers lack standing because the injury they allege—being forced to pay higher prices for CISP—could have only occurred in the two states where the named Indirect Plaintiffs reside, Florida and California. (Doc. 179 at 11). Thus, for the remaining claims brought under the other 26 state antitrust laws and 17 state consumer protection laws, Defendants argue that the Indirect Purchasers lack standing to pursue these claims because they do not reside in these states, have not alleged that they purchased CISP in these states, and have not alleged that they suffered an injury that can be addressed under the laws of these states. (*Id.* at 12). The Downstream Plaintiffs respond that the named Plaintiffs have met the requisite elements to establish individual standing and that the concerns raised by Defendants are more appropriate addressed when the Court addresses class certification. (Doc. 202 at 17).

In support of their position, the Downstream Purchasers cite the United States Court of Appeals for the Sixth Circuit case *Fallick v. Nationwide Mutual Insurance Company*. 162 F.3d 410 (6th Cir. 1998). In *Fallick*, the Sixth Circuit highlighted the distinction between a plaintiff's standing under Article III and "the relationship between

30

a potential class representative and absent class members." *Id.* at 422. The Sixth Circuit elaborated on the distinction between these two matters as follows:

> Threshold individual standing is a prerequisite for all actions, including class actions. A potential class representative must demonstrate individual standing vis-[a]-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action. As this Court has made clear, however, once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure.

*Id.* at 423 (internal citation and quotation omitted). Certain district courts have followed the line of reasoning set forth in *Fallick* and have concluded that "class certification is logically antecedent [to Article III concerns] where its outcome will affect the Article III standing determination." *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 213 (S.D.N.Y. 2012) (internal quotation omitted).

Federal courts are split regarding the appropriate procedural juncture for a court to decide Article III standing in a class action case. The cause for this split regarding when standing must be determined was created by the combination of two United States Supreme Court cases: *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) and *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). In *Amchem*, a case concerning the legitimacy of a class certification sought to achieve global settlement of asbestos-related claims, the Court found the class certification issues in the case to be dispositive because their resolution was "logically antecedent to the existence of any Article III issues." 521 U.S. at 612. In *Ortiz*, a global settlement of claims against a manufacturer of asbestos-containing products, the Court concluded that the class certification issues before the Court should be "treated first" because they were "logically antecedent to Article III

concerns, and themselves pertain[ed] to statutory standing." 527 U.S. at 831. The parties have derived the "logically antecedent" language from these cases and have reached differing conclusions as to its meaning.

In considering both parties' positions, the Court notes that the Sixth Circuit has not explicitly determined the meaning of the phrase "logically antecedent" or decided whether a court must consider class certification before standing in the states in which a named plaintiff is not a resident. *See In re Polyurethane Foam Antitrust Litig.*, 799 F. Supp. 2d at 805; *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 654 (E.D. Mich. 2011) ("The United States Court of Appeals for the Sixth Circuit has not ruled on the issue. Within this district, courts have issued conflicting opinions on the subject."). Indeed, the fact that the Sixth Circuit has not weighed in on this issue explains the divergent positions of the parties in the instant litigation. Considering the current, unsettled state of the law on this issue, the Court is left to decide which avenue is most appropriate in *this* litigation to resolve Defendants' standing challenges.

Even though the Sixth Circuit has not explicitly ruled on this issue, the Court finds that *Fallick* supports a conclusion that, in instances such as the present matter, issues related to Article III standing are more appropriately resolved *after* a ruling on class certification. Defendants acknowledge, with certain caveats, that the Downstream Plaintiffs could assert claims in their home states, and the relief they are seeking in the states in which they do not reside is sought for absent class members. If the Court were to decide the standing issue at this juncture on the basis that the named plaintiffs do not reside in some of the states under whose laws they bring claims on behalf of the class, it would not be giving due appreciation to the complex nature of Article III standing in class actions and the nuances of class certification. Keeping this in mind, the Court

concludes that "the better path is to defer this issue until the class certification stage" when the class itself will be determined. *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612, at *11 (E.D. Mich. June 6, 2013). Accordingly, Defendants' Motion to Dismiss with respect to this issue will be **DENIED**.

ii. Antitrust Standing

Even if a plaintiff has Article III standing, the Court must also determine "whether the plaintiff is the proper party to bring a private antitrust action." *AGC*, 459 U.S. at 535 n.31. As evidenced by *Twombly*, antitrust standing is a "threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [a court] must dismiss it as a matter of law—lest the antitrust laws become a treble-damages sword rather than the shield against competition-destroying conduct that Congress meant them to be." *NicSand, Inc.*, 507 F.3d at 450. Indeed, the Sixth Circuit has described antitrust standing as "the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws." *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991).

Relying on principles identified in *AGC*, the Sixth Circuit has set forth several factors that a court can consider in determining whether a plaintiff has antitrust standing:

> 1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir. 1983).

A pivotal case in the development of an indirect purchaser's right to bring a private antitrust action was the United States Supreme Court case *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In *Illinois Brick*, the Court held that indirect purchasers in an antitrust action could not bring a lawsuit to recover overcharges passed onto them because "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party injured in his business or property." *Id.* at 728 (internal quotation omitted). Following the *Illinois Brick* decision, several states enacted legislation designed to repeal the impact of *Illinois Brick* to permit indirect purchasers to bring claims. *In re Auto. Parts Antitrust Litig.*, 2014 WL 2993742, at *12 (E.D. Mich. July 3, 2014). As the Downstream Purchasers in the instant case are bringing their claims under various state statutes (aside from the Consumer's claim under the Sherman Act), the Court will not delve into the intricacies of the *Illinois Brick* repealer statutes. *See California v. ARC Am. Corp.*, 490 U.S. 93, 103, 109 S. Ct. 1661, 1666 (1989) ("nothing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws."). Rather, the issue before the Court is whether to apply the Sixth Circuit factors to the Downstream Plaintiffs' claims even though they are bringing their claims pursuant to state statutes.

In their Motions, Defendants argue that all but four of the state antitrust statutes under which Plaintiffs seek relief require application of the federal antitrust standing principles. (Doc. 184 at 32). In response, Plaintiffs agree that the four states of Arkansas, Minnesota, South Carolina, and Tennessee do not require the application of federal antitrust standing principles and argue that "Defendants have greatly overstated each state's position as to *AGC*" and the application of federal antitrust standing

principles. (Doc. 202 at 25). Specifically, Plaintiffs contend that (1) Defendants have ignored "persuasive authority" that undermines the application of *AGC* to antitrust claims brought under Alabama, Arizona, California, Hawaii, Mississippi, and North Carolina statutes; (2) the statutes that Defendants cite for Arizona, District of Columbia, Hawaii, Michigan, Nebraska, Oregon, Rhode Island, South Dakota, Utah, Vermont, and West Virginia only "suggest that state antitrust laws should be harmonized with federal antitrust law"; (3) the cases that Defendants have cited for the District of Columbia, Iowa, Michigan, New York, North Dakota, Vermont, and Wisconsin are inapplicable to the instant matter; (4) the cases that Defendants have cited for the District of Columbia, Iowa, Michigan, New York, North Dakota, Vermont, and Wisconsin involve plaintiffs who were not indirect purchasers and "had a more remote relationship with the defendants"; and (5) courts that have addressed this issue have declined to apply the *AGC* factors. (Doc. 202 at 25-26).[4]

Whether the *AGC* factors should be applied to the Downstream Purchasers' claims is a matter of state law. In considering legal questions controlled by state law, the Court is "bound by the rulings of the state supreme court." *In re Darvocet, Darvon, & Propoxyphene Products Liab. Litig.*, 756 F.3d 917, 937 (6th Cir. 2014). If the state supreme court has not issued a determinative ruling regarding this issue, the Court may also consider "how the court would rule by looking to all available data, including decisions of the states' appellate courts." *Id.* Courts in this Circuit have described this as a two-part process: (1) considering whether the states at issue in an action have explicitly adopted the *AGC* factors; and (2) applying the *AGC* factors to the states that

---

[4] Although Plaintiffs advance many arguments through both the text of their brief and the corresponding footnote, Plaintiffs have not addressed Defendants' argument with respect to the claims brought in Illinois and New Hampshire.

have adopted them. *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *9 (E.D. Mich. Apr. 9, 2013) *motion to certify appeal denied*, 2013 WL 4009023 (E.D. Mich. Aug. 5, 2013) *and appeal dismissed*, 731 F.3d 586 (6th Cir. 2013). The twenty-five states that are at issue here for this determination are Alabama, Arizona, California, Washington D.C., Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Utah, Vermont, West Virginia, and Wisconsin. (Doc. 184-4).

Although the Court has considered the parties' positions, as it is deferring ruling on the Article III standing issue, it will also defer ruling on this antitrust standing issue at this juncture. *See Ross v. Bank of Am., N.A.(USA)*, 524 F.3d 217, 222 (2d Cir. 2008) ("A court proceeds to an antitrust standing analysis only after Article III standing has been established"); *see also Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 405 (6th Cir. 2012) *aff'd*, 134 S. Ct. 1377, 188 (2014) ("Antitrust causation is much more limited than Article III standing"); *Hyland v. Homeservices of Am., Inc.*, 2008 WL 4000546, at *3 (W.D. Ky. Aug. 25, 2008) ("Antitrust standing "requires more than the constitutional minimum for the 'case or controversy' that brings jurisdiction to Article III court"). Accordingly, Defendants' Motions with respect to this issue will be **DENIED**.

> b. Conspiracy Allegations under *Twombly* and Statute of Limitations Issues

In their Motions, Defendants each argue that the Downstream Plaintiffs have failed to state a claim for conspiracy at the standard required under *Twombly*. Although the Downstream Plaintiffs have not alleged a claim under the Sherman Act

and rather identify claims under state law, the arguments against these conspiracy claims address the same issues. Namely, whether the Consolidated Amended Complaints fail to show a price-fixing agreement between the Defendants, whether the allegations they state support a plausible inference that a price-fixing conspiracy existed pursuant to their respective state law claims, and whether the Downstream Plaintiffs adequately plead fraudulent concealment. For the reasons articulated *supra* with respect to the Direct Purchasers, Defendants' Motions to Dismiss will also be **DENIED** on this ground with respect to the Downstream Purchasers.

### c. State Antitrust Claims

Defendants next argue that the Downstream Plaintiffs have failed to address the essential elements of their state antitrust claims. (Doc. 184 at 36). In support of their position, Defendants submit that the claims of the Downstream Plaintiffs should be dismissed because: (1) Rhode Island has followed *Illinois Brick* and barred indirect purchaser actions; (2) the District of Columbia, Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, West Virginia, and Wisconsin require that a plaintiff plead allegations establishing a sufficient nexus between a defendant's conduct and intrastate commerce and the Downstream Plaintiffs have failed to do so; and (3) Arkansas does not provide a private right of action for price-fixing claims. (Doc. 184 at 36-40).

### Rhode Island

In response to Defendants' position regarding Rhode Island, the Downstream Plaintiffs submit that Rhode Island permits indirect purchasers to bring an antitrust claim under Rhode Island General Laws Section 6-36-12(g). Section 6-36-12(g) provides:

> In any action under this section the fact that a person or public body has not dealt directly with the defendant shall not bar or otherwise limit recovery. Provided, however, that the court shall exclude from the amount of monetary relief awarded in the action any amount of monetary relief that duplicates amounts that have been awarded for the same injury. No provision of this chapter shall be construed to limit the standing of any person or public body, whether the person or public body is a direct or indirect purchaser, from bringing suit on his or her own behalf.

R.I. Gen. Laws § 6-36-12(g). In interpreting this statute in 2002, the Supreme Court of Rhode Island held that § 6-36-12 "reserves to the Attorney General as *parens patriae*, the right to sue on behalf of indirect purchasers for monetary damages resulting from a violation of the Antitrust Act" and concluded that individual indirect purchasers could not bring their claims. *Siena v. Microsoft Corp.*, 796 A.2d 461, 465 (R.I. 2002). However, on July 15, 2013, the Rhode Island legislature passed an *Illinois Brick* repealer statute. Since the enactment of this statute, courts have interpreted this statute as applying solely prospectively. *See In re Aggrenox Antitrust Litig.*, 2015 WL 1311352, at *21 (D. Conn. Mar. 23, 2015) ("In the absence of evidence of the Rhode Island legislature's intent to the contrary, I conclude that the law applies only prospectively."); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 759 (E.D. Pa. 2014) ("the repealer statutes of both states are presumed to apply only prospectively, absent evidence of legislative intent to the contrary"). Accordingly, Defendants' Motion to Dismiss regarding the Indirect Purchasers' claims brought pursuant to Rhode Island's Antitrust Act will be **GRANTED** as to claims alleging overcharges before July 15, 2013.

### *Arkansas*

Defendants also submit that Indirect Purchaser's claim under the Arkansas Unfair Practices Act must be dismissed because "Arkansas does not provide a private

38

right of action for price-fixing claims." (Doc. 184 at 40). In response, the Indirect

Purchaser's cite to Arkansas Code Annotated § 4-75-211, which provides:

> Any person, firm, private corporation, or municipal or other public
> corporation, or trade association, may maintain an action to enjoin a
> continuance of any act or acts in violation of this subchapter and, if injured
> thereby, for the recovery of damages.

Ark. Code Ann. § 4-75-211(a). Indeed, federal district courts in Arkansas have

interpreted this statute as permitting private plaintiffs to bring a cause of action under

this subsection of the Arkansas Unfair Practices Act. *See Goodner v. Clayton Homes,*

*Inc.*, 2014 WL 4722748, at *1 (W.D. Ark. Sept. 23, 2014); *Coffee.org, Inc. v. Green*

*Mountain Coffee Roasters, Inc.*, 2012 WL 511485, at *3 (W.D. Ark. Feb. 15, 2012).

However, the Indirect Purchasers' argument becomes problematic based on the

fact that Arkansas' prohibition on price-fixing is located is a separate subchapter of the

Arkansas Unfair Practices Act, in which actions are only permitted by the Attorney

General. *See* Ark. Code Ann. § 4-75-309; Ark. Code Ann. § 4-75-310; Ark. Code Ann. §

4-75-315 (providing that the Attorney General may bring an action on behalf of injured

persons); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1191 (N.D.

Cal. 2009) ("Defendants contend—and plaintiffs do not disagree—that plaintiffs do not

have standing to seek relief under Arkansas antitrust law because that law only permits

predatory pricing claims alleging that items were sold at less than cost and does not

create a private right of action for an alleged conspiracy to raise prices.") (internal

quotation omitted). Thus, as this subsection of the statute does not provide for a private

individual to bring an action and only permits actions by the Attorney General, the

Indirect Purchasers' claim must be **DISMISSED**.

*Illinois*

Defendants next argue that the Consumers' claims under Illinois's antitrust statute must be dismissed because the statute expressly bars indirect purchasers from bringing class actions. (Doc. 184 at 40); 740 Ill. Comp. Stat. 10/7 ("Provided further that no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General"); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2014 WL 6792663, at *27 (E.D. Pa. Dec. 3, 2014). Consumers failed to respond to this argument in their brief. *See generally* Doc. 202. The Court has reviewed the Illinois statute and, finding Defendants' position well-supported and unopposed by the Consumers, will **GRANT** Defendants' Motion to Dismiss with respect to this claim.

*Hawaii*

With respect to the claims brought under Hawaii's antitrust statute, Defendants argue that a plaintiff must notify the Hawaii Attorney General before bringing a claim under this provision, and that the Downstream Purchasers have failed to comply with this requirement. (Doc. 184 at 40). However, in their Response, Indirect Purchasers submit that they notified the Hawaii Attorney General of their intent to bring their claims on August 15, 2014. (Doc. 202 at 55; Doc. 202-1). As the Indirect Purchasers established that they complied with this requirement, Defendants' Motion to Dismiss will be **DENIED** with respect to the Indirect Purchasers' claim.

It is unclear from the parties' filings whether the Consumer Purchasers have also complied with this requirement. Courts that have reached this issue are split regarding whether a plaintiff's failure to comply with this requirement bars him from proceeding with his unfair competition claims. *In re Aggrenox Antitrust Litig.*, 2015 WL 1311352, at

*22; *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d 224, 232 (M.D. Pa. 2010) ("Under § 480–13.3(a), any action based upon unfair competition must adhere to the attorney general notification procedures enumerated by statute; the [] plaintiffs' failure to comply with the statutory provision therefore warrants dismissal"); *In re Aftermarket Filters Antitrust Litig.*, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009) ("the statute does not provide for dismissal of the action for failure to comply, and that dismissal is inconsistent with the remedial purposes of the statute"). Given the parties' limited discussion of this issue, the split of authority regarding whether this is a bar to proceeding with an unfair competition claim, and the remedial nature of Hawaii's antitrust statute, the Court declines to dismiss the Consumer Purchasers' claim under Hawaii's antitrust statute on this ground.

*District of Columbia, Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, West Virginia, and Wisconsin*

Turning to Defendants' next argument for dismissal, Defendants argue that the claims under the laws of the states of the District of Columbia, Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, West Virginia, and Wisconsin must be dismissed because the Downstream Plaintiffs fail to allege a connection to the intrastate commerce of the individual states. In response, the Downstream Plaintiffs argue that they have described "a pervasive price-fixing scheme that affected the entire CISP market and impacted commerce nationwide." (Doc. 202 at 52). In addition to reviewing the parties' positions, the Court has examined the laws of the District of Columbia, Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, West Virginia, and Wisconsin. *See* D.C. Code § 28-4502 ("Every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce all or any

41

part of which is within the District of Columbia is declared to be illegal."); Miss. Code. Ann. § 75-21-1; Nev. Rev. Stat. Ann. § 598A.06; N.Y. Gen. Bus. Law § 340; N.C. Gen. Stat. Ann. § 75-1 ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal"); S.D. Codified Laws § 37-1-3.1 ("A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful."; Tenn. Code Ann. § 47-25-101; W. Va. Code Ann. § 47-18-3 ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in this State shall be unlawful"); Wis. Stat. Ann. § 133.03. The Court has also reviewed the Downstream Purchasers' allegations regarding their claims brought under these statutes. The Court will first summarize the state of the law in each state before reaching a conclusion regarding whether the Downstream Purchasers have stated a claim under the laws of these states.

<em>Mississippi</em>

District courts that have examined Mississippi's Antitrust Act have construed it "to require allegations of at least some activity or conduct occurring in intrastate commerce or trade." *California v. Infineon Technologies AG*, 531 F. Supp. 2d 1124, 1158 (N.D. Cal. 2007); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d at 1188 ("The Court agrees with defendants that the Mississippi Antitrust Act requires some allegations of intrastate conduct, but finds that plaintiffs have sufficiently alleged such conduct."); *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1099 (N.D. Cal. 2007).

## District of Columbia

As for the District of Columbia, the case law interpreting this statute is relatively limited. The courts that have interpreted the statute have described it as paralleling Section 1 of the Sherman Act. *Atl. Coast Airlines Holdings, Inc. v. Mesa Air Grp., Inc.*, 295 F. Supp. 2d 75, 87 (D.D.C. 2003); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 682, 692 (E.D. Mich. 2000); *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 45 (D.D.C. 1998). However, a district court in the District of Columbia described the District of Columbia antitrust statute as "not requir[ing] an interstate nexus, but rather a connection within this jurisdiction." *GTE New Media Servs.*, 21 F. Supp. 2d at 45.

## Nevada

In Nevada, the antitrust statute "prohibits conduct that is part of a conspiracy in restraint of trade in Nevada. " *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 889 (E.D. Mich. 2014). Courts considering this statute have dismissed claims that have failed "to allege a causal connection between [the plaintiff's] injuries and the conduct prohibited by the laws of those states, which require a showing that such conduct occurred, or whose effect was felt, in-state." *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *8 (D.N.J. Oct. 20, 2011); *see also Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 397 (E.D. Pa. 2010) ("Nevada requires only that the plaintiffs show that some part of the prohibited activity caused harm in Nevada, not that the commencement of the sham litigation took place there.").

## New York

New York's antitrust statute—the Donnelly Act—is also modeled on the Sherman Act, and courts typically interpret claims brought under the Donnelly Act consistent with claims brought under the Sherman Act. *See In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 1378946, at *27 (S.D.N.Y. Mar. 26, 2015); *TechReserves Inc. v. Delta Controls Inc.*, 2014 WL 1325914, at *10 (S.D.N.Y. Mar. 31, 2014), *appeal dismissed* (Sept. 4, 2014); *Solla v. Aetna Health Plans of New York, Inc.*, 14 F.Supp.2d 252, 259–60 (1998), *aff'd*, 182 F.3d 901 (2d Cir.1999) ("It is well-established that the Donnelly Act was modeled on the Sherman Act and is generally to be construed in accordance with federal antitrust precedents."). However, unlike the Sherman Act, the Donnelly Act "makes clear that it applies to contracts in restraint of trade relating to the 'conduct of any business, trade or commerce or in the furnishing of any service *in this state* . . . '" *Conergy AG v. MEMC Elec. Materials, Inc.*, 651 F. Supp. 2d 51, 61 (S.D.N.Y. 2009) (emphasis original) (quoting N.Y. Gen. Bus. Law § 340(1).

## North Carolina

To allege a claim under the North Carolina antitrust statute, a plaintiff must establish that "the injuries [alleged] have a 'substantial in-state effect on North Carolina trade or commerce.'" *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 540 (E.D. Pa. 2010) (quoting *Lawrence v. UMLIC-Five Corp.*, 2007 WL 2570256, at *7 (N.C. Super. June 18, 2007). Thus, to state a claim under this statute, plaintiffs must allege that at least part of the violation took place in North Carolina. *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d at 231.

*South Dakota*

South Dakota's antitrust statute provides that a "contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful." S.D. Codified Laws § 37-1-3.1. Similar to the other statutes, South Dakota's antitrust statute requires that part of the anticompetitive conduct occur within South Dakota or have an effect within South Dakota. *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 581; *In re Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1098 (N.D. Cal. 2007); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 172 (D. Me. 2004) ("plaintiffs need only allege that a part of the trade or commerce occurred within South Dakota").

*Tennessee*[5]

As for the TTPA, the Supreme Court of Tennessee has concluded that it "does not contain any language indicating that the legislature intended that the scope of the act be limited to intrastate commerce." *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522 (Tenn. 2005). In support of its conclusion, the court noted that if "the legislature intended such a limitation, the legislature simply could have included the limitation in the act." However, in Tennessee, a plaintiff bringing a claim must allege that "the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree." *Id.* at 523.

---

[5] Mirroring the way the parties have structured their own arguments, this section only applies to the Downstream Purchasers' multi-state class claim under the statute. The Consumer Plaintiffs' first claim for relief under the TTPA will be addressed separately *infra*.

*West Virginia*

A plaintiff seeking to state a claim under the West Virginia Antitrust Act must also allege that the wrongful conduct has produced "in-state effects." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 582. Thus, a plaintiff must show that the wrongful conduct occurred in West Virginia or was felt in West Virginia to assert a violation of the West Virginia Antitrust Act. *In re Magnesium Oxide Antitrust Litig.*, 2011 WL 5008090, at *8. A federal district court in West Virginia has even described the antitrust law as being "directed towards intrastate commerce." *Anziulewicz v. Bluefield Cmty. Hosp., Inc.*, 531 F. Supp. 49, 53 (S.D.W. Va. 1981).

*Wisconsin*

Under Wisconsin's antitrust act, a plaintiff bringing a claim must allege that:

> (1) actionable conduct, such as the formation of a combination or conspiracy, occurred within this state, even if its effects are felt primarily outside Wisconsin; or (2) the conduct complained of "substantially affects" the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside this state.

*Olstad v. Microsoft Corp.*, 700 N.W.2d 139, 158 (Wis. 2005); *see also Sheet Metal Workers Local 441 Health & Welfare*, 737 F. Supp. 2d at 402 ("The Wisconsin Supreme Court has expressly ruled that the Act applies to interstate commerce").

Turning to whether the Downstream Purchasers' pleadings are sufficient for this group of states, the Court finds that identifying one state as an example to be informative. Thus, the Court has selected the Downstream Purchasers' allegations with respect to their claims brought in the District of Columbia to serve as an example of the deficiencies within these allegations.

The Consumers, in support of their claim under the District of Columbia antitrust statute, alleged that:

> Defendants' combinations or conspiracies had the following effects (1) CISP price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) CISP prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the classes, who resided in the District of Columbia and/or purchased products containing CISP in the District of Columbia, were deprived of free and open competition, in the District of Columbia; and (4) Plaintiffs and members of the classes, who resided in the District of Columbia and/or purchased products containing CISP in the District of Columbia, paid supracompetitive, artificially inflated prices in the District of Columbia for products containing CISP.

(Doc. 122 at 42). It is clear that these allegations do not specifically identify certain details relating to the wrongful conduct or identify a connection between the District of Columbia and the wrongful conduct. It also cannot be said the Consumers have made any attempt to meaningfully address intrastate commerce. As such, the Court finds that Consumers have failed to state a claim under the District of Columbia antitrust act.

As for the Indirect Plaintiffs, the only district-specific allegation they have stated regarding the District of Columbia is that "Defendants engaged in a contract, combination, or conspiracy in unreasonable restraint of trade and commerce in violation of District of Columbia Code Annotated, §§ 28-4501, *et seq.*" While the Court is cognizant of the relatively flexible standard it must use to consider claims at this stage in litigation, it is unable to conclude that these allegations are sufficient to state a claim under the District of Columbia antitrust act. The Indirect Plaintiffs have not alleged any facts specific to the District of Columbia and fail to address how Defendants' actions have in any way affected intrastate commerce in the District of Columbia. Similar to the Consumer Plaintiffs, these allegations are not sufficient to establish a connection within the District of Columbia. As the Downstream Purchasers' allegations under the states of

Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, Wisconsin, and West Virginia are similarly conclusory without addressing any connection between the individual state and the wrongful conduct, these allegations are also insufficient. Accordingly, the Indirect Plaintiffs' and Consumer Plaintiffs' claims under these statutes will be **DISMISSED**.

Defendants next argue that the Indirect Purchasers have failed to state a claim under California antitrust law. (Doc. 179 at 18). Defendants argue that the allegations stated in the Indirect Purchasers' Consolidated Amended Complaint fail to meet the heighted pleading standard under California's Cartwright Act.[6]

The Cartwright Act is the California antitrust statute that "prohibits combinations in unreasonable restraint of trade. *Marsh v. Anesthesia Serv. Med. Grp., Inc.*, 200 Cal. App. 4th 480, 493 (2011). To sufficiently state a claim under the Cartwright Act, a plaintiff must allege "(1) the formation and operation of the conspiracy; (2) illegal acts done pursuant thereto; and (3) damage proximately caused by such acts." *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 718 (Ct. App. 1982); *see also Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 8 (2012) ("A Cartwright Act violation requires a combination of capital, skill or acts by two or more persons that seeks to achieve an anticompetitive end") (internal quotation omitted). "Cartwright Act claims are properly dismissed 'where the complaint makes conclusory allegations of a combination and does not allege with factual particularity that separate entities maintaining separate and independent interests combined for the purpose to restrain

---

[6] The Court will address Defendants' arguments with respect to Plaintiffs' claims brought under California's Unfair Competition Law and the Florida Deceptive and Unfair Practices Act *infra* with the other consumer protection and unfair competition claims.

trade.'" *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 320 (N.D. Cal. 2007) (quoting *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 189 (1999)).

Defendants argue that the Indirect Purchasers' claims under the Cartwright Act fail because their Consolidated Amended Complaint consists of conclusory allegations rather than alleging "the required facts necessary to suggest that anyone from McWane conspired with anyone from Charlotte Pipe to fix list prices, multipliers, or rebates for CISP." (Doc. 179 at 20). In response, the Indirect Purchasers argue that they have "provided clear evidence" that Defendants violated the Cartwright Act through the following allegations: (1) Defendants used CISPI to further their conspiracy; (2) Defendants restrained competition for their customers; (3) Defendants eliminated competition by buying and destroying the assets of potential competitors such as Star Pipe; (4) the FTC investigated Defendants' activities; (5) the CISP market is ripe for collusion because of its structural features; (6) Defendants parallel price increased their CISP for unjustified reasons; and (7) the Indirect Purchasers suffered injury based on Defendants' unlawful actions. (Doc. 202 at 41).

Viewing the Indirect Purchasers' allegations in the light most favorable to them, the Court finds that they have sufficiently stated a claim under the Cartwright Act. While Defendants make many compelling points about potential weaknesses in the Indirect Plaintiffs' case, the Court can only evaluate the merits of the claim on the Consolidated Amended Complaint, not on speculation. The allegations identified by the Indirect Plaintiffs are sufficient to establish the elements of a Cartwright Claim at the pleading stage of litigation. Thus, based on the allegations stated in the Consolidated Amended Complaint, the Court concludes that the Indirect Purchasers have stated a

claim under the Cartwright Act, and Defendants' Motions to Dismiss will be **DENIED** as to this claim.

### d. Consumer Protection and Unfair Competition Claims

Defendants advance several arguments in support of their position that the Downstream Purchasers have failed to state a claim under certain state consumer protection and unfair competition statutes. (Doc. 184 at 40). Specifically, Defendants submit that: (1) Arkansas, Michigan, New Mexico, and Rhode Island bar the Downstream Plaintiffs from asserting claims under their statutes; (2) the District of Columbia, Hawaii, Michigan, Missouri, Montana, Nevada, and Rhode Island do not permit businesses to bring claims under their unfair and deceptive trade practices statutes; (3) California, Montana, New Hampshire, New York, and North Carolina require that a plaintiff bringing a claim under their consumer protection statutes establish a substantial effect on intrastate commerce and the Downstream Plaintiffs have failed to do so; (4) Montana and South Carolina prohibit private plaintiffs from bringing class actions under their state consumer protection statutes; (5) California, Florida, and Michigan only permit plaintiffs to bring class actions under their state consumer protection statutes on behalf of persons residing in or injured in their states; (6) North Carolina has indicated that plaintiffs are only allowed to bring class actions under its state consumer protection statutes on behalf of persons residing in or injured in North Carolina; and (7) Massachusetts requires that a plaintiff provide notice before bringing an action. (Doc. 184 at 41-44). The Court will address each of the Defendants' arguments by state.

As a preliminary matter, the Court notes that the Downstream Plaintiffs have withdrawn their respective claims under the consumer protection statutes of Arizona,

Kansas, Mississippi, and Minnesota. (Doc. 202 at 55 n.33). Additionally, Defendants raise issues regarding the claims brought under the state statutes of Nebraska, New York, and Vermont based on antitrust standing principles. As the Court has deferred ruling on this issue, it will not discuss Defendants' arguments related to standing.

*Arkansas*

With respect to their claims under the Arkansas Deceptive Trade Practices Act ("ADTPA"), the Downstream Plaintiffs claim that courts have liberally construed the act and permitted "price-fixing actions to proceed." (Doc. 202 at 58). The ADTPA prohibits many specific deceptive and unconscionable trade practices, and includes a catch-all provision prohibiting "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a)(10). A person "who suffers actual damage or injury as a result of an offense or violation" of the ADTPA can recover actual damages and reasonable attorney's fees. Ark. Code Ann. § 4-88-113.

The Supreme Court of Arkansas has recognized that "liberal construction of the [A]DTPA is appropriate." *State ex rel. Bryant v. R & A Inv. Co.*, 985 S.W.2d 299, 302 (1999). Courts that have examined whether the ADTPA extends to price fixing claims in the antitrust context have held that, "even in light of the broad definition of unconscionability adopted by the Arkansas Supreme Court, in absence of authority from Arkansas courts that the ADTPA extends to price-fixing claims, those claims should be dismissed." *In re Lidoderm Antitrust Litig.*, 2015 WL 2089223, at *7 (N.D. Cal. May 5, 2015) (collecting cases); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1029 (N.D. Cal. 2007). However, many courts have also held that the ADTPA encompasses price-fixing claims and permitted plaintiffs' claims to proceed. *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 836, 859 (E.D. Mich. 2014) (collecting cases).

Given the state of the law on this issue and the fact that a district court in the Sixth Circuit has permitted these ADTPA price-fixing claims to proceed, the Court is reluctant to dismiss the Downstream Plaintiffs' claims on this basis. Accordingly, Defendants' Motion to Dismiss will be **DENIED** with respect to this claim.

*Michigan*

Under Michigan's Consumer Protection Act ("MCPA"), "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce are unlawful[.]" Mich. Comp. Laws Ann. § 445.903(1). As Defendant notes in its brief, the MCPA defines certain acts that fall within these categories, including "[c]harging the consumer a price that is grossly in excess of the price at which similar property or services are sold," but does not explicitly include price fixing. Mich. Comp. Laws Ann. § 445.903(1)(z). The Court has reviewed the parties submissions regarding this state, and notes that the Indirect Purchasers have neither addressed Defendants' argument with respect to Michigan nor cited any authority specific to the state of Michigan. *See* Doc. 202 at 58-59 (arguing that its claims under the states of Arkansas, New Mexico, and Rhode Island should not be dismissed). In the absence of definitive case law to the contrary and the Downstream Plaintiffs' apparent lack of opposition to Defendants' position, the Court agrees that the plain language of the statute does not include price fixing and concludes that the Indirect Purchasers' claims must be **DISMISSED**.

*New Mexico*

The New Mexico Unfair Practices Act ("NMUPA") prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce." N.M. Stat. Ann. § 57-12-3. Similar to the ADTPA, the provisions of the NMUPA has been construed broadly to facilitate its remedial purpose. *In re Chocolate*

52

*Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 585.   Courts generally permit plaintiffs to bring price-fixing claims under the NMUPA so long as the "plaintiff alleges a 'gross disparity' between the price paid for a product and the value received."   *Id.* (collecting cases).   Thus, in order to state a claim for price-fixing under the NMUPA, a plaintiff must "allege that as a result of defendants' alleged price-fixing, there was a gross disparity in the value of products received and the amount that they paid for those products."   *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1127 (N.D. Cal. 2008). As the Downstream Purchasers have pled that Defendants' actions created artificially high prices for CISP, the Court finds that the Downstream Purchasers' claims have been sufficiently plead under the NMUPA.   Accordingly, Defendants' Motion to Dismiss will be **DENIED** as to this claim.

*Rhode Island*

The Rhode Island Deceptive Trade Practices Act ("RIDTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." R.I. Gen. Laws Ann. § 6-13.1-2.   Courts that have examined the RIDTPA have found it to encompass price fixing claims because price fixing is "likely to offend public policy[.]" *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 536 F. Supp. 2d 1129, 1145 (N.D. Cal. 2008); *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d at 892.   Accordingly, the Court will **DENY** Defendants' Motion with respect to these claims on this ground.

Defendant also argues that Indirect Plaintiffs cannot bring a claim under the RIDTPA because only consumers can bring claims under RIDTPA.   Specifically, RIDTPA contains a section that addresses private and class actions, which provides:

> Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by § 6-13.1-2, may bring an action under the rules of civil procedure in the superior court of the county in which the seller or lessor resides; is found; has his or her principal place of business or is doing business; or in the superior court of the county as is otherwise provided by law, to recover actual damages or two hundred dollars ($200), whichever is greater

R.I. Gen. Laws Ann. § 6-13.1-5.2; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d at 1130. As Indirect Purchasers have not purchased CISP for primarily personal purposes, Defendants' Motion to Dismiss will be **GRANTED** as to Indirect Purchaser's claim under the RIDTPA.

### District of Columbia

The District of Columbia Consumer Protection and Procedures Act ("DCCPPA") "affords a panoply of strong remedies, including treble damages, punitive damages and attorneys' fees, to consumers who are victimized by unlawful trade practices." *Ford v. Chartone*, Inc., 908 A.2d 72, 80-81 (D.C. 2006). Courts overseeing multidistrict litigation as well as state courts in the District of Columbia have correctly held that "[t]ransactions along the distribution chain that do not involve the ultimate retail customer are not 'consumer transactions' that the [DCCPPA] seeks to reach. Rather, it is the ultimate retail transaction between the final distributor and the individual member of the consuming public that the [DCCPPA] covers." *Adam A. Weschler & Son, Inc. v. Klank*, 561 A.2d 1003, 1005 (D.C. 1989); I*n re Lidoderm Antitrust Litig.*, 2015 WL 2089223, at *5. Thus, the DCCPPA "does not apply to commercial dealings outside the consumer sphere. . . [and] a valid claim for relief under the [DC]CPPA must originate out of a consumer transaction." *In re Refrigerant Compressors Antitrust Litig.*, 2013

WL 1431756, at *22 (internal quotation omitted). Accordingly, as the Indirect Purchasers are not consumers within the meaning of the DCCPPA, the Indirect Purchasers' claims arising under the DCCPPA will be **DISMISSED**.

*Hawaii*

Hawaii's unfair competition statute prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Haw. Rev. Stat. § 480-2. The statute also provides that "[n]o person other than a consumer, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section" but that "[a]ny person may bring an action based on unfair methods of competition declared unlawful by this section." Haw. Rev. Stat. § 480-2. Haw. Rev. Stat. § 480-2 (West). The term "consumer" is defined as "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment." Haw. Rev. Stat. § 480-1. The term "person" is defined as "individuals, corporations, firms, trusts, partnerships, limited partnerships, limited liability partnerships, limited liability limited partnerships, limited liability companies, and incorporated or unincorporated associations, existing under or authorized by the laws of this State, or any other state, or any foreign country." Haw. Rev. Stat. § 480-1. Thus, based on Hawaii's unfair competition statute, the Indirect Purchasers will only be able to bring their claim based on grounds of unfair methods of competition. *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289, at *2 (N.D. Cal. Dec. 8, 2010) ("However, by its terms, the restriction applies only to claims involving deceptive acts or practices, not unfair competition; no such restriction applies to claims

55

for unfair competition."). Accordingly, to the extent the Indirect Purchasers were seeking to bring a claim based on unfair or deceptive acts or practices under Hawaii's unfair competition statute, that claim will be **DISMISSED**.

*Missouri*

Missouri's Merchandising Practices Act ("MMPA") prohibits "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Ann. Stat. § 407.020(1). Regarding who can bring civil actions, Missouri's consumer protection statute provides:

> Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages.

Mo. Ann. Stat. § 407.025(1).

While the Indirect Plaintiffs argue that the Court should extend this language to include businesses, they have not provided convincing authority that supports their interpretation of the MMPA. *See In re Auto. Parts Antitrust Litig.*, 2014 WL 2993753, at *23 ("[plaintiffs] have offered no authority from Missouri to support their expansive interpretation of the statutory language. The Court finds no reason to reach a different conclusion here."). Thus, Defendants' Motion to Dismiss will be **GRANTED** as to this claim, and the Indirect Purchasers' claim under the MMPA will be **DISMISSED**.

*Nevada*

Turning to the Nevada Deceptive Trade Practices Act ("NDTPA"), and to specifically, the section regarding actions by victims of fraud, the section provides that an action "may be brought by any person who is a victim of consumer fraud." Nev. Rev. Stat. Ann. § 41.600 (defining consumer fraud as including NDTPA sections 598.0915 to 598.0925). Courts have interpreted this language as permitting only natural persons to bring claims under the NDTPA. *See In re DDAVP Indirect Purchaser Antitrust Litig.,* 903 F. Supp. 2d at 226; *In re Chocolate Confectionary Antitrust Litig.*, 749 F. Supp. 2d at 234; *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 163 (E.D. Pa. 2009). Accordingly, as the Indirect Purchasers are not natural persons, their claim under this statute will be **DISMISSED**.

*California*

California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Cal. Bus. & Prof. Code § 17200. In interpreting the meaning of the UCL, California courts "have specifically held that California's UCL does not support claims by non-California residents where none of the alleged misconduct or injuries occurred in California." *Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005). However, courts have found that alleging that overcharges occurred in California establishes this intrastate nexus. *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2014 WL 6792663, at *26; *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *19 ("these cases would support a request to dismiss claims under the

statute by non-California residents who do not allege misconduct or injuries that occurred in California."). As the Indirect Purchasers are located in California and operated their business in California at the time of the alleged injuries, the Court finds this sufficient to establish an intrastate nexus.   Accordingly, Defendants' Motion to Dismiss will be **DENIED** as to these claims.[7]

## *Montana and South Carolina[8]*

Montana's Consumer Protection Act ("MCPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mont. Code Ann. § 30-14-103.   The MCPA defines trade or commerce as "the advertising, offering for sale, sale, or distribution of any services, any property, tangible or intangible, real, personal, or mixed, or any other article, commodity, or thing of value, wherever located, and includes any trade or commerce directly or indirectly affecting the people of this state." Mont. Code Ann. § 30-14-102(8). While the MCPA permits a consumer to bring an individual action under the statute, the explicit language of the statute does not permit a consumer to bring a class action.  Mont. Code Ann. § 30-14-133(1) ("A consumer who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by 30-14-103 may bring an individual but not a class action").[9]

---

[7] As the Court has denied Defendants' Motions to Dismiss with respect to Plaintiffs' Cartwright Act claim, Defendants' argument that Plaintiffs' UCL claim should be dismissed because their actions were permissible under California's antitrust laws has effectively been rendered moot. (Doc. 179 at 21).

[8] As the Indirect Purchasers' note in their brief, they have not brought a claim under Montana law and only the Consumers have brought a claim under Montana law.  (Doc. 202 at 59 n.37).

[9] Defendants argue that the Consumer Plaintiffs' claim must be dismissed because they have not established that the wrongful conduct had a substantial effect on intrastate commerce in Montana, but the authority they have provided in support of their position is not conclusive on this issue. *See In re*

Similar to the MCPA, the South Carolina Unfair Trade Practices Act ("SCUTPA") provides that a person who has suffered "ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 may bring an action individually, but not in a representative capacity, to recover actual damages." S.C. Code Ann. § 39-5-140(a). Thus, the question before the Court in regard to the Downstream Purchasers' claims brought under the SCUTPA and MCPA is whether the Downstream Purchasers may bring these claims even though the state statutes provide otherwise.

In the United States Supreme Court case *Shady Grove v. Orthopedic Assoc. v. Allstate Ins. Co.*, 559 U.S. 393, 401 (2010), the Supreme Court held that "[r]ule 23 permits all class actions that meet its requirements, and a State cannot limit that permission by structuring one part of its statute to track Rule 23 and enacting another part that imposes additional requirements." Courts that have interpreted *Shady Grove* in this context have concluded that these state prohibitions do not affect the substantive rights of the individuals because "a rule barring class actions does not prevent individuals who would otherwise be members of the class from bringing their own separate suits or joining in a preexisting lawsuit." *See In re Hydroxycut Mktg. & Sales Practices Litig.*, 299 F.R.D. 648, 654 (S.D. Cal. 2014); *In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d at 861 ("Rule 23 applies in federal court unless it "abridge[s], enlarge[s] or modif[ies] any substantive right" under the Rules Enabling Act, 28 U.S.C. § 2072(b).") Thus, the Court concludes that the state prohibitions are procedural in nature. Because these provisions of the MCPA and the SCUTPA regarding class actions

---

*Dynamic Random Access Memory (Dram) Antitrust Litig.*, 516 F. Supp. 2d at 1103. Accordingly, Defendants' Motion to Dismiss will be **DENIED** on this ground with respect to the Consumer Plaintiffs' claims brought under the MCPA.

are procedural and not substantive in nature, Rule 23 will govern the Downstream Purchasers' claims under the SCUTPA and MCPA, and Defendants Motion to Dismiss on this ground will be **DENIED**.

*New Hampshire, New York, and North Carolina*

New Hampshire's consumer protection laws make it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. Ann. § 358-A:2. Courts that have reviewed the issue of the extent to which a plaintiff is require to plead allegations regarding intrastate commerce have frequently "acknowledged that the [consumer protection act] requires the proscribed conduct to occur within the state; merely selling a good in New Hampshire is not enough when the proscribed conduct occurs elsewhere." *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *22 (N.D. Cal. Oct. 2, 2014); *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *18; *but see In re Ductile Iron Pipe Fittings (DIPF) Indirect Purchaser Antitrust Litig.*, 2013 WL 5503308, at *22 (D.N.J. Oct. 2, 2013)("courts interpreting New Hampshire's consumer protection law disagree as to whether a nationwide scheme in which the plaintiffs pay a higher price in the state is sufficient to satisfy the statute's requirement.").

New York's Consumer Protection Act ("NYCPA") "was enacted to provide consumers with a means of redress for injuries caused by unlawfully deceptive acts and practices." *Goshen v. Mut. Life Ins. Co. of New York*, 774 N.E.2d 1190, 1194 (2002). Similar to New Hampshire's consumer protection law, the NYCPA specifically provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service *in this state* are hereby declared unlawful." N.Y. Gen.

Bus. Law § 349(a) (emphasis added); *see In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2015 WL 363894, at *15 (S.D.N.Y. Jan. 28, 2015); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 263 F.R.D. 205, 214 (E.D. Pa. 2009) ("the claim must be dismissed in this case because the alleged deceptive conduct in this case neither occurred in New York nor was directed at consumers").

The North Carolina Unfair Trade Practices Act ("NCUTPA") prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. Ann. § 75-1.1(a). North Carolina federal courts have interpreted the NCUTPA as addressing "primarily local concerns." *The In Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502 (M.D.N.C. 1987) (quoting *Am. Rockwool, Inc. v. Owens-Corning Fiberglas Corp.*, 640 F. Supp. 1411, 1428 (E.D.N.C. 1986)); *Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) ("plaintiffs have failed to allege a substantial effect on any in-state business operations, and therefore that their claim falls outside the reach of the North Carolina Trade Practices Act").

Considering the Downstream Plaintiffs' failure to plead allegations specific to New Hampshire, New York, and North Carolina, the Court once again finds that Plaintiffs have failed to meaningfully address intrastate commerce with respect to these claims. Accordingly, the Downstream Plaintiffs' claims brought under New Hampshire's consumer protection act, the NYCPA, and the NCUTPA will be **DISMISSED**.

*Florida*

Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. Ann. §

501.204(1).  While nothing in the language of the statute suggests this limitation, certain Florida courts have concluded that "only in-state consumers can pursue a valid claim under the Unfair Trade Act." *Oce Printing Sys. USA, Inc. v. Mailers Data Servs., Inc.*, 760 So. 2d 1037, 1042 (Fla. Dist. Ct. App. 2000); *Coastal Physician Servs. of Broward Cnty., Inc. v. Ortiz*, 764 So. 2d 7, 8 (Fla. Dist. Ct. App. 1999).  A review of the more recent court decisions regarding this issue reflects that "courts have expanded coverage to claims of out[-]of-state consumers if the offending conduct occurred predominantly or exclusively in Florida." *Karhu v. Vital Pharm., Inc.*, 2013 WL 4047016, at *9 (S.D. Fla. Aug. 9, 2013) (collecting cases); *F.T.C. v. Info. Mgmt. Forum, Inc.*, 2013 WL 3323635, at *6 (M.D. Fla. June 28, 2013). The Court agrees with this latter position, that a claim can be brought by out-of-state residents under the FDUTPA as long as "the offending conduct took place predominantly or entirely in Florida." *Karhu*, 2013 WL 4047016, at *10.  Similar to many of its other claims, the Downstream Plaintiffs have failed to allege state-specific allegations in their Consolidated Amended Complaints.  Thus, they fail to establish that their claims occurred predominantly in Florida, and their claims under the FDUTPA will be **DISMISSED**.

*Massachusetts*

Massachusetts' consumer protection law declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws Ann. ch. 93A, § 2. Section 9 of this act provides:

> (1) Any person, other than a person entitled to bring action under *section eleven of this chapter*, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful *by section two* or any rule or regulation issued thereunder . . . may bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C whether by way of original complaint, counterclaim, cross-claim or third party action, for damages

62

and such equitable relief, including an injunction, as the court deems to be necessary and proper.

. . .

(3) At least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent. . . .

Mass. Gen. Laws Ann. ch. 93A, § 9 (emphasis added). Although Defendants claim that the Downstream Plaintiffs have not complied with this provision, the Downstream Plaintiffs submit that they are not required to comply with this provision because they are bringing their claims pursuant to Sections 2 and 11 of the statute, not section 9. *See Landworks Creations, LLC v. U.S. Fid. & Guar. Co.*, 2008 WL 660341, at *7 (D. Mass. Feb. 6, 2008) ("Defendant asserts that plaintiff's failure to send a demand letter is a bar to the ch. 93A claim. Such a letter is only a jurisdictional prerequisite to suit under ch. 93A, § 9, not § 11, which governs here") (internal quotation omitted). The Court finds the Downstream Plaintiffs' position to be well taken considering the language of the statute, and thus Defendants' Motion to Dismiss will be **DENIED** as to this claim.

e. Consumer Plaintiffs' Unjust Enrichment Claim

Defendants next argue that the Consumer Plaintiffs' unjust enrichment claims consist of conclusory allegations, justifying dismissal of these claims. (Doc. 184 at 45). Defendants also argue that, even if the Consumer Plaintiffs' had tailored their claims to the specific state laws, they should still be dismissed because they fail to allege that the Consumer Plaintiffs "conferred an identifiable benefit on a Defendant." (*Id.* at 45). In their response to Defendants' Motions to Dismiss, the Consumer Plaintiffs argue that they have adequately pled the unjust enrichment claims because they have alleged that

"Defendants benefitted from their illegal price fixing conspiracy and that retaining that benefit would be inequitable." (Doc. 202 at 71).

In their Consolidated Amended Complaint, the Consumer Plaintiffs bring unjust enrichment claims under the laws of the Consumer States and allege that Defendants have been unjustly enriched "by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on CISP." (Doc. 122 at 67). Courts faced with multi-state unjust enrichment claims have recognized that, "although the particular elements of unjust enrichment vary from jurisdiction to jurisdiction, when stripped to its essence, a claim of unjust enrichment requires [Plaintiffs] to allege sufficient facts to show that Defendants received a benefit and under the circumstances of the case, retention of the benefit would be unjust." *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1014 (E.D. Mich. 2014); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d at 541 ("almost all states at minimum require plaintiffs to allege that they conferred a benefit or enrichment upon defendant and that it would be inequitable or unjust for defendant to accept and retain the benefit"); *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 684 F. Supp. 2d 942, 959 (N.D. Ohio 2009), *as amended* (Nov. 4, 2009) ("Rather than describing the specific conduct of the defendant, the 'unjust, inequitable, or wrongful' element of an unjust enrichment claim speaks to the general circumstances of the parties."). In reviewing the Consumer Plaintiffs' Consolidated Amended Complaint, the Court finds that they have sufficiently pled these elements and therefore declines to dismiss the Consumer Plaintiffs' unjust enrichment claims on the ground that they are conclusory allegations.[10] The Court will now perform a state-by-state

---

[10] Although Defendants argue that the Consumer Plaintiffs should have connected "their alleged overpayment to intermediate CISP sellers . . . through builders, plumbers, contractors, distributors, and

analysis regarding the specific states under which Defendants argue that Plaintiffs have failed to state a claim for unjust enrichment.[11]

## Arkansas

In Arkansas, unjust enrichment is defined as "an equitable doctrine that allows a party to recover for benefits conferred on another. It is restitutionary in nature and focuses on the benefit received." *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). A party pleading unjust enrichment must not only plead that a party has received "something of value, to which he was not entitled and which he must restore," but also allege that there was "some operative act, intent, or situation to make the enrichment unjust and compensable." *Hatchell v. Wren*, 211 S.W.3d 516, 522 (Ark. 2005); *Dews v. Halliburton Indus., Inc.*, 708 S.W.2d 67, 69 (Ark. 1986). As the Consumer Plaintiffs have failed to plead an operative act, intent, or situation by the Defendants in support of their claim for unjust enrichment under Arkansas law, the Court concludes that this claim will be **DISMISSED**.

## California

Many courts have recognized the split in authority regarding whether a plaintiff can bring an individual unjust enrichment claim or whether it can only serve as an equitable remedy. *See In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1113 (C.D. Cal. 2012). The two cases at the heart of this dispute are *Melchior v. New Line Prods., Inc.*, 131 Cal. Rptr. 2d 347, 357 (Cal. Ct. App. 2003), in which an appellate court in California

the direct purchasers," the Court finds that this level of detail is not required pursuant to Federal Rule of Civil Procedure 8 and *Twombly*, 550 U.S. at 556.

[11] As the Consumer Plaintiffs note in their Response, Defendants have not raised specific arguments for dismissal with respect to the District of Columbia, Hawaii, Illinois, Iowa, Massachusetts, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, Oregon, Rhode Island, South Dakota, Vermont, West Virginia, and Wisconsin. (Doc. 202 at 72 n.49). Thus, Defendants' Motion to Dismiss will be **DENIED** as to these claims.

held that "there is no cause of action in California for unjust enrichment," and *Ghirardo v. Antonioli*, 924 P.2d 996, 1002 (1996), in which the California Supreme Court held that a plaintiff was "entitled to seek relief under traditional equitable principles of unjust enrichment." In reconciling these cases and the body of case law that has developed around them, the court in *In re Conagra Foods* held that "a cause of action for unjust enrichment is not cognizable. Rather, unjust enrichment is a theory that permits recovery on other recognized causes of action." *In re ConAgra Foods Inc.*, 908 F. Supp. 2d at 1114. The Court finds this to be the proper interpretation of these cases, and thus holds that the Consumer Plaintiffs cannot plead a claim of unjust enrichment under California law. Accordingly, the Consumer Plaintiffs' claim for unjust enrichment in California will be **DISMISSED**.

*Florida, Kansas, Maine, Michigan, North Carolina, North Dakota, and Utah*

In both of their briefs, the parties have grouped together the states of Florida, Kansas, Maine, Michigan, North Carolina, North Dakota, and Utah. Defendant submits that these seven states "require that a plaintiff confer a direct benefit on the defendant in order to state a claim for unjust enrichment." (Doc. 184 at 47). In response, Consumer Plaintiffs submit that the word "'direct' is intended to refer not to the relationship between the parties, but to a type of benefit that is not 'incidental.'" (Doc. 202 at 72).

For these states, the Court recognizes that there is a split of case law regarding whether a plaintiff can plead unjust enrichment solely through a direct benefit, or if it is possible for a plaintiff to plead unjust enrichment through an indirect benefit. *See In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d at 1020 (denying defendant's argument with respect to claims for unjust enrichment brought in Maine); *In re Processed Egg*

*Products Antitrust Litig.*, 851 F. Supp. 2d 867, 929 (E.D. Pa. 2012) (collecting split of Florida, Kansas, North Carolina, Utah cases on this issue and denying defendant's motion to dismiss); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 2010 WL 5094289, at *7 (N.D. Cal. Dec. 8, 2010) ("A claim for unjust enrichment under Michigan law does not require that the plaintiff confer a direct benefit on the defendant."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d at 1190 (collecting cases regarding split in North Carolina and Michigan and denying defendant's motion to dismiss). Thus, based on the parties' submissions and the number of courts that have permitted plaintiffs to bring unjust enrichment claims through an indirect benefit, the Court declines to dismiss the Consumer Plaintiffs' claims on this basis.

The outlier of this group of states is North Dakota. The Consumer Plaintiffs have failed to cite any authority supporting their position that a direct benefit is not required while Defendants cite to the North Dakota Supreme Court case, *Apache Corp. v. MDU Res. Grp., Inc.*, 603 N.W.2d 891 (N.D. 1999). In *Apache*, the North Dakota Supreme Court confirmed that "[t]he essential element in recovering under a theory of unjust enrichment is the receipt of a benefit by the defendant from the plaintiff which would be inequitable to retain without paying for its value." *Id.* at 895 (quoting *Zuger v. North Dakota Ins. Guar. Ass'n*, 494 N.W.2d 135, 138 (N.D. 1992)). As the Consumer Plaintiffs are unable to allege a direct benefit in support of their unjust enrichment claim in North Dakota, those claims will be **DISMISSED**.

### New York

The parties agree that New York permits plaintiffs to bring unjust enrichment claims as long as the relationship between the plaintiff and the defendant is not "too

67

attenuated." *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007); *see also State ex rel. Spitzer v. Daicel Chem. Indus., Ltd.*, 840 N.Y.S.2d 8, 12 (N.Y. 2007). However, the parties dispute whether the relationship between the Consumer Plaintiffs and the Defendants is sufficient under this standard. The Court has considered the parties' positions and finds that Consumer Plaintiffs have not stated a sufficient relationship with Defendants to meet this standard. Specifically, the connection between the parties and the fact that they had no dealings directly with each other leads the Court to conclude that the relationship does not support a claim for unjust enrichment. *See Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *14 (S.D.N.Y. Mar. 28, 2014); *Malone & Co. v. Rieder*, 973 N.E.2d 743, 747 (2012). Accordingly, the Consumer Plaintiffs unjust enrichment claims brought in New York will be **DISMISSED**.

*South Carolina*

The elements of a claim for unjust enrichment in South Carolina are: "(1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by defendant of the benefit under conditions that make it inequitable for him to retain it without paying its value." *Ellis v. Smith Grading & Paving, Inc.*, 366 S.E.2d 12, 15 (S.C. Ct. App. 1988). In their briefs, the parties dispute whether the Consumer Plaintiffs were required to establish that Defendants owed them a duty under South Carolina law. (Doc. 184 at 48; Doc. 202 at 73 n.50).

The courts that have determined that South Carolina requires pleading the existence of a duty have mischaracterized the cases which have discussed this proposition. The case relied on by the Defendants, and which is often cited by other multidistrict litigation courts, is *Pitts v. Jackson Nat. Life Ins. Co.*, 574 S.E.2d 502, 512

68

(S.C. Ct. App. 2002). In *Pitts*, a South Carolina appellate court found that a plaintiff "failed to establish any duty to disclose or other cause of action that would allow recovery for unjust enrichment" because he had failed to allege any benefit conferred to defendants that would be unjust for them to retain. *Id.* Specifically, "the plaintiff purchased an insurance policy from an insurance agent with whom he had no previous relationship and later discovered that he was eligible for a less expensive policy." *In re Microsoft Corp. Antitrust Litig.*, 401 F. Supp. 2d 461, 464 (D. Md. 2005). The Court finds *Pitts* to be distinguishable from the instant case because Plaintiffs have pled that it would be unjust for Defendants to retain the money made off of the inflated prices and profits on CISP. Additionally, a court in this Circuit has recently held that there is "no requirement to allege the existence of a duty." *In re Auto. Parts Antitrust Litig.*, 2014 WL 2993753, at *36 . Accordingly, the Court will **DENY** Defendants' Motion to Dismiss with respect to Consumer Plaintiffs' claim for unjust enrichment in South Carolina.

*Mississippi*

Mississippi permits plaintiffs to bring a claim for unjust enrichment when "the defendant holds money which in equity and good conscience belongs to the plaintiff." *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331, 342 (Miss. 2004) (quoting *Fordice Construction Company v. Central States Dredging Company*, 631 F.Supp. 1536. (S.D.Miss. 1986)). Although Defendants argue that Mississippi only permits unjust enrichment claims to be brought when money has been paid based on a mistake of fact, numerous courts have rejected this position. *See In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2014 WL 6792663, at *36 (collecting cases). While it is true that a plaintiff can bring a claim for unjust enrichment when he has mistakenly paid another party, this does not mean that this is

69

the only way that a plaintiff can bring an unjust enrichment claim. Accordingly, Defendants' Motion to Dismiss with respect to Consumer Plaintiffs' Mississippi unjust enrichment claims will be **DENIED**.

f.  Consumer Clayton Act Claim

In their Motions, Defendants argue that the Consumer's Clayton Act Claim is barred by black letter law. Specifically, Defendants submit that the Consumers' claim under Section 7 of the Clayton Act should be dismissed because they fail to allege an antitrust injury proximately caused by Charlotte Pipe's acquisition of Star Pipe. Defendants also submit that Consumers are indirect purchasers and lack standing to bring a claim for treble damages and that it is not possible to grant Consumers injunctive relief because the acquisition was completed in 2010 and remedied by the Consent Order. (Doc. 184 at 51-52). In response to Defendants' position, at the December 19, 2015 Hearing on this Motion, the Consumers conceded that Count V of their Amended Consolidated Complaint should be dismissed. *See* Doc. 235 at 103. Accordingly, Defendants' Motions to Dismiss with respect to the Consumers Clayton Act Claim will be **GRANTED** and this claim will be **DISMISSED**.

g.  Consumer TTPA Claim

Defendants next argue that the Consumer's class action under the TTPA should be dismissed because it does not comply with the Tennessee Supreme Court case *Freeman Industries, LLC.*, 172 S.W.3d at 512. Additionally, Defendants argue that the Consumer Plaintiffs are Arkansas residents who purchased CISP from Arkansas sellers, leaving them no connection with the state of Tennessee. (Doc. 179 at 28). In response, the Consumer Plaintiffs argue that they have "alleged sufficient factual detail of

substantial effects of Defendant manufacturers' conspiracy on Tennessee commerce" in order to withstand Defendants' Motions to Dismiss. (Doc. 202 at 70).

The TTPA provides that:

[a]ll arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

Tenn. Code Ann. § 47-25-101. The Tennessee Supreme Court reviewed the purpose and construction of the TTPA in *Freeman*. The plaintiff in *Freeman* was attempting to bring a claim under the TTPA based on defendant's conduct of (1) communicating with co-defendants at in-person meetings to create a price-fixing agreement; (2) implementing the agreement by drafting price schedules, adjusting prices, and taking orders from customers at the new prices; and (3) concealing its conduct by limiting the employees that had knowledge of the price-fixing agreement. *Freeman*, 172 S.W.3d at 524. The court ultimately found these allegations "primarily relate[d] to the defendants' actions in conspiring and implementing the conspiracy" rather than the effects of the conduct on Tennessee commerce and concluded that the claim did not fall within the scope of the TTPA. *Id.*

In its analysis of the TTPA, the court described the TTPA's plain language as prohibiting "arrangements that decrease competition or affect the prices of goods even if those goods arrived in Tennessee through interstate commerce." *Freeman*, 172 S.W.3d at 522. The court also noted that the legislature had not intended to limit the TTPA's scope to intrastate commerce, otherwise it would have included such a limitation. *Id.*

In regard to the standard that should be applied in determining the effects of the anticompetitive conduct on Tennessee interstate commerce, the court concluded that the substantial effects standard was the correct one. Under the substantial effects standard, "courts must decide whether the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree." *Id.* at 523. The meaning of the phrase "substantial degree" turns on the circumstances of a given case and constitutes some measure between "mathematical nicety" and "the demise of Tennessee businesses." *Id.* Thus, based on *Freeman*, a non-resident indirect purchaser can bring a TTPA claim as long as the alleged anticompetitive conduct had a substantial effect on Tennessee trade and commerce.

Both parties agree that another case decided in this District, *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185, at *23 (E.D. Tenn. May 20, 2013), is relevant to the instant determination of whether the Consumer Plaintiffs have sufficiently plead a TTPA claim. In *Skelaxin*, the court reviewed the *Freeman* decision to determine whether indirect purchasers, consisting of non-resident pharmacies and other purchasers for resale who were forced to pay more for metaxalone products due to Defendants' unlawful conduct, sufficiently pled a TTPA claim. *Id.* The court found that, viewing the facts in the light most favorable to the indirect purchasers, the acts alleged in the complaint would have substantially affected intrastate commerce because: (1) the defendant had its corporate headquarters and principal place of business in Tennessee; (2) the indirect purchasers "paid possibly hundreds of millions of dollars in overcharges" and the defendant "likely received a significant portion of the sales"; (3) a "substantial portion" of the overcharges likely "flowed back to Tennessee"; and (4) at

least some of the money used to further the anticompetitive scheme deprived the state of Tennessee of additional funds. *Skelaxin*, 2013 WL 2181185, at *24.

Turning to the facts of the instant case, Consumer Plaintiffs allege that CISP was sold in Tennessee by one or both Defendants, CISPI had its principal place of business in Hixson, Tennessee, the Defendants used CISPI to communicate about the alleged price fixing and coordinate their activities, and the Defendants had bi-annual meetings at CISPI for the purpose of implementing their price-fixing agreement. Based on these facts, Consumer Plaintiffs submit that "[m]illions of dollars in revenue is generated for the . . . Defendants by the utilization of [CISPI] in Tennessee" and Defendants "[d]erived substantial revenue in Tennessee from CISP sold, purchased, and used in Tennessee and throughout the United States." (Doc. 121 at 12).

Taking these facts in the light most favorable to the Consumer Plaintiffs, as the Court is required to do, the Court finds that they fail to establish that the alleged wrongful conduct of Defendants McWane and Charlotte Pipe would have substantially affected intrastate commerce. The allegations stated in the Amended Consolidated Complaint are similar to the conduct alleged in *Freeman*, and thus they fail to state a claim on the same grounds. Specifically, the conduct alleged relates to the Defendants' actions in forming and implementing the conspiracy rather than focusing on the effect of the conspiracy on Tennessee commerce. As for Defendant CISPI, the Court concludes that the conduct alleged could have a substantial effect on interstate commerce in Tennessee. *See Skelaxin.,* 2013 WL 2181185, at *24. In fact, the majority of the Consumer Plaintiffs allegations relating to Tennessee-specific conduct are based around CISPI and its role in the price-fixing conspiracy. *See* Doc. 202 at 69. Accordingly, Defendants' Motion to Dismiss will only be granted with respect to Consumer Plaintiffs'

TTPA claims brought against Charlotte Pipe and McWane but not to the claim against CISPI.

## III.    MOTIONS TO STRIKE

Defendants move to strike the Indirect Purchasers' class action allegations because "applying the law of thirty states in a multi-state class action renders the class unmanageable." (Doc. 152 at 3). Defendants move to strike the Consumer Plaintiffs' class action allegations on the same grounds stated in their Motion against the Indirect Purchasers, and also argue that the Consumer Plaintiffs' class action under the TTPA should be stricken. (Doc. 153).

## A.    Standard of Law

Federal Rule of Civil Procedure 12(f) states that "a court may strike only material that is contained in the pleadings," which are defined as "a complaint and answer; a reply to a counterclaim denominated as such; an answer to a cross-claim, if the answer contains a cross-claim; a third party complaint, if a person who was not an original party is summoned under the provisions of Rule 14; and a third-party answer, if a third-party complaint is served." *Fox v. Mich. State Police Dep't*, 173 F. App'x 372, 375 (6th Cir. 2006) (quotation omitted).

The Sixth Circuit has stated that "a district court should defer decision on class certification issues and allow discovery 'if the existing record is inadequate for resolving the relevant issues.'" *Bearden v. Honeywell Int'l Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Tenn. 2010) (quoting *In re Am. Med. Sys.*, 75 F.3d 1069, 1086 (6th Cir. 1996). For a court to determine class certification issues at the pleadings stage of the litigation, there "must be an adequate statement of the basic facts to indicate that each requirement of the rule is fulfilled." *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir.

1974).  Additionally, this determination ordinarily "should be predicated on more information than the pleadings will provide."  *Id.*; *In re Allstate Ins. Co. Underwriting & Rating Practices Litig.*, 917 F. Supp. 2d 740, 751 (M.D. Tenn. 2008) ("the plaintiffs are entitled, based on their showing to this point, to develop this case and seek class certification based on developments in discovery.").

Although the ordinary course of proceedings is for this matter to be decided on a class certification motion, there are circumstances in which class certification issues can be decided based on a pleading.  These circumstances include when "further discovery and briefing on the certification issue would simply postpone the inevitable conclusion that the putative class cannot be certified."  *Loreto v. Procter & Gamble Co.*, 2013 WL 6055401, at *3 (S.D. Ohio Nov. 15, 2013); *Cowit v. CitiMortgage, Inc.*, 2013 WL 940466, at *2 (S.D. Ohio Mar. 8, 2013) ("A court may strike class action allegations before a motion for class certification where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met").

The requirements that a claimant must establish in bringing a claim on behalf of a class as identified in Federal Rule of Civil Procedure 23 are:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1-4). Rule 23(c)(1)(A) provides that the court must determine whether an action will be  certified as a class action at "an early practicable time after the person sues."

## B.    Analysis

In support of their position that these class action allegations should be dismissed, Defendants cite to *Pilgrim v. Universal Health Card, LLC*, 600 F.3d 943 (6th Circuit 2011).  In *Pilgrim*, two consumers were seeking to represent a nationwide class of people who had joined a healthcare discount program created by Universal Health Card and Coverdell & Company.  *Id.* at 945.  Universal Health Card filed a motion to strike the class action allegations, and the district court concluded that Ohio's choice-of-law rules required it to analyze each class member's claim under the laws of his or her home state, and that this made the class "unmanageable."  *Id.*  The Sixth Circuit Court of Appeals reviewed this decision and found that the district court did not abuse its discretion in finding that the plaintiffs could not demonstrate that common questions of fact or law to class members predominated over questions of law and fact affecting individual members.  *Id.* at 946.  The court reached this conclusion for several reasons: (1) different laws governed the class members' claims; (2) common issue of fact could not overcome the difference in laws; and (3) the conclusion was consistent with other decisions in this Circuit.  *Id.* at 946-49.  A court that has examined the *Pilgrim* decision found it distinguishable on the basis that the "minimal facts set forth in the pleadings demonstrated—and the plaintiffs readily conceded—that the class was 'purposely' overbroad and was not ascertainable." *Modern Holdings, LLC v. Corning Inc.*, 2015 WL 1481459, at *4 (E.D. Ky. Mar. 31, 2015).

Defendants also cite to *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D. 555 (E.D. Tenn. 2014) in support of their position.  The Court briefly reviewed *Skelaxin supra,* but with respect to this argument, Defendants cite to a later decision made by the court regarding a motion for class certification. Considering the posture of the litigation

76

at the time the class certification order was issued in *Skelaxin*—the parties having conducted discovery and thoroughly briefed the issue—the Court finds the *Skelaxin* decision to be unhelpful in determining the instant matter.

The Court notes that this issue is typically handled through a class certification motion and extensive briefing. *See Modern Holdings,* 2015 WL 1481459, at *7; *Bearden v. Honeywell Int'l Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Tenn. 2010) ("Here, the briefing on class issues is relatively cursory. As discussed below, the court will defer its decision on whether the fraud claims are appropriate for class resolution."); *In re Allstate Ins. Co. Underwriting & Rating Practices Litig.*, 917 F. Supp. 2d at 751. Thus, while the Court does not find Defendants' Motion to be procedurally improper, it recognizes the limitations of deciding this issue at the pleadings stage as well as the wealth of information to be gained through class discovery. *See Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("Sometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim, and sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question").

In reviewing the parties' briefs, the Court finds Defendants' concern about the Downstream Purchasers' class action claims to be well taken. The numerous states under which the Downstream Purchasers bring their antitrust and consumer protection claims will almost certainly raise issues with some of the requirements under Rule 23. However, with the facts stated in the Complaint, the Court is reluctant to strike these allegations at this stage in the litigation. While it is possible that the Downstream Plaintiffs will be unable to meet the class certification requirements, the Court is unwilling to deem it an impossibility based on the pleadings alone. Rather, the Court

finds that class discovery will clarify whether Plaintiffs are able to meet the requirements identified in Federal Rule of Civil Procedure 23(b). Thus, a ruling on this issue at this juncture could only be considered premature, and Defendants' Motions to Strike Class Action Allegations (Docs. 151, 154) will be **DENIED**.

## IV.    CONCLUSION

For the reasons stated herein:

- Defendants' Motions to Dismiss Direct Purchaser Plaintiffs' Consolidated Amended Complaint (Docs. 178, 181) are hereby **GRANTED IN PART** and **DENIED IN PART**;

   o   The Direct Purchaser Plaintiffs' claim under the Clayton Act against McWane is hereby **DISMISSED**;

- Defendants' Motions to Dismiss Indirect Purchaser Plaintiffs' Consolidated Amended Complaint (Doc. 176, 182) are hereby **GRANTED IN PART** and **DENIED IN PART**;

   o   The Indirect Purchaser Plaintiffs' claims under the antitrust laws of Rhode Island (prior to July 15, 2013), Arkansas, District of Columbia, Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, Wisconsin, and West Virginia are hereby **DISMISSED**;

   o   The Indirect Purchaser Plaintiffs' claims under the consumer protection and unfair practices laws of Michigan, Rhode Island, District of Columbia, Missouri, Nevada, New Hampshire, New York, North Carolina, Florida, and Hawaii (with respect to claims for unfair or deceptive acts or practices) are hereby **DISMISSED**;

- Defendants' Motions to Dismiss Consumer Plaintiffs' Consolidated Amended Complaint (Docs. 177, 183) are hereby **GRANTED IN PART** and **DENIED IN PART**;

    o The Consumer Plaintiffs' claims under the antitrust laws of Illinois, District of Columbia, Mississippi, Nevada, New York, North Carolina, South Dakota, Tennessee, Wisconsin, and West Virginia are hereby **DISMISSED**;

    o The Consumer Plaintiffs' claims under the consumer protection and unfair practices laws of New Hampshire, New York, North Carolina, and Florida are hereby **DISMISSED**;

    o The Consumer Plaintiffs' claims under the unjust enrichment laws of Arkansas, California, North Dakota, and New York are hereby **DISMISSED**;

    o The Consumer Plaintiffs' claim under the Clayton Act is hereby **DISMISSED**;

    o The Consumer Plaintiffs' claims against Charlotte Pipe and McWane under the TTPA are hereby **DISMISSED**;

- Defendants' Motion to Strike Indirect Purchaser Plaintiffs' Class Action Allegations (Doc. 151) and Motion to Strike Consumer Plaintiffs' Class Action Allegations (Doc. 154) are hereby **DENIED**;

**SO ORDERED** this 24th day of June, 2015.


                                        _____/s/ Harry S. Mattice, Jr._____
                                        HARRY S. MATTICE, JR.
                                        UNITED STATES DISTRICT JUDGE